Page 1

1    STATE OF ILLINOIS      )
                            )    SS.
2    COUNTY OF COOK         )
3            IN THE DISTRICT COURT OF THE UNITED STATES
4              FOR THE NORTHERN DISTRICT OF ILLINOIS
5                      EASTERN DIVISION
6

     CARMEL PRENDERGAST,            )
7                                   )
                 Plaintiff,         )Case No. 07 C 00679
8                                   )
          vs                        )
9    KOHL'S DEPARTMENT STORES,      )
                                    )
10               Defendant.         )
11
12
13
14              The Deposition of CARMEL PRENDERGAST
15    taken before SHERRY L. JONES, a Certified
16    Shorthand Reporter, pursuant to the Federal
17    Rules of Civil Procedure for the United States
18    District Courts, pertaining to the taking of
19    depositions, at 233 South Wacker Drive,
20    Suite 5500, Chicago, Illinois, at 1:00 p.m., on
21    the 9th day of April, A.D., 2008.
22
23
24

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergast

Page 2

1  Present:
2
   PITTACORA & CROTTY, LLC
3  BY:  MR. JAMES R. PITTACORA
   9550 West Bormet Drive, Suite 205
4  Mokena, Illinois 60448
   (708) 390-2800
5  Appeared on behalf of the Plaintiff;
6  SEGAL MCCAMBRIDGE SINGER & MAHONEY
   BY:  MS. NANCY WOODWORTH
7  233 South Wacker Drive, Suite 5500
   Chicago, Illinois
8  (312) 645-6054
   Appeared on behalf of the Defendant.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1          I N D E X
2
   EXAMINATION OF CARMEL PRENDERGAST        PAGE
3
   BY MS. WOODWORTH                8
4
5
6
7
8
9  EXHIBITS MARKED
10 DEPOSITION EXHIBIT A        91
   DEPOSITION EXHIBIT B        139
11 DEPOSITION EXHIBIT C        140
   DEPOSITION EXHIBIT D        171
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          (The witness was duly sworn.)
2          MS. WOODWORTH:  Good morning,
3  Mrs. Prendergast.  Can you please state your
4  name and spell it for the record.
5          THE WITNESS:  Carmel Prendergast.  First
6  and last, C-a-r-m-e-l, Prendergast,
7  P-r-e-n-d-e-r-g-a-s-t.
8          MS. WOODWORTH:  Do you have a middle
9  name?
10         THE WITNESS:  R., Rose.
11         MS. WOODWORTH:  Let the record reflect
12 that this is the discovery deposition of Carmel
13 Prendergast taken pursuant to notice and
14 agreement of parties.  This deposition will
15 proceed in accordance with the Federal rules of
16 Civil Procedure and any and all other applicable
17 local rules for the Northern District of
18 Illinois.
19         Mrs. Prendergast, have you ever had
20 your deposition taken before?
21         THE WITNESS:  Yes.
22         MS. WOODWORTH:  When?
23         THE WITNESS:  About ten years ago.
24 Approximately 1997 or '98.  I think it was '96.

Page 5

1  I'm not sure.
2          MS. WOODWORTH:  Was this in relation to
3  a car accident?
4          THE WITNESS:  Yes.
5          MS. WOODWORTH:  Have you had your
6  deposition taken any other time?
7          THE WITNESS:  No.
8          MS. WOODWORTH:  Have you taken any
9  medications today or anything that would effect
10 your memory?
11         THE WITNESS:  No.
12         MS. WOODWORTH:  Before we begin I would
13 like to go over a few ground rules to make the
14 process a little easier for both of us, as well
15 as the court reporter.
16         This is the court reporter sitting
17 here.  As you know, it's her job to take down
18 everything that we say.  So we want to make her
19 job as easy as possible.
20         First, everything we say here needs
21 to be out loud.  The court reporter can't take
22 down nodding or shaking of the head or shrugs of
23 the shoulders.  So you must answer the questions
24 out loud.  Do you understand?

2 (Pages 2 to 5)

Prendergrast  v.  Kohl's                              4/9/2008                              Carmel  Prendergrast

---

Page 6

1         THE WITNESS:  Yes.
2         MS. WOODWORTH:  Second, if you're
3    answering yes or no please try not to say uh-huh
4    or uh-uh as we all tend to do.  Again, it's
5    difficult for the court reporter to accurately
6    take down those types of answers.
7         THE WITNESS:  Yes.
8         MS. WOODWORTH:  Third, please wait until
9    I finish asking my question before you begin to
10   answer.  This is because the court reporter
11   can't take down two people talking at the same
12   time.  I'll extend you the same courtesy and
13   wait for you to finish your answer before asking
14   another question.  Can we agree not to talk over
15   each other?
16        THE WITNESS:  Yes.
17        MS. WOODWORTH:  Fourth, if you don't
18   understand the question I'm asking, please just
19   ask me to repeat it or rephrase the question.  I
20   would be happy to.  If you answer a question, we
21   will assume that you understood it.
22        THE WITNESS:  Yes.
23        MS. WOODWORTH:  Fifth, do you understand
24   that you're under oath today?

---

Page 7

1         THE WITNESS:  I do.
2         MS. WOODWORTH:  Do you understand that
3    you have sworn to tell the truth?
4         THE WITNESS:  I do.
5         MS. WOODWORTH:  And that everything that
6    you say during the deposition has the same
7    effect as you said it in a courtroom before a
8    judge?
9         THE WITNESS:  I do.
10        MS. WOODWORTH:  Sixth, if you don't
11   remember something, feel free to tell me that.
12   I don't know is a perfectly acceptable answer.
13   However, if you later remember the answer,
14   you're obliged to let your attorney know, and
15   he'll contact us.
16            Finally, if you need to take a break
17   or anything, please just let me know.  We can
18   take a restroom break or stop to get a drink at
19   any time.  I would just ask that if there is a
20   question pending that you finish answering the
21   question before we take a break.
22        THE WITNESS:  Yes.
23        MS. WOODWORTH:  I want to remind you
24   that today is our only day to talk.  So I want

---

Page 8

1    you to tell me everything and do your best and
2    be as forthcoming as possible.
3         THE WITNESS:  Okay.
4            CARMEL PRENDERGAST,
5         called as a witness herein, having
6    been first duly sworn, was examined and
7    testified as follows:
8         E X A M I N A T I O N
9    BY MS. WOODWORTH:
10       Q.  Aside from talking to your attorney have
11   you done anything to prepare for your deposition
12   today?
13       A.  No.
14       Q.  Have you read anything, past medical
15   reports, discovery responses, or any other
16   material?
17       A.  No.
18       Q.  Aside from your attorney have you talked
19   to anyone else to prepare for your deposition
20   today?
21       A.  No.
22       Q.  What's your date of birth?
23       A.  March 22, 1941.
24       Q.  That makes you how old today?

---

Page 9

1        A.  67.
2        Q.  And where were you born?
3        A.  Evergreen Park, Illinois.
4        Q.  Are your parents still living?
5        A.  No.
6        Q.  How did they pass?
7        A.  My father was 88, and my mother was 80
8    when she passed.
9        Q.  And what caused them to pass?
10           MR. PITTACORA:  Objection, relevance.
11           You can answer.
12           THE WITNESS:  My mother died of
13   congestive heart failure.
14   BY MS. WOODWORTH:
15       Q.  And your father?
16       A.  Old age.
17       Q.  What's your Social Security number?
18       A.  334 --
19           MR. PITTACORA:  I'm going to object to
20   that question on the basis of just privacy
21   concerns.  If you absolutely need it, we can
22   give it to you off the record.  I just don't
23   want it in something that could be filed with
24   the Court.

---

3 (Pages 6 to 9)

Ph# 312-578-9323
Fx# 312-578-9235

Page 10

1        MS. WOODWORTH:  That would be fine.
2   BY MS. WOODWORTH:
3        Q.  What's your current address?
4        A.  12601 South Meade Avenue.
5        MR. PITTACORA: M-e-a-d-e.
6   BY MS. WOODWORTH:
7        Q.  And the city?
8        A.  Palos Heights, P-a-l-o-s, Heights,
9   Illinois 60463.
10       Q.  Do you live in a home?
11       A.  Yes.
12       Q.  Do you own or rent?
13       A.  Own.
14       Q.  Is it a one story or two story?
15       A.  One story.
16       Q.  Do you have a basement?
17       A.  No.
18       Q.  Are there steps leading up to the front
19   door?
20       A.  One.
21       Q.  How long have you lived at this
22   address?
23       A.  Since 1976.
24       Q.  Any plans to move?

Page 11

1        A.  No.
2        Q.  Who do you live with at this address?
3        A.  My husband and our son.
4        Q.  And what is your husband's name?
5        A.  Robert Prendergast.
6        Q.  And your son's name?
7        A.  James Prendergast.
8        Q.  Any other relatives live with you?
9        A.  No.
10       Q.  Did you live -- you lived at this
11   location at the time of the incident complained
12   of in your complaint?
13       A.  Say that again.
14       Q.  You lived -- you've lived at this
15   address since 1976.  So you were living here at
16   the time of your fall at Kohl's?
17       A.  Correct.
18       Q.  When did you first meet Robert
19   Prendergast?
20       MR. PITTACORA:  Objection, relevance.
21           You can answer.
22   BY MS. WOODWORTH:
23       Q.  You can answer.
24       A.  1975.

Page 12

1        Q.  And when were you married?
2        A.  Wait a minute.  No, I think it was '74,
3   1974.
4        Q.  And when were you married?
5        A.  1975.
6        Q.  Were you ever married before you were
7   married to Robert?
8        A.  No.
9        MR. PITTACORA:  Objection, relevance.
10   That's okay.  You were going to answer anyway.
11   BY MS. WOODWORTH:
12       Q.  How many children do you have?
13       A.  One.
14       Q.  And how old is James?
15       A.  32.
16       Q.  Has he ever lived outside the home?
17       A.  When he was away in college for a brief
18   time.
19       Q.  When did he go away to college, when he
20   was 18?
21       A.  Yes.
22       Q.  And where did he go to school?
23       A.  He went to Indiana University in
24   Bloomington, Indiana, and he graduated from

Page 13

1   Saint Xavier University, Chicago.
2        Q.  How long did he attend IU?
3        A.  One year.
4        Q.  And then he graduated from Saint
5   Xavier?
6        A.  Chicago.
7        Q.  Then after he finished college did he
8   live with you?
9        A.  Yes.
10       Q.  And has he lived with you since that
11   time?
12       A.  Yes.
13       Q.  Has he held down a job?
14       MR. PITTACORA:  Objection, relevance.
15           You can answer.
16       THE WITNESS:  Answer?
17       MR. PITTACORA:  Yes.
18       THE WITNESS:  Not recently.
19   BY MS. WOODWORTH:
20       Q.  When was his last job?
21       A.  I can't remember.  Right after
22   college.
23       Q.  Does he have a medical condition that
24   prevents him from working?

4 (Pages 10 to 13)

Prendergrast  v. Kohl's                        4/9/2008                        Carmel  Prendergrast

Page 14

1    A.  Yes.
2    Q.  And what is that?
3    A.  Cervical dystonia spasmodic torticollis.
4    Q.  Could you give us an understanding of
5  what that condition entails?
6    A.  It's a neurological movement disorder
7  for which there is no cure.
8    Q.  And how does this limit your son
9  physically?
10    A.  It very much limited him.  He is unable
11  to work.
12    Q.  Is he able to prepare his own meals?
13    A.  With some help.  With my help mainly.
14    Q.  If you're not home is he able to prepare
15  a meal on his own?
16    A.  No.
17    Q.  Is he able to do his laundry?
18    A.  No.
19    Q.  Can he ride a bike?
20    A.  No.
21    Q.  Drive a car?
22    A.  No, not at this time.
23    Q.  Has he ever been able to?
24    A.  Yes.

Page 15

1    Q.  When was that?
2    A.  When he was in school.
3    Q.  When he was in college?
4    A.  Right.
5    Q.  Has he driven a car since college?
6    A.  Not since -- a little bit after college
7  he did.
8    Q.  Did his condition worsen after
9  college?
10    A.  Yes.
11    Q.  And when did his condition decline?
12    A.  Meaning?
13    Q.  Did his condition become much worse
14  after he came home?  I'm just trying get a sense
15  of about what year that occurred.
16    A.  I would say so, yes.
17    Q.  Does your husband help prepare meals for
18  your son too?
19    A.  He does most of the shopping and helps
20  with the preparation, an all around guy.
21    Q.  You were not working at the time of the
22  incident in November of 2005, correct?
23    A.  No.
24    Q.  So your son wasn't depending upon you

Page 16

1  for financial support?
2    A.  No, right, yes.
3      MR. PITTACORA:  No?
4      THE WITNESS:  No.  Sorry.
5  BY MS. WOODWORTH:
6    Q.  So your husband worked at that time?
7    A.  No.
8    Q.  No.
9      Was your husband retired as well?
10    A.  Yes.
11    Q.  What did he do for a living?
12    A.  He worked for People's Energy
13  Corporation, which is now Entergy.
14    Q.  What did he do for People's Energy?
15    A.  He was an inspector.  I guess -- I don't
16  know his full title.
17    Q.  That's fine.
18      And when did he retire?
19    A.  Let's see.  If I got it correct, I think
20  it was 1996.
21    Q.  Do you have a valid driver's license?
22    A.  Yes.
23    Q.  Are there any restrictions on your
24  driver's license?

Page 17

1    A.  I don't think so.  If it's for glasses,
2  I'm not sure.  I haven't looked at it recently.
3  It probably is for glasses.  Should I look?
4    Q.  That's okay.
5      MR. PITTACORA:  You wear glasses.  So
6  it's a fair assumption that you need to wear
7  glasses.
8      MS. WOODWORTH:  That's fine.
9  BY MS. WOODWORTH:
10    Q.  Do you wear your glasses every day?
11    A.  Yes, I do.
12    Q.  Have you ever worn contact lenses?
13    A.  No.
14    Q.  Where did you attend high school?
15    A.  St. Louis Academy in Chicago.
16    Q.  Did you graduate?
17    A.  Yes.
18    Q.  What year?
19    A.  I think it was 1959, I think.
20    Q.  Did you attend college?
21    A.  Yes, I did.
22    Q.  Where?
23    A.  Saint Xavier University, Chicago.
24    Q.  What was your degree in?

5 (Pages 14 to 17)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 18

1     A.  B.A. in education.
2     Q.  Did you play any sports in high
3  school?
4     A.  I'm trying to think.  Well, we played
5  baseball and volleyball, but it wasn't
6  organized.
7     Q.  You weren't on the varsity team?
8     A.  They didn't have it.  Catholic schools
9  didn't.
10    Q.  Okay.  That's fine.
11         After you graduated from Saint
12  Xavier was that in approximately 1963?
13    A.  Right.
14    Q.  You began teaching?
15    A.  Yes, I did.
16    Q.  Where did you teach?
17    A.  In Dolton, Illinois in a school district
18  out there in Calumet City.
19    Q.  What was the name of the school?
20    A.  One was Diekman and the other one was --
21  I forgot the second one.  One was in Dolton.
22  The other one was in Calumet City, but they are
23  both the same district.
24    Q.  What grade did you teach?

Page 19

1     A.  Second grade.
2     Q.  How long were you a teacher?
3     A.  It was 13 and a half years if I'm not
4  mistaken.  To the best of my recollection it was
5  13 and a half.
6     Q.  '63 to '76?
7     A.  Right, until my son was born.
8     Q.  Then you stopped working when your son
9  was born?
10    A.  I went on maternity leave and I
11  retired.
12    Q.  Have you had any other jobs since
13  1976?
14    A.  Nothing that I was paid for, all
15  volunteered.
16    Q.  Where did you volunteer?
17    A.  At my church and bible school during the
18  summers.
19    Q.  Do you still do that today?
20    A.  No.
21    Q.  When did you stop?
22    A.  I can't remember the exact date.
23    Q.  10 years ago, 20 years ago?
24    A.  Yeah, I would say about 10.  Maybe more

Page 20

1  than 10 or 12 years ago.
2     Q.  You never served in the military?
3     A.  No.
4     Q.  Have you ever filed any personal injury
5  lawsuits prior to this one?
6     A.  Just the one --
7     Q.  Related to the car accident?
8     A.  Right.
9     Q.  Any others besides the car accident?
10    A.  Not that I can recall, no.
11    Q.  Let's talk about the car accident.
12  What year did this accident occur?
13    A.  I think it was about 12 years ago.
14    Q.  1996?
15    A.  12 or 13, yeah, to the best of my
16  recollection.
17    Q.  Where did the accident occur?
18    A.  What city?
19    Q.  Yes.
20    A.  Chicago, I think, yes.  I'm trying to
21  remember.
22    Q.  What happened?
23    A.  I was rear ended waiting for the train
24  to pass.

Page 21

1     Q.  Did you hit another car in front of
2  you?
3     A.  No, not that I can remember.
4     Q.  Were you taken by ambulance to the
5  hospital?
6     A.  No.
7     Q.  You went to the hospital on your own?
8     A.  I think my nephew took me.  I can't
9  remember.  Somebody picked me up and took me.
10    Q.  I realize this is 12 years ago.
11    A.  I don't remember.  I know I didn't go
12  into an ambulance though.
13    Q.  You know that --
14    A.  That I did not go in an ambulance.
15    Q.  Did you go to the hospital that day?
16    A.  It's been so long that I can't remember
17  all the details.
18    Q.  Do you remember who you saw?
19    A.  What are we talking about?  In regards
20  to what?
21    Q.  Do you remember which hospital you were
22  taken to?
23    A.  No.
24    Q.  What did they do when you got to the

6 (Pages 18 to 21)

Page 22

1  hospital?
2      A.  You know, I can't remember the whole
3  thing.  It's been so long I can't remember.  It
4  must be in my records somewhere in regards to my
5  welfare.  I don't remember.
6      Q.  What was your injury?
7      A.  Whiplash that I remember, severe.
8      Q.  Severe.
9          Did that cause you to experience
10  back and neck pain?
11      A.  Neck.
12      Q.  And did you go to physical therapy?
13      A.  Yes, a lot of it.
14      Q.  How many times per week?
15      A.  I don't know exactly, two or three times
16  a week.  I can't remember.  It should be in my
17  medical records.
18      Q.  For how long did you go to physical
19  therapy?
20      A.  That's another thing.  That's the time
21  span that I don't remember.
22      Q.  Six months, a year?
23      A.  Yeah, six months or more probably.  I'm
24  not sure.  It was a long time ago.

Page 23

1      Q.  I understand.
2          What was the result of that lawsuit?
3  Did you obtain a settlement?
4      A.  Yes.
5      Q.  It didn't go to trial?
6      A.  No.
7      Q.  Have you ever filed a worker's
8  compensation claim?
9      A.  No.  You have to be working to do
10  that.
11      Q.  This would be a claim that you would
12  file with your employer as a result of an on the
13  job accident.
14      A.  No.
15      Q.  Have you ever had any sports related
16  injuries from playing tennis or golf or --
17      A.  No.
18      Q.  -- anything like that?
19          I understand since you were retired
20  at the time of the incident that you're not
21  claiming lost wages; is that correct?
22      A.  Right.
23      Q.  What are your current sources of
24  income?

Page 24

1      A.  I have a teacher's pension that I live
2  on.
3      Q.  And how much do you receive per month?
4      A.  They just -- I think it's over $700 or
5  something, 7 or $800 a month.  I'm not sure.
6  It's direct deposit, so I don't know.
7      Q.  Are you receiving Social Security?
8      A.  No.
9      Q.  Medicare or Medicaid?
10      A.  Yes, Medicare.  I pay for that out of my
11  own pocket.
12      Q.  Are there any other sources of income
13  from your husband or elsewhere?
14      A.  He gets Social Security.
15          MS. WOODWORTH:  Can we go off the record
16  for one minute?
17          (Whereupon, a discussion
18          was held off the record.)
19  BY MS. WOODWORTH:
20      Q.  Have we now discussed all of your
21  sources of income?
22      A.  I think so.
23      Q.  Have your medical expenses since the
24  November, 2005 incident at Kohl's been covered

Page 25

1  by medical insurance?
2      A.  Some of it has been.
3      Q.  Where are you insured?
4      A.  I have Medicare as my primary and Blue
5  Cross Blue Shield of Illinois as my secondary.
6      Q.  And what hasn't been covered?
7      A.  Whatever Medicare doesn't cover.
8      Q.  Is what you pay out of pocket?
9      A.  Or Blue Cross doesn't cover either.  So
10  it's the normal.
11      Q.  What have you spent out of pocket?
12      A.  I don't have an itemized statement on
13  that as of this minute, but probably when you
14  check through my records you can tally that up.
15  I don't have it.
16      Q.  Could you give me a ballpark figure of
17  what you have paid out of pocket for medical
18  expenses related to this accident?
19      A.  To be honest I don't know.  I really
20  don't.  I'm being honest about it.  I don't
21  know.
22      Q.  Are there any bills that remain unpaid
23  right now?
24      A.  I think there are some that I have,

Real-Time Reporters, Inc.                    Ph# 312-578-9323
Real-TimeReporters.com                    Fx# 312-578-9235

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 26

1   yeah.  There are a few.
2       Q.  What type of medical care does your
3   insurance not cover related to this incident?
4       A.  I really don't know.  I have to look it
5   up.  You mean what does Medicare not cover?
6       Q.  Uh-huh.
7       A.  Whatever the standard is.  I don't know.
8   You know, whatever I submit if they don't cover
9   it, they don't cover it.
10      Q.  I'm just wondering to find out if there
11  is a certain type of care, a type of physical
12  therapy or something you've had repeatedly that
13  isn't covered by your insurance.
14      A.  According to Medicare there is a certain
15  amount that they will cover.  So I've got to go
16  back and read up on that.
17      Q.  So it may be capped at a certain
18  amount?
19      A.  I'm not sure.  I don't know.
20      Q.  Because you filed a lawsuit we need to
21  ask these questions.
22          Have you ever been convicted of any
23  crime?
24      A.  No.

Page 27

1       Q.  Felony, misdemeanor?
2       A.  No.
3       Q.  Have you ever filed for bankruptcy?
4       A.  No.
5       Q.  As a child were you active?
6       A.  I would say so.
7       Q.  You were able to go out and play with
8   other kids in the neighborhood?
9       A.  I use to play with the boys.
10      Q.  You were able to dance, play sports?
11      A.  Loved it.
12      Q.  In your 20's were you an active woman?
13      A.  Yes.
14      Q.  You were able to take care -- mow the
15  lawn, do outdoor activities?
16      A.  Did everything.
17      Q.  In your 30's were you still an active
18  woman?
19      A.  Yes.
20      Q.  What types of activities did you do?
21      A.  Like I said, I took care of things
22  around the house, took care of my parents, and
23  was in all the activities with my son and played
24  all the games they did and went swimming with my

Page 28

1   husband.
2       Q.  I've seen in your records that you've
3   had a history of chronic back pain.  When did
4   that begin?
5       A.  You know, I can't remember exact dates,
6   but I don't know where it's at in my records.  I
7   can't put a date on it.
8       Q.  And that's fine.  I'm not looking for a
9   specific date or a specific year.  Can you give
10  me a decade?  Did it start in your 40's?
11      A.  You know, I really can't tell.  I don't
12  know.  I don't remember exactly.  I'm not being
13  dishonest, but I just don't remember exactly
14  when.
15      Q.  Do you remember -- do you recall having
16  back pain as long as the past 15 years?
17      A.  It goes and comes.  So I don't know
18  if -- I don't really -- I'm not aware of it
19  until this business.  So I don't know.  Maybe on
20  and off, but it didn't really bother me that
21  much.
22      Q.  Are you saying that you don't recall
23  significant back pain prior to the November,
24  2005 fall at Kohl's?

Page 29

1       A.  Not as significant.
2       Q.  Really, okay.
3           Was there an injury or an incident
4   that occurred that you remember that that's when
5   my back pain started was after that fall or
6   after lifting that heavy object?  Is there
7   anything like that that you remember?
8       A.  I'm trying to remember.  I don't know if
9   I could pinpoint it to anything.  Do you know
10  what I mean?
11      Q.  Okay.
12      A.  I don't know if it's in my records.  I
13  don't know.  I can't pinpoint it per se right
14  now.  Probably when I go home I will.
15      Q.  Can you remember any specific incidents
16  where you fell other than this fall at Kohl's?
17      A.  Well, I've fallen, yes, but I don't
18  remember any specific damage to me.  Do you know
19  what I mean?
20      Q.  Were there previous falls that caused
21  you to seek medical treatment at one time?
22      A.  Yes, a long time ago, but I can't
23  remember exactly what happened to me or when.
24      Q.  But you can remember a specific instance

8 (Pages 26 to 29)

Prendergrast v. Kohl's                  4/9/2008                  Carmel Prendergrast

Page 30

1  where you fell and sought medical treatment?
2     A.  Not right away.  I just wanted to get
3  checked out to see what was going on with me.
4     Q.  Do you know what the doctor for you at
5  that time -- what type of tests he performed?
6     A.  No, I can't recall but it must be --
7  whatever is in my records.  You must have all my
8  medical records, right?
9     Q.  I would just like to know what you
10  recall.
11     A.  I don't remember.  I don't remember
12  specifics.  How many years ago was that?  I
13  can't recall.  It wasn't recent.  It was not
14  recent.
15     Q.  I'll tell you what.  Let's go through
16  some of those.  Maybe we can refresh your
17  memory.
18        I have records from Parkview
19  Radiology from the year 1988, which is about 20
20  years ago where you had an x-ray of your lumbar
21  spine.  Do you recall having back pain as far
22  back as 20 years ago.
23     A.  I remember that, yeah.
24     Q.  And do you recall seeing a Dr. Araujo,

Page 31

1  A-r-a-u-j-o?
2     A.  No.
3     Q.  Do you recall being told that you had
4  degenerative changes in your L3 and L4?
5     A.  Yes, but I don't remember that doctor.
6  Who was that?
7     Q.  You don't remember the specific doctor
8  who performed the x-ray?
9     A.  No, no.
10     Q.  That's fine, but you remember going to
11  Parkview Radiology?
12     A.  Uh-huh.
13     Q.  Parkview Orthopedic, do you recall going
14  to that institute?
15     A.  Uh-huh, yes.
16     Q.  That was as far back as 1988?
17     A.  1988.
18     Q.  20 years ago.
19        They talked about a fall that you
20  had where you struck a brick wall.  Do you
21  remember that fall?
22     A.  Yes, I remember that.
23     Q.  Is that the one that you were referring
24  to earlier?

Page 32

1     A.  I was trying to remember what happened,
2  yes.
3     Q.  And what happened with the brick wall?
4     A.  Nothing.  I just must have tripped.  I
5  don't know.
6     Q.  You tripped and ran into --
7     A.  I don't know what happened.  I cannot
8  remember.  All I know is I must have bumped into
9  the wall, but I don't know what went on with the
10  back and the business and all of that.
11     Q.  Okay.  Do you remember having back pain
12  after that?
13     A.  Yes, now I do.
14     Q.  Do you remember having pain that
15  radiated down your left leg?
16     A.  Yes.
17     Q.  The records indicated that you had
18  another fall in December and then a fall in
19  February over a chair at home.  Do you remember
20  the fall over a chair?
21     A.  No.
22     Q.  Did the doctors talk to you at that time
23  about beginning a weight loss program that may
24  help your back problems?

Page 33

1     A.  Yes.
2     Q.  Do you recall that?
3     A.  Uh-huh, yes.
4     Q.  And how did that go?
5     A.  I must have lost some weight and then
6  regained.
7     Q.  Your weight has fluctuated over the
8  years?
9     A.  Yes.
10     Q.  Do you recall wearing a corset for your
11  back at that time?
12     A.  Yes, vaguely.
13     Q.  Did you ever have to wear it again after
14  that 1988 period?
15     A.  No.
16     Q.  When you had that fall did you talk to
17  your doctor about possibly having an inherent
18  weakness in your leg in 1988?  Do you recall
19  anything about that?
20     A.  What do you mean by that?
21     Q.  There was a complaint to your doctor
22  that you may have had an inherent weakness in
23  your leg.  Do you remember feeling one leg being
24  weaker than the other?

9 (Pages 30 to 33)

Prendergrast v. Kohl's                4/9/2008                    Carmel Prendergrast

Page 34

1    A.  As a result of the fall, I don't
2  remember that.
3    Q.  No, they are saying that's what may have
4  caused the fall.
5    A.  No, I was never told that.
6    Q.  I just wanted to check with you to see
7  if you recall any of these other incidents.
8        Do you remember a fall on Christmas
9  day?
10   A.  No.
11       MR. PITTACORA:  Objection.  When?
12  BY MS. WOODWORTH:
13   Q.  In 1989.
14   A.  No.
15   Q.  Again, there were complaints of lower
16  back pain.  Do you recall your first MRI?
17   A.  I can't remember where or when, no.  I
18  can't remember time.
19   Q.  I have a record of an MRI from Highland
20  Tech Medical on February 23, 1999.  I wanted to
21  see if you recalled any MRI's before that or if
22  this would have been the first one?
23   A.  I don't remember.
24   Q.  You can't remember either way.  That's

Page 35

1  just fine.
2        Do you recall what the results of
3  that MRI were?
4    A.  Who ordered it?
5    Q.  This was Dr. Wyclif (phonetic) at High
6  Tech Medical.
7    A.  I don't remember.
8    Q.  Do you remember being told that you had
9  degenerative disk disease at that time?
10   A.  No, not the way you are saying it, no.
11   Q.  Did he speak to you about -- did any of
12  the doctors at that time speak to you about
13  degenerative changes at your disc space at the
14  L4-L5?
15   A.  I think one doctor mentioned it.
16   Q.  Now, I understand that you and I aren't
17  doctors and there is a lot of terminology that's
18  difficult to understand.  Would you -- have you
19  always been honest and forthcoming with your
20  doctors?
21   A.  In regards to what?
22   Q.  In regards to the symptoms that you're
23  feeling when you are going there to seek
24  treatment.

Page 36

1    A.  I think I have been.
2    Q.  Right, because you want them to be able
3  to diagnose and help you.  So you've given them
4  as much information as you can?
5    A.  Yes.
6    Q.  So you would defer to what's in your
7  records as to what was discussed during those
8  office visits?
9    A.  I'm assuming what was in there is -- I
10  don't know what he put in there.  He didn't tell
11  me.
12   Q.  Because when you go to the doctor
13  generally they take down notes --
14   A.  Uh-huh.
15   Q.  -- of the visit?
16   A.  That was so long ago that I don't
17  remember what I said 20 years ago.
18   Q.  And, yes, I wouldn't expect you to, but
19  would you defer to what's in your records at
20  that time?
21       MR. PITTACORA:  I'm going to object to
22  the form of the question.  Unless she knows
23  what's stated in the records, how can she defer
24  to it?  If you want to confront her with

Page 37

1  particular excerpts, then she can agree or
2  disagree with it.
3  BY MS. WOODWORTH:
4    Q.  My question for you, Mrs. Prendergast,
5  is regarding office visits from 20 years ago, no
6  one expects you to have a recollection of
7  exactly what was said during those visits.
8  Would you defer to what's in your medical
9  records as to what the content of that visit
10  was?
11       MR. PITTACORA:  Same objection.
12  BY MS. WOODWORTH:
13   Q.  We're both going to object back and
14  forth.  You can answer the question.
15   A.  I can't answer a deferment because I
16  don't even know what's in there.
17   Q.  Well, we can go through them.  That's
18  fine.
19       MR. PITTACORA:  Off the record.
20        (Whereupon, a discussion
21        was held off the record.)
22  BY MS. WOODWORTH:
23   Q.  Mrs. Prendergast, I just want to be
24  clear that we're talking about the

10 (Pages 34 to 37)

Prendergrast v. Kohl's                4/9/2008                Carmel Prendergrast

Page 38

1   February 23, 1989 MRI that was performed at High
2   Tech Medical. Your records indicated that there
3   is degenerative disc disease, and they talked to
4   you about degenerative changes at the disc space
5   L4 and L5 and also L5 to S1. Do you recall
6   this?
7       A.  I remember what you're talking about,
8   lumbar and that, but I don't remember what they
9   discussed about it.
10      Q.  You don't remember the specific
11  conversation?
12      A.  No.
13      Q.  That's fine.
14          Back on March 7, 1999 at Parkview
15  Orthopedic you complained about problems with
16  your left knee and your left calf. Do you
17  recall having problems over the years with your
18  left knee and your left calf?
19      A.  I don't remember my left knee, no. I
20  don't know what they said about that. What did
21  they say about that?
22      Q.  During this office visit it was noted
23  that you had complaints of pain in your left
24  knee and your left calf, and the doctors advised

Page 39

1   you to embark on a weight loss program and
2   advised that if this didn't improve that they
3   would recommend a discectomy at the L3-L4. Then
4   they further stated that if that didn't relieve
5   your symptoms that you would require a spinal
6   laminectomy. Do you remember doctors talking to
7   you in that time period about the possibility of
8   surgery if these types of pains didn't get
9   better?
10      A.  I'm trying to remember the terminology
11  that you are throwing out at me.
12      Q.  And I understand, and I'll try and make
13  it more general.
14          These are different types of
15  surgeries on your back as a result of the pain
16  that you were experiencing. Do you remember
17  doctors discussing with you the possibility of
18  needing back surgery down the road if your
19  symptoms didn't improve?
20      A.  I don't remember him or her, whoever
21  said it specifically, saying this is going to be
22  required of you, no, not specifically.
23      Q.  Okay.
24          Now, do you recall them talking

Page 40

1   about the possibility of needing back surgery,
2   not that it would be required but that you may
3   need it if your symptoms did not improve?
4       A.  I don't know what to say. It doesn't --
5       Q.  You don't ever remember hearing a doctor
6   saying, hey, you may need to have surgery and
7   you thought, gosh, I might have to have a
8   surgery?
9       A.  No one has ever said this will be a
10  requirement if you don't do this or don't do
11  this or don't do that, no, not to narrow it
12  down.
13      Q.  You don't have a specific recollection
14  of that conversation?
15      A.  (Nonverbal response.)
16      Q.  The following month on April 4, 1999,
17  they again talked to you about embarking on
18  getting on a weight loss program and talked
19  about the occurrence of your lumbar disc
20  symptoms and encouraged you to go on a weight
21  loss program. Do you remember these
22  conversations with the doctors?
23      A.  If it was said, it was said in passing,
24  nothing --

Page 41

1       Q.  That's fine.
2           It seems like things went okay for a
3   couple of years after that. My next record is
4   from 1992, June 19, 1992, Parkview Radiology.
5   You had some x-rays done of your left foot. Do
6   you remember if you had a fall or something that
7   precipitated those x-rays?
8       A.  No, no fall.
9       Q.  At that time the doctors stated -- this
10  is your visit to Parkview Radiology on
11  June 24, 1992 that you presented with a history
12  of complaints related to your back and left leg.
13  Do you remember having problems with your left
14  leg at that time?
15      A.  I'm trying to remember if it was related
16  to the foot because of the way I was walking. I
17  don't remember.
18      Q.  Specifically your complaint at that time
19  was related to the left heel area. Do you
20  remember having problems with your left heel?
21      A.  I had plantar fascitis, but it's okay.
22  It's all been taken care of. At that time I
23  believe that's what he put in that record,
24  right?

11 (Pages 38 to 41)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

---

Page 42

1      Q.   We haven't gotten to the plantar
2   fascitis yet.
3           At that time you had further x-rays
4   of your left ankle and your left heel?
5      A.   Uh-huh.
6      MR. PITTACORA:  You have to say yes or
7   no.
8      THE WITNESS:  Yes, sorry.
9   BY MS. WOODWORTH:
10      Q.   Do you recall whether there was any
11   specific instance that gave rise to all these
12   x-rays of your heel, your ankle, your foot?
13      A.   No.
14      Q.   You felt pain out of nowhere?
15      A.   I just wanted to find out what was
16   causing it.
17      Q.   I just wondered if this was related to
18   the fall back in 1989, any of those three falls
19   that we discussed earlier?
20      A.   No.
21      Q.   Did the plantar fascitis -- I'm sorry if
22   I'm mispronouncing that.  Did that cause you to
23   have difficulty walking?
24      A.   At that time.

---

Page 43

1      Q.   And did you use -- ever use a walker?
2      A.   No.
3      Q.   A cane?
4      A.   No.
5      Q.   Crutches?
6      A.   No, not that I can recall, no, no.
7      Q.   It was just a little more difficult to
8   walk?
9      A.   Right.
10      Q.   That's fine.
11           I understand that they did diagnose
12   you at that time back in back on April 8, 1993
13   with a fracture of your left heel.
14      A.   I forgot about that.  That's in my
15   records?
16      Q.   Do you know what happened at that time
17   to cause you to fracture your heel?
18      A.   No.
19      Q.   The doctors stated that your chief
20   complaint was that you were unable to walk
21   because of your left heel.  Do you recall being
22   confined to a chair or a couch for a period of
23   time?
24      A.   I know it was difficult to walk.  I

---

Page 44

1   forgot about that.  I didn't know it was
2   fractured.  That's a long time back.
3      Q.   I understand.  I understand.
4           I'm going to jump ahead a ways.  In
5   May, May 18, 1993, you went back to your doctor
6   at Palos Community Hospital regarding some right
7   foot problems related to an incident you had
8   dancing.  Do you recall anything about that
9   incident?
10      A.   I'm trying to remember.
11      Q.   At that time x-rays were done of your
12   right foot.
13      A.   I can't remember what happened, no.
14      Q.   But do you remember going and having
15   x-rays done of your right foot?
16      A.   I don't remember -- wait a minute.  I
17   don't know.  Not at that time.  I can't
18   remember.
19      Q.   I understand we're going back many
20   years.  Let's go to the next incident.
21           In June, June 30, 1994, there was a
22   description from Chicago Orthopedic
23   Rehabilitation Services about an incident where
24   you were barbecuing and you bent over to turn

---

Page 45

1   off the grill and you had a sharp pain in your
2   lower right back.  Do you remember that
3   incident?
4      A.   Oh, my God, no.  What's it called,
5   Chicago Orthopedic?
6      Q.   Chicago Orthopedic Rehabilitation
7   Services.
8      A.   I mean, I'm trying to remember who that
9   is.  1994?
10      Q.   June 30, 1994.
11      A.   I'm really sorry, but I can't recall
12   that.
13      Q.   At that time an x-ray of your lumbar
14   spine and pelvis was done.  Do you recall --
15      A.   Who ordered it?
16      Q.   Dr. Araujo again at Parkview Radiology.
17      A.   No.
18      Q.   Your records indicated that the results
19   of that x-ray were mild degenerative changes
20   with early spurring of L3-L4 and L5.  Do you
21   recall having conversations with your doctors
22   during that time period about degenerative
23   changes?
24      A.   No.

---

Real-Time Reporters, Inc.                    Ph# 312-578-9323
Real-TimeReporters.com                    Fx# 312-578-9235

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 46

1    Q.  Your records indicated that you were
2  taking Vicodin at that time.  Do you know when
3  you first started taking Vicodin for back
4  pain?
5    A.  What was that, '94?
6    Q.  '94.
7    A.  I think that was the only time.
8    Q.  1994 was the only time that you took
9  Vicodin for back pain?
10   A.  I'm trying to -- I don't even know if I
11  had the prescription filled.  I don't remember
12  the last time I had a prescription for Vicodin
13  filled.  Not recent.  Not this, you know --
14   Q.  So the only time you recall taking
15  Vicodin is back in 1994?
16   A.  Can I ask who prescribed it?
17   Q.  The records that show the Vicodin were
18  back from Parkview Radiology in July of 1994.
19   A.  See, I don't remember.  If he gave it to
20  me, he must have thought I needed it.
21   Q.  Do you remember any side effects that
22  you experienced with the Vicodin?
23   A.  No.
24   Q.  Was there a reason you stopped taking

Page 47

1  it?
2    A.  I remember that because I remember
3  medicine.  I don't take that much medicine.
4    Q.  Do you recall why you stopped taking
5  it?
6    A.  To be truthful, I don't remember taking
7  it, but if I stopped taking it it's because I
8  didn't need it.
9    Q.  Are there other pain killers other than
10  Vicodin, prescription pain killers that you
11  recall taking over the years?
12   A.  No, because I try not to take medicine
13  if I don't have to.
14   Q.  I know some people prefer to resort to
15  Advil or over-the-counter medications.  Did you
16  take those kind of medications instead of
17  prescription pain killers?
18   A.  I'm trying to remember.  I'm not
19  taking -- I mean, I don't remember.  That's so
20  long ago that I can't remember what I took.  I
21  didn't even remember that he gave me Vicodin.
22   Q.  Do you recall doing physical therapy in
23  the '90's for these back problems that you were
24  experiencing?

Page 48

1    A.  Yes.
2    Q.  And how often did you do physical
3  therapy at that time?
4    A.  Whatever the doctor recommended.  I
5  don't recall exact amounts of times or days.
6    Q.  Is this -- the physical therapy that you
7  had done, is that something that you've done
8  every year for the last 20 years or are there
9  periods that, hey, during these five years I
10  seem to be doing better and I stopped my
11  physical therapy all together or has it been
12  pretty consistent?
13   A.  For my back?
14   Q.  Yes.
15   A.  I can't remember the last time I had
16  therapy.  I mean, from Parkview you're talking
17  about?  I can't remember the last time there.
18  What are you asking me?
19   Q.  Okay.  Your records -- we've gone
20  through your records from the early '90's, and
21  there have been several references to physical
22  therapy that you had done during that time.  I'm
23  wanting to know if that was related to a
24  specific incident or if you continually had

Page 49

1  physical therapy during those years a couple of
2  times a week, a couple of times a month?
3    A.  If you could tell me who ordered the
4  therapy, what period of time, then I could give
5  a decent answer.  I don't know --
6    Q.  I'll tell you what.  I just want to know
7  what you know.
8    A.  I don't remember when I went and when I
9  stopped.  Whenever the doctor ordered it I
10  went.
11   Q.  You went, okay.  That's just fine.
12       Again, on July 19, 1994, Chicagoland
13  Orthopedic Rehabilitation Services, your doctor
14  Dr. Blair at this time talked about you wearing
15  a corset again and being seen for physical
16  therapy three times a week.  Do you remember
17  wearing this corset for your back pain?
18   A.  What year?
19   Q.  1994.
20   A.  And what was the name of the doctor?
21   Q.  Dr. Blair at Chicagoland Orthopedic
22  Rehabilitation Services?
23   A.  I don't remember seeing a Dr. Blair at
24  that time.

13 (Pages 46 to 49)

Prendergrast  v.  Kohl's                          4/9/2008                          Carmel  Prendergrast

Page 50

1     Q.  Do you remember going to Chicagoland
2  Orthopedic Rehabilitation Services?
3     A.  That's CORES.  Is that what it is?
4     Q.  The acronyms would be CORES.  I don't
5  know if it's generally referred to as CORES.
6     A.  I'm not sure that's where I went.  You
7  know, I don't remember all the dates that you're
8  giving me and all that they did.
9     Q.  And I don't expect you to remember the
10  dates.
11     A.  I know that I went for physical therapy.
12  When they told me to go, I went.
13     Q.  The records indicated during that time
14  period of November 1, 1994 that you had a fall
15  at home and you had a fracture on your ankle and
16  you were put in a splint at that time.  Do you
17  recall this incident?
18     A.  I never fractured my ankle.
19     Q.  This was from November 1, 1994.  You
20  were -- the records indicated that you were
21  treated with an ankle splint apparatus but you
22  were allowed to walk without crutches.
23     A.  I don't remember fracturing my ankle.  I
24  don't remember doing that.  Who is the doctor?

Page 51

1     Q.  We can pull the specific medical records
2  during a break if you would like.  The records
3  indicated that you went back and you -- the
4  fracture was healing.  This was at the fifth
5  meticarsal in your left foot, and you were moved
6  from a cumbersome brace to an air splint.
7     A.  That was when I was single, not the
8  '90's.  50 years ago I don't remember that at
9  all in my left foot.
10     Q.  Would you have any reason to dispute the
11  medical records from your doctors?
12     A.  I'm just trying to say I don't know what
13  foot you're talking about.
14     Q.  We're talking about your left foot.
15     A.  My left foot?
16     Q.  November 22, 1994.
17     A.  Okay.  I don't know what I was -- I
18  don't know what happened with my foot there.  I
19  don't remember fracturing my ankle.
20     Q.  Okay.  I understand that.  This is a
21  long time ago.  You may not remember the
22  specifics, but would you have any reason to
23  doubt what's contained in your medical records
24  regarding that incident?

Page 52

1     A.  I would have to see it.
2     Q.  Well, we can pull that for you.
3          On March 7, 1995 your records
4  indicated that you were involved in a rear end
5  car accident.  Is that the same incident that we
6  discussed earlier regarding the personal injury
7  lawsuit?
8     A.  I'm pretty sure that's the one.
9     Q.  At that time at Palos Community Hospital
10  they performed x-rays of your cervical spine,
11  which showed a mild to moderate degree of muscle
12  spasms.  Do you recall going in for x-rays as a
13  result of that car accident?
14     A.  Yes.
15     Q.  Do you remember going for physical
16  therapy following that?
17     A.  Yes.
18     Q.  Do you recall having back pain as a
19  result of that car accident?
20     A.  I don't remember the back pain because
21  the neck pain was so bad I can't recall.  I
22  mean, I was concentrating on the neck.
23     Q.  So you may have had back and neck pain,
24  but your neck pain was so severe that that's

Page 53

1  what you remember?
2     A.  Uh-huh, yes.
3     Q.  On April 24, 1995, you went in for
4  orthotics to fit in your shoes.  Do you recall
5  wearing orthotics in your shoes?
6     A.  Yes, for a short period of time.
7     Q.  Have you been back for orthotics any
8  time since 1995?
9     A.  I don't remember.
10     Q.  You don't remember?
11     A.  No.
12     Q.  When was the last time you wore them?
13     A.  After the reflexologist told me I didn't
14  need them.  I think that was in the 90's.
15     Q.  Do you recall being seen for back pain
16  during the mid '90's?  We can go through each
17  record or if you have a general recollection of
18  going --
19     A.  If I did go, I don't know who I saw.
20     Q.  But do you remember generally having
21  back pain in the mid '90's that you continually
22  sought treatment for from your doctors?
23     A.  Not at that time.  I don't remember at
24  that time.  I'm being truthful.  You've got all

14 (Pages 50 to 53)

Prendergrast  v. Kohl's                                    4/9/2008                                    Carmel  Prendergrast

Page 54

1  of it.  I don't recall.
2      Q.  It seems your left heel began having
3  problems again after a vacation to Kentucky
4  where you did a lot of walking.  Do you recall
5  that?  This would have been July 24, 1995.
6      A.  I went to Kentucky?  I don't remember.
7      MR. PITTACORA:  Maybe there is another
8  Carmel Prendergast.
9  BY MS. WOODWORTH:
10     Q.  This time the exam revealed the
11  beginning of your plantar fascitis.
12     A.  Well, if that's what he said maybe that
13  happened.  It's a possibility.
14     Q.  That must have been you then?
15     A.  It must have been me.
16     Q.  In September of 1995 you went -- began
17  going to Health South following some headaches
18  that you were having after dancing at a wedding
19  and pain in your cervical spine on the left
20  side.
21     A.  Health South?  That was '95?  Okay.
22  What did they say?
23     Q.  This was September, 1995.  Patient
24  states they was dancing at a wedding.  She

Page 55

1  started to experience significant headaches and
2  pain in the latter of the cervical spine on the
3  left.  Was that before or after the car
4  accident?
5      A.  The car accidents --
6      Q.  This record indicated in this specific
7  record that you had a significant history of
8  whiplash from your injury on February 28, 1995.
9  So this would have been following the car
10  accident.
11     A.  So maybe I went for a checkup.
12     Q.  So that would have been about seven
13  months after your car accident.  Do you remember
14  having back and neck pain seven months after
15  your car accidents?
16     A.  I probably did.
17     Q.  It continued that long, okay.
18     A.  If I saw him, I must have.
19     Q.  On July 3, 1996 another MRI was
20  performed.  This was done by Dr. Elias,
21  E-l-i-a-s.  Do you recall having another MRI
22  done in July of 1996?
23     A.  For what and where?
24     Q.  This would have been at Health South as

Page 56

1  a result of back pain.  The MRI showed mild
2  degenerative changes at multiple cervical
3  levels.
4      A.  Who ordered that?
5      Q.  I get to ask the questions.
6      A.  Oh, I don't remember that.
7      Q.  Okay, you don't remember it.  Well, we
8  can pull the specific records.
9          But if your records indicate that
10  you had an MRI of your spine in July of 1996,
11  would you have any reason to disagree with
12  that?
13     A.  If I knew the purpose of the MRI.  What
14  was the purpose of the MRI?  Was it to -- I
15  don't know what the purpose of the MRI was.
16     Q.  My laymen's understanding of an MRI is
17  when you present with back trouble is that an --
18     A.  I would like to know who ordered it, and
19  then I would know why I was given one.
20     Q.  Your car accident occurred in February
21  of 1996.  In August of 1996, about six months
22  later, your records indicated that you were
23  still feeling lower back pain at that time.  Do
24  you recall how long your back pain continued,

Page 57

1  your back and neck pain continued after the car
2  accident?
3      A.  I doctored because I was having cervical
4  pain.
5      Q.  What do you mean you doctored?
6      A.  I went to the doctor because I was
7  having cervical pain, cervical neck pain.  Wait
8  a minute.  When did you say I had this accident,
9  in '95 or '96?  You got me going here.
10     Q.  The accident shows February 28, 1996.
11     A.  I thought you said it was '95.  I
12  thought it was in '95 you said.
13     MR. PITTACORA:  I believe the car
14  accident -- the car accident was '95, February
15  of '95.
16     THE WITNESS:  That's what I thought.
17  BY MS. WOODWORTH:
18     Q.  It may have been a mistake in your
19  medical records.  They had referred to your
20  vehicle accident in '96.
21     A.  So now we have some discrepancies in my
22  medical records, okay.
23     Q.  In August of 1998 you had presented to
24  Palos Community Hospital to the ER with an

15 (Pages 54 to 57)

Page 58

1  injury to your left hand after falling at your
2  house at night and striking your hand on
3  something in the house. Do you recall that
4  incident?
5      A. Yes. I fractured my left hand.
6      Q. Do you know what caused you to fall that
7  night?
8      A. Maybe I tripped over the cat. I don't
9  know. I don't remember.
10     Q. Have you tripped over the cat before?
11     A. Sometimes she's in the way. I don't
12  have her now. She's deceased.
13         MR. PITTACORA: Nancy, can we take a
14  quick bathroom break?
15         MS. WOODWORTH: Yes, absolutely.
16             (Whereupon, a recess was
17              taken.)
18  BY MS. WOODWORTH:
19     Q. Mrs. Prendergast, before the break we
20  were discussing a trip to the ER following a
21  fall at your house at night where you injured
22  your left hand and fractured it. Next we're
23  going to move on to your visit -- the first
24  visit I have record of is to the Illinois Heart

Page 59

1  and Vascular Association. Do you remember when
2  you first started going to that health care
3  organization?
4      A. The exact year, no.
5      Q. Do you remember the decade, whether it
6  was more than ten years ago?
7      A. Within the last ten years maybe.
8      Q. That would be about accurate. My first
9  record was in November -- November 21, 2001.
10  And you saw Dr. Levin for heart palpitations?
11     A. Yes.
12     Q. Is 2001 the year that you began having
13  that problem or had it been going on for a
14  couple of years before that?
15     A. I don't think so. I don't remember if
16  it was 2001, but I did go to see him for that
17  purpose.
18     Q. Do you remember your diagnosis at that
19  time?
20     A. I'm trying to think. I think he said a
21  slight case of mitrovalve prolapse.
22     Q. Do you recall what symptoms you were
23  experiencing that led you to go see this doctor?
24     A. My heart was racing and skipping

Page 60

1  beats.
2      Q. And you were feeling anxious at that
3  time; is that right?
4      A. Not anxious. I just wanted to know why
5  this is happening.
6      Q. Okay.
7      A. I didn't want to have a heart attack.
8      Q. Your cardiac evaluation from it says
9  when it occurs you become anxious, flushed, and
10  develops a knot in your throat. Does that
11  describe the symptoms that you were feeling at
12  that time?
13     A. At that time.
14     Q. What did he -- were you treated for the
15  mitrovalve prolapse?
16     A. It wasn't necessary, no.
17     Q. Did the doctor tell you it wasn't
18  necessary?
19     A. Yes.
20     Q. Was it treated with medication?
21     A. No. He said I didn't need any
22  medication.
23     Q. Does that mean that it wasn't -- what
24  else did he tell you about the --

Page 61

1      A. It was mild. So it didn't need
2  medicine.
3      Q. At that time Dr. Levin prescribed
4  Provecol for you. Do you recall taking that
5  medication?
6      A. Briefly.
7      Q. And was that for your heart
8  palpitations?
9      A. No.
10     Q. What was the Provecol for?
11     A. I believe that's for cholesterol.
12     Q. How long did you take Provecol?
13     A. I don't recall.
14     Q. Did you take it within the last five
15  years?
16     A. No.
17     Q. Cholesterol is fine now?
18     A. I stopped taking it.
19     Q. You stopped taking it because your
20  cholesterol was okay?
21     A. No, I take natural. I take natural
22  things.
23     Q. Mrs. Prendergast, do you recall in July
24  of 2002 having another fall where you injured

16 (Pages 58 to 61)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 62

1   your back?
2       A.  2002, July?
3       Q.  July, 15, 2002 you had a follow-up visit
4   with Dr. Levin, and your complaint was back pain
5   after recently falling and injuring your back.
6       A.  Why would I see a heart doctor for my
7   back?
8       Q.  My question is do you recall a fall
9   where you injured your back?
10      A.  No.
11      Q.  Do you recall taking Lipitor at that
12  time?
13      A.  I don't know if I ever took Lipitor.
14      Q.  If your doctor prescribed Lipitor, would
15  you have taken it?
16      A.  If he wanted me to try it I would have
17  tried it, but I don't remember him saying that I
18  had to take it.  Maybe he did.  I don't
19  remember.  I don't recall.  I don't take any
20  stay on drugs, and he knows it.
21      Q.  In October of 2002 the records indicated
22  that you went back to Palos Community Hospital
23  for another x-ray on your right foot.  Do you
24  recall if there was an incident that caused you

Page 63

1   to go have an x-ray on your foot?
2       A.  Yes.  I believe the doctor ordered it.
3       Q.  Was there a fall or something that
4   caused pain in your foot?
5       A.  I don't think there was a fall.  I know
6   he was concerned about my foot.  The doctor was
7   concerned about my foot.
8       Q.  Because it was causing you pain?
9       A.  Uh-huh.
10      Q.  Do you recall having an MRI done in May,
11  2003 at Chicago Ridge Radiology?
12      A.  Who ordered that one?
13      Q.  Dr. -- I'm going to spell that for the
14  court reporter.  S-e-p-a-h-d-a-r-i, Sepahdari.
15      A.  He is the radiologist or he is the
16  doctor ordering it?
17      Q.  His name is listed on the MRI.
18      A.  I remember going to Chicago Ridge
19  Radiology, yes.
20      Q.  And you remember having an MRI
21  performed?
22      A.  Yes.
23      Q.  Do you recall the results of that MRI?
24      A.  I think it was given to the doctor who

Page 64

1   ordered it.
2       Q.  Did they discuss those results with
3   you?
4       A.  Nothing has changed in my back.
5       Q.  So they told you your back was fine?  Is
6   that what you are telling me?
7       A.  Status quo.
8       Q.  So you were still experiencing pain?
9       A.  Not all the time.
10      Q.  But enough that they would do an MRI?
11      A.  There must have been a reason for the
12  MRI.  The doctor must have ordered that for a
13  purpose.
14      Q.  The MRI results showed right paracentral
15  disc protrusion at L4-L5 and L5-S1 and lesser to
16  the extent at L5-S1.
17      A.  So it's been the same since you said 20
18  years ago.  It hasn't changed that much from
19  what you've read.
20      Q.  I'm not a doctor.  So I'm not going to
21  comment on your medical records.
22      A.  I don't know either.  It means it sounds
23  like it's the same as what you read 20 years
24  ago.

Page 65

1       Q.  So you continued to have the same
2   problems over those 20 years with your back?
3       A.  I don't think those are problems.  I
4   don't think I went there for a problem.  I think
5   I went there for a reason.  The doctor must have
6   ordered it for something.
7       Q.  Would you agree with me that an MRI
8   would not be ordered unless you presented with a
9   complaint of back pain?
10          MR. PITTACORA:  Objection, as to
11  speculation.  I don't know if the witness would
12  know that, but if you know you can answer.
13          THE WITNESS:  That's why I want to know
14  who ordered the MRI.  Then I'll know why I went.
15  If it was for a doctor to do something so he can
16  make sure I'm okay, what's going on with me,
17  then I'll know why.  That's not the doctor who
18  ordered it because that's not my doctor.
19  BY MS. WOODWORTH:
20      Q.  Do you recall in October, 2003, going
21  into the ER for a right foot injury?
22      A.  I can't remember why I went in there for
23  the right foot injury.  I don't know what
24  happened there.

17 (Pages 62 to 65)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 66

1    Q.  Your records indicated that you twisted
2  your right foot and you heard a crack and had
3  pain in your right foot.
4    A.  Now I remember when you tell me.  Now I
5  remember why I went in.
6    Q.  What happened?
7    A.  I don't know.  I probably fractured my
8  ankle.
9    Q.  Do you remember taking Vicodin for
10 pain?
11   A.  Did the doctor order that at that time?
12   Q.  I'm asking you if you remember taking
13 Vicodin at that time?
14   A.  If he ordered it, I took it.
15   Q.  About a week later you went back to the
16 doctor to have -- complaining of pressure from
17 the cast to have that removed.  Do you recall
18 wearing a cast following that fracture?
19   A.  Yes.
20   Q.  And how did your foot do after the cast
21 was removed?
22   A.  Fine.
23   Q.  Didn't have anymore pain?
24   A.  I was put in some kind of a walking

Page 67

1  boot.
2    Q.  A walking boot?
3    A.  And it healed perfectly.
4    Q.  Healed perfectly?
5    A.  No problem.
6    Q.  Oh, great.
7        How long have you been going to the
8  Christ Women's Health Center?
9    A.  Maybe within the last -- I can't
10 remember, last five, six years to the best of my
11 recollection.
12   Q.  And what led you to start going there?
13   A.  My sister-in-law, her doctor is there,
14 and she said they are good doctors.
15   Q.  So did you begin going there as a result
16 of a problem or just for your annual exam?
17   A.  It was a good women's center to go to.
18   Q.  So you began going there for your annual
19 exams?
20   A.  Right.
21   Q.  The first record I show from Christ
22 Women's Health Center was in October,
23 October 19, 2004?
24   A.  That was the first time I went there.

Page 68

1    Q.  I don't know.  I would like to know from
2  you if you think you started going there before
3  that.
4    A.  I don't think so.
5    Q.  On March 10, 2005, the records indicated
6  that you went back to Dr. Will as a result of
7  your heart skipping and more palpitations.  Do
8  you remember that incident?
9    A.  Probably went for a checkup.
10   Q.  Do you remember him giving you any
11 medications at that time?
12   A.  It's a she.  No.
13   Q.  She.  At that time she listed that the
14 medications that you were taking were Vicodin,
15 as needed for disc herniation, Skalexin as
16 needed, Amoxicillin, Metrogel, and Shaklee for
17 cholesterol.
18   A.  No, I didn't take anything for
19 cholesterol.  Oh, Shaklee, S-h-a-k-l-e-e?
20   Q.  Yes.
21   A.  Right, that's right.
22   Q.  Were you taking cholesterol medication
23 at that time?
24   A.  That's not cholesterol.  It's

Page 69

1  vitamins.
2    Q.  It says for cholesterol.
3    A.  That's for cholesterol.
4    Q.  It's both?
5    A.  It's vitamins for cholesterol.
6        MR. PITTACORA:  I think that's part of
7  the natural supplement that she testified that
8  she was taking for cholesterol.
9        MS. WOODWORTH:  Okay.
10 BY MS. WOODWORTH:
11   Q.  At that time, March 25, 2005, you had
12 already seen a Dr. Piracha (phonetic) and talked
13 to him about a claustrophobic sensation that you
14 were feeling as a result of the heart
15 palpitations.  Do you recall that?
16   A.  She's the heart specialist, and I wanted
17 my heart checked out.  She checked my heart out
18 because I wanted to know what was going on, and
19 she checked me out thoroughly.
20   Q.  So you remember seeing her?
21   A.  I remember seeing her.
22   Q.  Do you remember the conversations that
23 you had with her about your symptoms at that
24 time?

18 (Pages 66 to 69)

Page 70

1    A.  No, just about the palpitations.  She's
2  a heart specialist.  She knows more about it
3  than I do.
4    Q.  She stated that the patient has had
5  chest discomfort which feels like anxiety and
6  uncomfortable sensation in her chest.  This
7  occurs mainly after eating.  She noted increased
8  stress in her life.  She tends to feel a
9  claustrophobic sensation and mainly with
10  shortness of breath.
11      Do you remember having shortness of
12  breath at that time?
13    A.  If she said it, I must have.  I don't
14  remember that.
15    Q.  She also complains of being tired.
16  She's had prior palpitations or flutters.
17    A.  Yeah, that's right.
18    Q.  So at this time would you get tired when
19  you were walking or being very active?
20    A.  I haven't had any problems recently.
21    Q.  Well, actually this was back in March of
22  2003.
23    A.  Yeah, yeah, 3, okay.  At that time I was
24  having those problems.

Page 71

1    Q.  July 29, 2005, you had another -- this
2  is about the third ultrasound in the record on
3  your pelvis where they had noted ovarian
4  calcifications.
5    A.  Is that --
6    Q.  This is from the Christ Women's Center.
7    A.  She was doing a yearly ultrasound on my
8  pelvic area.
9    Q.  Are you claiming any injuries as a
10  result of your fall at Kohl's that are -- that
11  you sought treatment for at the Women's Health
12  Center?
13    A.  What do you mean?
14    Q.  You've been back to the Women's Health
15  Center every year for your annual exam?
16    A.  I go there, yes.
17    Q.  Are there any injuries that you are
18  seeking treatment for from them that are as a
19  result of your fall at Kohl's?
20    A.  At this time?
21    Q.  Yes.
22    A.  No.
23    Q.  There weren't any gynecological problems
24  that resulted from your fall?

Page 72

1    A.  There was one where we thought it was
2  something to do with the fall.  Dr. Pervise
3  (phonetic) ordered an exam, a test, and I think
4  that could have been part of the fall.
5    Q.  And what did the doctor find?  Do you
6  recall what kind of test they performed at that
7  time?
8    A.  I saw three doctors on three days.  I
9  don't remember.  I had to go through a CT
10  scan.
11    Q.  And did they determine that that problem
12  was somehow related to your fall?
13    A.  I don't remember what their results --
14  what their final diagnosis was in regards to
15  that.
16    Q.  What problem were you having that you
17  attribute to the fall?
18    A.  A lot of pain.  I still have pain, pain
19  in areas that I hadn't had before.
20    Q.  And what makes you attribute that to a
21  fall that you had?
22    A.  Well, I didn't have the pain before and
23  I have it after the fall, so you wonder about
24  the association.

Page 73

1    Q.  Well, I suppose if I had a fall and
2  didn't hit my nose, I wouldn't later if I had
3  pain in my nose think it was related.  So I'm
4  trying to figure out the --
5    A.  It wasn't later.  It wasn't that much
6  time after.
7    Q.  Okay.  I'm trying to determine if you
8  hit a certain area of your body when you fell
9  that caused gynecological problems?
10    A.  Oh, I don't know if that was
11  gynecological problems.  I don't know what they
12  said.  Who are you talking about now?
13    Q.  I'm talking about the treatment that you
14  received at the Christ Women's Health Center.
15    A.  But I didn't go there at that time for
16  that.
17    Q.  Okay.
18    A.  I did.  You know, you've got me all
19  mixed up here on dates and times and what I'm
20  doing.  Start over with the question on that
21  page, please.  I don't know where you are going.
22  I don't know what you're asking me.  Start over,
23  please.
24      MR. PITTACORA:  Let me just interpose a

Page 74

1  statement here. She gets to ask the questions.
2  You have to answer them. If you don't
3  understand her question, you can simply ask her
4  to repeat it or rephrase it. You can ask the
5  court reporter to read it back. So if you --
6  just say you don't understand the question, and
7  I'm sure she will be happy to rephrase it or
8  restate it.
9        THE WITNESS: I'm sorry.
10       MR. PITTACORA: You can't -- you're not
11  suppose to be asking her questions.
12       THE WITNESS: Okay, sorry. Excuse me.
13       MR. PITTACORA: She's actually being
14  nicer than I would.
15       THE WITNESS: I'm sorry.
16       MR. PITTACORA: No, it's okay.
17       THE WITNESS: So please repeat the
18  question if you can.
19  BY MS. WOODWORTH:
20    Q.  I'll tell you what. I'll come back to
21  this when we get to your treatment following the
22  incident, okay?
23    A.  Okay. Sorry about that.
24    Q.  Mrs. Prendergast, on September 12, 2005,

Page 75

1  you had another MRI done?
2    A.  Okay, I think.
3    Q.  Do you remember having an MRI done at
4  that time?
5    A.  I didn't know I had that MRI done, no.
6  Where was that done? Please tell me.
7    Q.  Okay. The doctor that performed the MRI
8  was Dr. Bauer, and the complaint that gave rise
9  to that MRI was low back pain. The impression
10  from the MRI was multiple level spondylosis with
11  severe spinal stenosis at L4-L5 and moderate
12  spinal stenosis at L3-L4.
13    A.  I can't ask a question.
14    Q.  Do you recall having an MRI done?
15    A.  What's the date again?
16    Q.  September 12, 2005.
17    A.  I think so.
18    Q.  Do you recall having back pain at that
19  time that led the doctor to give you an MRI?
20    A.  I'm not sure. There must have been --
21  I'm not sure put it that way.
22    Q.  Mrs. Prendergast, I understand that
23  you're not going to remember the specific
24  conversation that you had with your doctor. If

Page 76

1  your MRI records showed that your chief
2  complaint was low back pain, would you have any
3  reason to dispute that?
4    A.  No. I don't know who that doctor is.
5    Q.  Mrs. Prendergast, I think we've covered
6  your prior medical history. So we're going to
7  change it up now.
8        Had the doctors ever told you to
9  avoid lifting heavy objects as a result of your
10  back pain?
11    A.  Over the years, be careful.
12    Q.  Over the years they've advised you to
13  maintain a healthy diet and lose weight that
14  would reduce back pain?
15    A.  (Nonverbal response.)
16    Q.  Yes?
17    A.  Yes.
18    Q.  They have also advised you not to lift
19  heavy objects?
20    A.  I would say so to the best of my
21  recollection.
22    Q.  Are there any other activities that you
23  would avoid as a result of your back pain?
24    A.  At this time?

Page 77

1    Q.  No. I'm talking about before your
2  incident at Kohl's.
3    A.  I did pretty much everything.
4    Q.  You just lived with the pain?
5    A.  And I -- you know, you treat your back
6  right.
7    Q.  What do you mean by treat your back
8  right?
9    A.  Well, you just go to back school and you
10  learn how to do things properly. That's what
11  they teach you.
12    Q.  By back school are you referring to
13  physical therapy?
14    A.  There and through the doctors, yes.
15    Q.  So that includes seeking treatment when
16  you are having pain?
17    A.  Right.
18    Q.  So would you agree with me -- after
19  we've gone through your medical records since
20  1988, which is 20 years ago, would you agree
21  with me that you've had back pain since 1988?
22    A.  On and off.
23    Q.  On and off.
24        But it's been a reality for you

20 (Pages 74 to 77)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 78

1 every year at some point during that time?
2     A. You live with it.
3     Q. Do you have a family physician that you
4 see regularly now?
5     A. I've been seeing Dr. Will. I haven't
6 seen her recently, but she's my family doctor.
7     Q. When was last time you saw her?
8     A. '05. I think it was -- no, '06.
9     Q. When was the last time you saw any
10 doctor for any type of problem?
11    A. Within the last year you're talking
12 about. Probably within the last year.
13    Q. Who is that?
14    A. Dr. -- what's her name? It's my
15 gynecologist, but that's my routine checkup.
16    Q. And that was just an annual exam?
17    A. Uh-huh.
18    Q. Before that?
19    A. For my shoulder.
20    Q. Which shoulder?
21    A. My left shoulder.
22    Q. This was just because you're
23 experiencing pain?
24    A. After I fell, yes.

Page 79

1     Q. Are you attributing shoulder pain to
2 your fall?
3     A. Yes.
4     Q. Are you a smoker?
5     A. No.
6     Q. Ever smoked?
7     A. No.
8     Q. Mrs. Prendergast, we've discussed a
9 number of visits that you have had to the ER
10 during the course of the past 20 years. Are
11 there any other ER visits that we haven't talked
12 about today that you recall?
13    A. I didn't even remember those, no. I
14 remembered a couple of ones that you were
15 talking about. None that I can recall at this
16 time.
17    Q. I'm going to talk to you more about the
18 pain medication that you've taken over the
19 years. We've discussed the Vicodin that you've
20 taken off and on when it's been prescribed for
21 you over the years. What other pain medications
22 have you taken for back pain?
23    A. The Skelaxin is a muscle relaxant.
24    Q. Do you have any side effects from the

Page 80

1 Skelaxin?
2     A. No, because I take it at bed time, and I
3 take half the dose he told me to. So I cut it
4 in half.
5     Q. Do you only take it at bed time?
6     A. If I need it. I haven't taken it in
7 months.
8     Q. How about the Vicodin? Would you just
9 take it as needed during the day?
10    A. Maybe once or twice a month if I really
11 need it, and it depends on how bad the pain is.
12 I haven't had a prescription filled on that in
13 years.
14    Q. Have any of your doctors talked to you
15 about back pain being chronic and that it may
16 never go away?
17    A. I think my last doctor has.
18    Q. Who was that?
19    A. Bovendram (phonetic).
20    Q. Where is Dr. Bovendram?
21    A. Rush.
22    Q. When did he tell you that, Bovendram?
23    A. I can't remember the last time I saw
24 him. I saw him in December of '05 or January of

Page 81

1 '06.
2     Q. How about early on when the doctors
3 first noted the degenerative changes in your
4 back?
5     A. I don't recall any conversations with
6 those doctors. That's too far back. No one has
7 ever said that it won't go away.
8     Q. Oh, right, no one can predict that, but
9 I'm saying have doctors indicated to you that
10 back pain is something you may continue to
11 experience for the rest of your life?
12    A. And sometimes it can be exasperated,
13 yes.
14    Q. What exactly did they say?
15    A. I don't remember. I mean, I don't take
16 a tape recording with me.
17    Q. Are there any conversations that you
18 remember?
19    A. No.
20    Q. Have you ever had any type of surgery?
21    A. I only had a laporoscopy my whole life.
22 That's all I had. I consider that surgery.
23    Q. When was the laporoscopy?
24    A. '89.

21 (Pages 78 to 81)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 82

1    Q. Where did you have that done?
2    A. St. Joseph's Hospital. I'm not sure if
3  it was '89 either. I have no idea.
4    Q. What's your understanding of the
5  laparoscopy?
6    A. They just go in and clean out your
7  ovaries to see what's going on if you want to
8  get pregnant.
9    Q. Are there any other surgeries that you
10  recall happened during your life?
11    A. None.
12    Q. Do you recall ever going to your doctor
13  and complaining of feet swelling?
14    A. No.
15    Q. How about around the time that you had
16  the plantar fascitis problems?
17    A. Plantar fascitis.
18    Q. Yes, thank you.
19    A. I don't remember if my feet was swelling
20  at that time.
21    Q. Have you ever complained to any of your
22  health care providers about difficulty
23  walking?
24    A. Just when that foot was bad, not now.

Page 83

1    Q. How about as a result of any of those
2  prior falls that we have discussed?
3    A. No.
4    Q. Have you had issues sleeping over the
5  years?
6    A. No, thank God.
7    Q. In order to make sure we've covered
8  everything in your medical history, I want to go
9  through a few final points.
10        When is your first recollection of
11  being diagnosed with degenerative disc disease?
12    A. Maybe 10, 15 years ago. I don't know.
13  It must be more than 10 years ago. More than 10
14  years ago.
15    Q. Do you recall who diagnosed you with
16  that?
17    A. No.
18    Q. Do you recall what hospital?
19    A. No. It's been so long ago.
20    Q. Do you recall what first diagnosed you
21  with chronic low back pain?
22    A. You want a specific doctor on what time?
23    Q. Yes.
24    A. I don't remember the specific doctor.

Page 84

1    Q. Do you recall what hospital or health
2  care institution? Would this have been the same
3  time period as the degenerative disc disease 10
4  to 15 years ago?
5    A. Probably.
6    Q. Do you recall the first time you were
7  diagnosed with a herniated disc?
8    A. That was about -- I think from what you
9  said and according to my records in the '80's,
10  early '90. I'm not sure.
11    Q. Other than the car accident that we
12  discussed have you been diagnosed with whiplash
13  any other time?
14    A. Not that I can recall.
15    Q. Have you ever sprained your lower back
16  while lifting something heavy?
17    A. No, not to my recollection. I don't
18  lift anything heavy.
19    Q. Mrs. Prendergast, I want to ensure that
20  I have the records from your physical therapy
21  treatment. Could you give me a list of the
22  places where you've sought physical therapy?
23    A. Just off the top of my head, no.
24    Q. Are there numerous different

Page 85

1  institutions?
2    A. I would have to look and see myself. I
3  can't -- whatever is in the record according to
4  what -- you mentioned one, I think, whatever you
5  said CORE. I think I remember going to them.
6  Off the top of my head I can't remember all of
7  them.
8    Q. About how many are there?
9    A. I have no idea.
10    Q. More than three?
11    A. Probably.
12    Q. More than five?
13    A. I don't think so. I don't know.
14    Q. Somewhere between three and five?
15    A. Sounds like a good number.
16    Q. How long have you been wearing
17  eyeglasses?
18    A. Gee, if you would have told me all these
19  questions, I would have had all this information
20  down for you. You mean the ones I wear all the
21  time?
22    Q. Yes.
23    A. Maybe the last ten years maybe or less.
24  I'm not sure.

22 (Pages 82 to 85)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 86

1    Q.  Who is your eye doctor?
2    A.  I go to Midwest Eye Center.
3    Q.  Do you go anywhere else?
4    A.  For my glasses, prescription, I go to
5  two different places.
6    Q.  What's the other place?
7    A.  Dr. Helsel.
8    Q.  Can you spell that?
9    A.  H-e-l-s-e-l.
10    Q.  Where is Dr. Helsel?
11    A.  On College Drive.
12    Q.  At what facility?
13    A.  I just went there the other day.  I
14  don't know the name.
15    Q.  When did you first start complaining to
16  your eye doctor about headaches?
17    A.  After I fell and hit my head.
18    Q.  How long after the fall was that?
19    A.  I've been getting headaches since I
20  fell.
21    Q.  My question was how long after you fell
22  did you seek treatment for your headaches?
23    A.  I would say within a month or so or two.
24  I'm not sure of the exact date.

Page 87

1    Q.  Let's talk about the Kohl's store.  This
2  incident occurred at the Kohl's store located in
3  Orland Park?
4    A.  Yes.
5    Q.  Is the address of the store 3 Orland
6  Park Place?
7    A.  I'm not sure of the address, but it's in
8  Orland Park.
9    Q.  How many times have you been to the
10  store before this incident?
11    A.  That was my first time there.
12    Q.  First visit.
13       Had you been to any other Kohl's
14  stores before?
15    A.  Yes.
16    Q.  Which other ones had you gone to?
17    A.  Crestwood.
18    Q.  In Westwood?
19    A.  Crestwood.
20    Q.  How many times have you been to that
21  Kohl store?
22    A.  Many times.  I can't count.
23    Q.  Are those the only two Kohl stores you
24  visited?

Page 88

1    A.  Yes.
2    Q.  Can you describe the outside of the
3  Orland Park store for me?
4    A.  The facade you mean?  It's like a
5  regular store with a doorway to go in and a
6  sidewalk.  You get off the curb, you walk off
7  the sidewalk, and you go into the doors.
8    Q.  How many entrances are there?
9    A.  The usual, two in and two out.  You mean
10  to the store?  There is one on the side I
11  entered facing LaGrange, and there is one in the
12  back, I think.  I'm not sure.
13    Q.  Is there one set of doors that faces
14  LaGrange or more than one set of doors?
15    A.  Two doors -- two that go in and two that
16  go out.  That's what I think I remember.  I'm
17  not sure.
18    Q.  As you're facing the front of the store
19  is the door to go in on the right or the left?
20    A.  The way they are usually set up I'm
21  assuming it's on the right.
22    Q.  Do you or your husband have a Kohl's
23  card?
24    A.  Yes.

Page 89

1    Q.  Is it in your name or his?
2    A.  I think one is in mine and one is in
3  his.  I'm not sure.
4    Q.  How long have you had it?
5    A.  For years.
6       MR. PITTACORA:  Loyal customers,
7  Nancy.
8       THE WITNESS:  Do you want me to get it
9  out and show you?
10  BY MS. WOODWORTH:
11    Q.  Do you regularly use that card for
12  purchases?
13    A.  Frequently.
14    Q.  Do you recall when you first signed on
15  for that Kohl's card?
16    A.  I'll dig it up if you want me to.  Do
17  you want me to?
18    Q.  Sure.
19       MR. PITTACORA:  Does it tell you a
20  member since when?
21       THE WITNESS:  Uh-huh, since 1995.
22  BY MS. WOODWORTH:
23    Q.  So you have been shopping at Kohl's
24  since 1995?

23 (Pages 86 to 89)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 90

1    A.  Correct.
2    Q.  Is the Crestwood store closer to your
3  home?
4    A.  Yes.
5    Q.  And is that why you go to that one --
6    A.  More often.
7    Q.  -- more often?
8        How far is the Orland Park store
9  from your home?
10    A.  I would say they're about roughly 20
11  miles away.  I'm not sure.
12    Q.  So what caused you to go to that Kohl's
13  store on that particular day?
14    A.  There are lots of places to eat at and
15  shop at over there.
16    Q.  So you had a whole day planned out for
17  that day?
18    A.  Yes.
19    Q.  How many times since 1995 do you think
20  you've been to that Crestwood store?
21    A.  I couldn't even tell you the number of
22  times.  Too many.
23    Q.  Do you go several times a year?
24    A.  Probably.

Page 91

1    Q.  Is the store set up -- is the outside of
2  this store set up the same way as the Crestwood
3  store?
4    A.  No, it's a different situation.  I mean,
5  the facade is -- the doorways are, yes.
6    Q.  The front entrances are generally the
7  same?
8    A.  Yes.
9    Q.  I'm going to give you a copy of this.  I
10  would like to show you a photograph,
11  Mrs. Prendergast.  Do you recognize the two
12  photographs on this case?
13    A.  Yes, I do.
14    MS. WOODWORTH:  I'm going to go ahead
15  and mark this as Deposition Exhibit A.
16        (Whereupon, Deposition
17        Exhibit A was marked for
18        identification.)
19    MR. PITTACORA:  Nancy, is this my copy?
20    MS. WOODWORTH:  Yes.
21  BY MS. WOODWORTH:
22    Q.  Mrs. Prendergast, does this picture
23  fairly and accurately depict the area outside
24  the Orland Park store where you fell?

Page 92

1    A.  Yes.
2    Q.  Could you please on the second
3  photograph mark the area -- the way that you
4  walked into the store?
5    A.  I walked in from here.  I was let off
6  here and walked this way (indicating).
7    Q.  Can you put arrows pointing to the
8  direction that you were walking?
9    A.  And there is the front door that way
10  going that way (indicating).
11    Q.  Could you circle the area where you were
12  dropped off in front of the store?
13    A.  Right here (indicating).
14    Q.  Thank you.
15        Who dropped you off at the store
16  that day?
17    A.  My husband Robert.
18    Q.  Was he going to wait in the car for
19  you?
20    A.  No.  I think he was going to go park the
21  car.
22    Q.  And he was going to join you inside the
23  store?
24    A.  Sometimes he will say I'll meet you

Page 93

1  here, I'll meet you there.
2    Q.  So your husband Robert dropped you off
3  at the curb in front of the store --
4    A.  Right.
5    Q.  -- near the entrance?
6        As you got out of the car did you
7  get out of the car -- could you mark where you
8  first stepped when you got out of the car?  Was
9  it before you crossed the yellow curb or was it
10  after?
11    A.  I'm not sure how close he was to the
12  curb.  So I don't know if I got out here or if I
13  got out there (indicating).
14    Q.  Just -- the court reporter is not able
15  to tell where we're pointing at.
16    A.  I'm not sure if I got off on to the
17  black pavement or on to the curb itself, the
18  sidewalk here by the curb -- before the curb or
19  after the curb you're asking me.  I'm not sure
20  if it was before or after the curb.
21    Q.  You're not sure whether you were dropped
22  off -- whether you got out of the car in the
23  parking lot area or on the sidewalk?
24    A.  Or on the sidewalk.  I think it was the

Real-Time Reporters, Inc.                    Ph# 312-578-9323
Real-TimeReporters.com                    Fx# 312-578-9235

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 94

1  sidewalk. I don't know. I can't recall how
2  close he was.
3      Q.  Could you describe the color of the curb
4  on the sidewalks?
5      A.  The curb is yellow.
6      Q.  And about how wide is the yellow
7  painting on the curb?
8      A.  I have no estimation or dimension, but
9  it's wide enough to see.
10     Q.  So you saw the yellow curb as you
11 stepped out of the car?
12     A.  Right.
13     Q.  So you looked down at the ground before
14 you stepped out of the car?
15     A.  I always do.
16     Q.  So when you stepped down and you noticed
17 the yellow curb, did you also notice what was in
18 front of the yellow curb?
19     A.  I can't remember.
20     Q.  At what point was -- could you describe
21 what's in front of the yellow curb for us?
22     A.  It's a rough, round -- it's a circle
23 patch of cement. It was very rough.
24     Q.  Circle patch of cement that's very

Page 95

1  rough. About how big in diameter is -- was this
2  circle of the rough patch of cement?
3      A.  I don't know. Let me see. Pretty big.
4  Fairly big. It looks small there, but it's
5  within the square (indicating).
6      Q.  Again, it's difficult for the court
7  reporter to tell when we gesture with our hands
8  how big something is.
9      A.  It's within a square of cement and it's
10 in the center. So I would say it's like almost
11 three-fourths of the square.
12     Q.  About how many feet would you
13 estimate?
14     A.  I have no idea what the dimensions are.
15 I didn't measure it.
16     Q.  Based on your recollection and your view
17 of the photograph, what would you estimate was
18 the diameter of the circle?
19     A.  I don't know how to estimate. I mean,
20 how would I estimate, you know? I don't know.
21     MR. PITTACORA:  If you don't know, you
22 don't know.
23     THE WITNESS:  I don't know. I can't
24 give you a dimension if I don't know. I don't

Page 96

1  have a tape measure to estimate how big it is.
2      MS. WOODWORTH:  I understand.
3  BY MS. WOODWORTH:
4      Q.  Would you say it was between one and
5  five feet wide?
6      A.  Probably. That's large, isn't it, five
7  feet.
8      Q.  Right. So you can estimate. So five
9  feet is too wide; is that right?
10     A.  I'm trying to think -- one whole section
11 of this table. It's pretty big. I don't know
12 how big the squares are, so I can't tell you how
13 big that is, but it's been patched from the curb
14 all the way up to the front door (indicating).
15     Q.  You were pointing at the photograph and
16 indicating to me that the rough patch of cement
17 ran from the yellow line all the way to the
18 front entrance of the store?
19     A.  No. The circle is the rough patch
20 that's been patched, but there is a crack that
21 has been patched from the curb all the way to
22 the front door. There is a part that includes
23 that circle.
24     Q.  Okay. But only --

Page 97

1      A.  So the circle is an extension. It
2  extends -- the crack goes all the way to the
3  front door.
4      Q.  And the circle is the only area that you
5  believe was rough?
6      A.  That's the only part that I tripped on,
7  my shoes tripped on. I never got beyond this
8  circle when I fell.
9      Q.  You told me before that five feet
10 sounded awfully wide. Would you say that the
11 diameter of the circle was between three and
12 four feet wide?
13     A.  I have no idea. I can't give you
14 dimensions. I didn't go over there and measure
15 it myself.
16     Q.  And you never went back to measure it?
17     A.  I never went back to measure it, no.
18     Q.  Did you ever go back to the store?
19     A.  Not to go in, no.
20     Q.  When did you go back to the store?
21     A.  Oh, I'm trying to think. I know my
22 husband went there, but I have not been to the
23 store since I fell.
24     Q.  Have you been back to their property

Real-Time Reporters, Inc.
Real-TimeReporters.com

Ph# 312-578-9323
Fx# 312-578-9235

Prendergrast v. Kohl's                4/9/2008                Carmel Prendergrast

Page 98

1  since you fell?
2      A.  I did not get out of the car.  I just
3  wanted to look and see.
4      Q.  Okay.  We'll get back to that.
5          So the first time you noticed -- you
6  hadn't been to the store before.  So the first
7  time that you noticed the rough patch of cement
8  is when you got out of the car when you were
9  dropped off?
10     A.  Right.
11     Q.  After you noticed it you continued to
12  walk across it to get into the entrance of this
13  store?
14     A.  I just proceeded, yes.
15     Q.  That square, was it flat?
16     A.  The part I was walking on was.
17     Q.  Okay.
18         So the pavement wasn't raised?
19     A.  No, just rough.
20     Q.  Did you feel that circle after you fell?
21  Did you rub your hand across it?
22     A.  It was rough.
23     Q.  My question was did you rub your hand
24  across it?

Page 99

1      A.  Yes.
2      Q.  Did it feel like sand paper?
3      A.  Rougher than sand paper.  Not smooth.
4      Q.  Not smooth, okay.
5          What's rougher than sand paper?
6  What do you mean by that?
7      A.  It was coarse.  It was coarse.  Sand
8  paper is smooth.  That's coarse.  It's coarse
9  cement.
10     Q.  Sand paper is smooth?
11     A.  Well, some of it is.  Some is fine.
12  It's cement.  It can't be compared to sand
13  paper.
14     Q.  Okay.  What about -- what is it about
15  this circle that you believe posed a hazard to
16  you?
17     A.  The roughness, my shoe catching it.
18     Q.  Is there anything other than the
19  roughness?
20     A.  Where it is, the location, roughness,
21  size.
22     Q.  Is that all?
23     A.  To the best of my recollection.
24     Q.  Now, the location, am I correct that

Page 100

1  it's located directly in front of a yellow
2  stripe along the curb?
3      A.  It's parallel to the yellow --
4      Q.  Parallel to the curb?
5      A.  Parallel to the curb.
6      Q.  About how far would you estimate the
7  circle is from the yellow curb?
8      A.  In the picture it doesn't look like it's
9  that far, but I don't know.  I didn't take
10  measurements.  I really don't know.
11     Q.  If you were standing 20 feet away from
12  this circular patch is this something that you
13  could see on the ground from that distance?
14     A.  20 feet away?
15     Q.  Yes.
16     A.  I don't know.
17     Q.  How about if you were standing 15 feet
18  away?  Is it something that's noticeable from 15
19  feet away?
20     A.  I can't give an opinion on that.  I
21  don't know.  I would have to go out there and
22  look again.
23     Q.  Ma'am, based on your perception of the
24  photographs that are sitting in front of you is

Page 101

1  that something that a person who is looking at
2  could notice from 15 feet away?
3          MR. PITTACORA:  Objection, asked and
4  answered and also asking her to speculate.  I
5  think she's already testified that she can't
6  estimate if you could see it or not without
7  going out and looking at it.
8          You can answer.
9          MS. WOODWORTH:  Could you please read
10  back the question.
11         (Whereupon, the record was
12         read by the court
13         reporter.)
14         MR. PITTACORA:  Same objection.
15         THE WITNESS:  I don't know.  Photos are
16  different than being there.
17         MS. WOODWORTH:  Okay.
18  BY MS. WOODWORTH:
19     Q.  If you were standing ten feet away from
20  that circle, do you think you could see it?
21     A.  I would still have to be in the presence
22  of the spot to make a judgment call on it.
23  Pictures are very different than being there.
24     Q.  But you were there and you saw it as you

26 (Pages 98 to 101)

Prendergrast  v. Kohl's                     4/9/2008                     Carmel  Prendergrast

Page 102

1   got out of the car?
2       A.  Right.
3       Q.  On the date of the incident, which was
4   November 17, 2005, do you recall what
5   medications you were taking that day?
6       A.  I don't recall any.  I don't think I was
7   taking any.  I can't recall.
8           MS. WOODWORTH:  Off the record.
9               (Whereupon, a recess was
10              taken.)
11  BY MS. WOODWORTH:
12      Q.  Mrs. Prendergast, I'm going to hand you
13  the Cook County EMS report form and on this form
14  the -- your patient information was taken down.
15  Do you recall the EMS personnel at the store
16  taking down your information?
17      A.  Yes.
18      Q.  They would have taken down your address
19  and the complaints of --
20      A.  Right.
21      Q.  -- what you had.
22          On that patient complaint the chief
23  complaint was pain in the left knee, and you
24  noted a history of herniated disc in your back,

Page 103

1   and the medications that are listed are Skelaxin
2   and Vicodin.
3       A.  That's -- what was the question asked
4   though?  That's not what I took.  They asked me
5   what medications have you taken.  I remember
6   that part, not that day; but, I mean, those are
7   the only medicines that I have had over the
8   years to take.
9       Q.  Okay.
10      A.  I didn't take them that day though.  I
11  know that.  To the best of my recollection I
12  don't take medicine on a regular basis.
13      Q.  So is it your testimony that the
14  question that they asked is what medication have
15  you taken in the past?
16      A.  In general, right, not that day.  That's
17  what I understood what they are asking me.
18      Q.  Okay.  Vicodin is a medicine to relieve
19  pain, correct?
20      A.  Right.
21      Q.  It has side effects of dizziness,
22  drowsiness.  Have you ever experienced those
23  side effects from Vicodin?
24      A.  No.

Page 104

1       Q.  Skelaxin, it's a muscle relaxant?
2       A.  At that time.
3       Q.  Is that right?
4       A.  Uh-huh, yes.
5       Q.  Did you consume any alcohol that day?
6       A.  No.  I don't drink.
7       Q.  Well, let's start -- what time did the
8   incident occur that day?
9       A.  Early afternoon to the best of my
10  recollection.
11      Q.  The incident report stated 12:45.  Does
12  that sound about right?
13      A.  Sounds right.
14      Q.  What did you do when you got up that
15  morning?
16      A.  I don't remember.  I mean, I have no
17  idea.  I don't know what I would do from one day
18  to the other.  I don't have a routine.  I just
19  get up, get dressed, take care of my family.
20      Q.  You stated before that the Orland Park
21  store is about 20 miles from your home and you
22  were probably going out there to go to a
23  restaurant.  Do you recall where else you went
24  before you went to the Kohl's store that day?

Page 105

1       A.  I believe that was our first stop and
2   our last that day.
3       Q.  Did you stop for lunch before that?
4       A.  No.  I think we had breakfast.  We all
5   ate breakfast.  I do remember that, and then we
6   went out.
7       Q.  Did you go out for breakfast or
8   breakfast at home?
9       A.  No, at home.
10      Q.  Was anyone else with you besides your
11  husband?
12      A.  No.
13      Q.  What were you wearing that day?
14      A.  Probably something I have on right
15  now.
16      Q.  Again, the court reporter --
17      A.  Jeans and a shirt and my white shoes and
18  jacket because it was kind of chilly.  It was a
19  winter chill.
20      Q.  Tennis shoes?
21      A.  No, they are SAS shoes, walking shoes.
22      Q.  What does SAS stand for?
23      A.  I don't know.  They are the ones I buy,
24  and I have them on now.

27 (Pages 102 to 105)

Prendergrast  v. Kohl's                                    4/9/2008                                    Carmel  Prendergrast

Page 106

1    Q.  Is SAS a brand?
2    A.  Brand.
3        MR. PITTACORA:  For the record they look
4  to be like gym shoes.  I don't know that you
5  would technically call them gym shoes.  They are
6  leather.  Looks like leather uppers, rubber
7  soles.
8        THE WITNESS:  They are walking shoes.
9        MR. PITTACORA:  I don't know if you
10  would want to run a marathon in them.
11       THE WITNESS:  No, you wouldn't.
12  BY MS. WOODWORTH:
13    Q.  So the shoes you were wearing on that
14  day were rubber soles?
15    A.  Yes.
16    Q.  Do you still have those shoes?
17    A.  I think they are the ones that I have on
18  now.
19    Q.  They are the ones you're wearing
20  today?
21    A.  Uh-huh.
22    Q.  Would you mind producing those to your
23  attorney?
24    A.  What do you mean?

Page 107

1    Q.  You know, not right now.
2    A.  To give them to him?
3    Q.  Yes.
4    A.  When he needs them, yes.
5        MR. PITTACORA:  Are you guys going to
6  buy her another pair of shoes?
7        THE WITNESS:  Are you going to buy me
8  some more?
9        MS. WOODWORTH:  You'll get them back.
10  BY MS. WOODWORTH:
11    Q.  Do you recall what day of the week it
12  was?
13    A.  No.
14    Q.  Which was the weather like that day?
15    A.  Sunshine and clear, brisk.
16    Q.  This incident occurred in 2005.  Were
17  the shoes new at that time?
18    A.  They were newer than they are now.
19    Q.  So you had probably purchased them
20  within the last year?
21    A.  Probably.
22    Q.  And do those shoes have tread on the
23  bottom of them on the bottom of the rubber
24  sole?

Page 108

1        MR. PITTACORA:  Yes.  So you don't have
2  to bend over and look at them, for the record
3  they look pretty worn.
4        THE WITNESS:  Now I need a new pair.
5  BY MS. WOODWORTH:
6    Q.  Have you ever worn orthopedic inserts in
7  those particular shoes?
8    A.  In these particular shoes, no.
9    Q.  Were you wearing any type of brace on
10  either leg at that time?
11    A.  No.  That much I remember.
12    Q.  Were your clothes damaged at all when
13  you fell?
14    A.  Torn?
15    Q.  Yes.
16    A.  No.
17    Q.  Was there any blood on your clothing?
18    A.  No.
19    Q.  It's generally your practice when you
20  are walking anywhere to keep an eye out where
21  you are going?
22    A.  Right.
23    Q.  And was it the same on this day when you
24  got out of the car, you were watching where you

Page 109

1  were going?
2    A.  Footage?
3    Q.  Yes.
4    A.  Always.
5    Q.  You looked at the ground, yes?
6    A.  Yes.
7    Q.  You looked up at the store?
8    A.  Right.
9    Q.  And you looked at the path in between?
10    A.  Right.
11    Q.  And you noticed the circle on the ground
12  and the crack that extended up to the store?
13    A.  Yes.
14    Q.  That was paved over.
15        You were paying attention?
16    A.  Right.
17    Q.  You were acting reasonably?
18    A.  Right.
19    Q.  Were you carrying anything?
20    A.  No, just my purse.
21    Q.  How large of a purse?
22    A.  This one here.  I didn't realize that I
23  had the same one (indicating).
24        MR. PITTACORA:  For the record, the

Real-Time Reporters, Inc.
Real-TimeReporters.com

Ph# 312-578-9323
Fx# 312-578-9235

Page 110

1    purse appears it's a brown purse.  It appears to
2    be approximately 18 inches by maybe 5 inches --
3    18 inches wide by 5 inches deep by 12 inches
4    high.  Would you agree with that?
5        MS. WOODWORTH:  That's fine.
6    BY MS. WOODWORTH:
7        Q.  Mrs. Prendergast, as you stepped out of
8    the car there was nothing obstructing your
9    view?
10       A.  No.
11       Q.  There was no other customer in your
12   way?
13       A.  No.
14       Q.  No shopping cart?
15       A.  No.
16       Q.  You weren't distracted by anything in
17   front of you?
18       A.  No.
19       Q.  And you weren't forgetful about what you
20   were doing or where you were going?
21       A.  No.
22       Q.  As you got out of the car you were going
23   to enter -- you were going to the front
24   entrance?

Page 111

1        A.  Yes.
2        Q.  And rather than drop you off -- rather
3    than drop you off at the handicap ramp where
4    there is no curb, you got out of the car right
5    in front of the yellow curb?
6        A.  Yes, because I was in a van and it's
7    kind of right there.
8        Q.  So as you got out of the van you had to
9    step down?
10       A.  Not as much as you would have to in a
11   car.  I mean, I don't know -- I guess you just
12   come from the car to there right on the
13   sidewalk.  I must have been on the sidewalk.  I
14   don't remember going on to the blacktop
15   (indicating).
16       Q.  Now, as you looked down at this circle
17   did you think that there was anything unsafe
18   about it?
19       A.  Not necessarily at that time.
20       Q.  How many steps did you take before you
21   stepped on that circle?
22       A.  It looks like one or two, one or two
23   steps.  I'm not sure or maybe three, one to
24   three.  It depends on how far it is.

Page 112

1        Q.  I understand you fell as you walked over
2    that circle; is that correct?
3        A.  Yes.
4        Q.  Did you see what caused you to fall
5    before you actually hit the ground?
6        A.  No.
7        Q.  But you believe it was this circular
8    area?
9        A.  I believe my foot caught on it, yes.
10       Q.  But you're not alleging that the circle
11   was raised.  It was just simply rough?
12       A.  No, it's not raised.  It's just very
13   rough.
14       Q.  It was plainly visible to you as you
15   stepped out of the car?
16       A.  Yes.
17       Q.  So did you fall to the ground?
18       A.  Yes.
19       Q.  And then after you landed on the ground
20   did you turn around and look back and see the
21   patch?
22       A.  I think I was on it.  I was walking.  I
23   was completely turned around and landed.
24       Q.  Could you elaborate?

Page 113

1        A.  I'm not sure.  I mean, it happened
2    and -- I mean, I was afraid to move after I went
3    down because I was hurting so bad.  I just -- my
4    body did a complete turn around.
5        Q.  Your body twisted around in a circle?
6        A.  It's almost like it did.
7        Q.  Then you fell directly on that circle?
8        A.  Fell down over, yeah.
9        Q.  And you didn't see your foot catch on
10   any particular area of it?
11       A.  No.
12       Q.  So you -- after you fell you drew
13   conclusions that that was what caused you to
14   fall?
15       A.  Yes.
16       Q.  And what are you basing your assumption
17   on that that's what caused you to fall?
18       A.  The people around me who were trying to
19   pick me up.
20       Q.  Let me make my question more clearer.
21   What are you basing your assumption on that the
22   circle of patched cement is what caused you to
23   fall?
24       A.  If the patch hadn't been there I don't

29 (Pages 110 to 113)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 114

1  think I would have fallen.
2      Q.  And why is that?
3      A.  Because my foot caught on it.
4      Q.  What did it feel like when your foot got
5  caught on it?
6      A.  It happened so fast that I couldn't tell
7  you.  It stopped me from moving.
8      Q.  What part of your shoe caught on it?
9      A.  I don't remember.
10     Q.  Was it the bottom of your shoe?
11     A.  Well, I don't think it was -- well,
12 yeah, if I'm walking on it it's going to be the
13 bottom of my shoe that's going to catch.
14     Q.  It was your right foot or your left foot
15 that caught?
16     A.  I'm not sure if it was my right or my
17 left.
18     Q.  What did it feel like when your foot hit
19 that?
20     A.  It happened so fast that I couldn't tell
21 you.
22     Q.  So it was the bottom of your foot that
23 hit.  You didn't stub your toe?
24     A.  No.  Not that I am aware of, no.

Page 115

1      Q.  After you were on the ground did you
2  reach back and touch that circle?
3      A.  Not that day.  I went back to see.
4      Q.  When did you first go back to the store
5  to see?
6      A.  Oh, I don't remember if I went back --
7  maybe Bob went back and then I went back a week
8  later or something like that.  He went back to
9  see.
10     Q.  Your husband went back alone to see the
11 store first?
12     A.  I think he went back first and then he
13 brought me.
14     Q.  When did your husband go back?
15     A.  I don't know.
16     Q.  Would it have been the day after or the
17 week after?
18     A.  I don't know if it was the day of or the
19 next day.  I don't know.  Probably the day of
20 everything.  Maybe it was the next day.  I don't
21 know.
22     Q.  So what did he say when he came home
23 from the store when he got back?
24     A.  He said there was a rough patch of

Page 116

1  cement.  That's why you fell.  I could see it.
2      Q.  Is that the first time that you learned
3  that the pavement was rough there?
4      A.  No, no.  When I was put in the
5  wheelchair I saw it.
6      Q.  But you didn't touch it at that time?
7      A.  Well, I was in pain.
8      Q.  My question was you didn't touch it at
9  that time?
10     A.  Not at that particular time, no.
11     Q.  So your husband came home from visiting
12 the store after the accident and told you there
13 was a rough patch of cement on the ground?
14     A.  No, he saw it the same day I did when I
15 fell.
16     Q.  Did he touch it at that time?
17     A.  You would have to ask him.  I don't know
18 if he did or not.
19     Q.  When he went back to the store later did
20 he tell you that he felt the ground?
21     A.  I didn't ask him, but he told me that it
22 was rough.  We both said it was rough because we
23 looked at it when I was in the wheelchair.
24     Q.  So you can tell by looking at it that it

Page 117

1  was rough?
2      A.  Oh, yes.  It was visible.
3      Q.  So when you stepped out of the car you
4  could see that there was a rough patch there?
5      A.  They repaired this since.  It wasn't
6  that bad when I saw it.
7      Q.  Pardon me?
8      A.  It looks likely they repaired something to
9  try and fix it up, but you could visibly see
10 that that was rough and if you walked
11 cautiously, which I did --
12     Q.  If you walked cautiously what?
13     A.  I knew where I was going.  I was
14 watching where I was going.
15     Q.  So since you were walking cautiously you
16 saw it?
17     A.  Yes.
18     Q.  But yet somehow when you stepped on it
19 you fell?
20     A.  My foot caught.
21     Q.  Is it possible that your foot caught on
22 the yellow pavement there on the curb?
23     A.  No, no.  I would have fallen over here.
24 I fell up here right on it.  I fell on the

30 (Pages 114 to 117)

Prendergrast  v. Kohl's                      4/9/2008                      Carmel Prendergrast

Page 118

1  patch, near the patch (indicating).
2      Q.  Okay.  How high do you estimate that
3  curb to be?
4      A.  I have no estimation.
5      Q.  Mrs. Prendergast, is that a curb like
6  every other street curb you see in the city?
7      A.  I don't know.  I live in the suburbs,
8  and we don't have those kind of curbs.
9      Q.  You don't have curbs in the suburbs?
10      A.  We have rounded curbs.  It does look
11  like the ones you find in the city in the
12  Palos -- not in Palos.
13      MR. PITTACORA:  Nancy, they don't have
14  sidewalks either.
15      MS. WOODWORTH:  I don't make it to the
16  suburbs often.
17      MR. PITTACORA:  It's very wooded.
18  BY MS. WOODWORTH:
19      Q.  You stated previously that you weren't
20  sure which foot --
21      A.  Caught.
22      Q.  Pardon?
23      A.  Which foot caught, right.
24      Q.  Was your leg extended when it caught?

Page 119

1      A.  I have no idea.  It happened so fast.
2  If I had knew -- I don't know.  I don't remember
3  what happened.  All I know is I was on the
4  ground fast.
5      Q.  Was your leg bent or straight?
6      A.  When they picked me up?
7      Q.  No, when you stepped on it.
8      A.  I don't know what you mean.
9      Q.  Because you don't recall what your leg
10  was doing at that time?
11      A.  I was walking.  So I don't know if my
12  leg was bent or straight.  It's whatever you do
13  when your leg walks.
14      Q.  Did you fall forward?
15      A.  No.  I was on my back when they picked
16  me up.
17      Q.  You testified that you spun around and
18  then fell?
19      A.  I must have spun around because I was
20  going in one direction and I wound up in
21  another.
22      Q.  So you were walking towards this
23  store?
24      A.  Right.

Page 120

1      Q.  But when you landed on the ground were
2  you facing the parking lot?  Is that what you
3  are saying?
4      A.  It was in reverse probably.  I'm trying
5  to remember.  I was in the opposite direction of
6  when I was going -- when I was walking.
7      Q.  Did you stumble a few steps before you
8  hit the ground?
9      A.  I can't remember.
10      Q.  Did your arms extend now to the front of
11  you before you hit the ground?
12      A.  I must have tried to protect myself.  I
13  don't remember.
14      Q.  Did your face hit the ground?
15      A.  Not my face but my head did.  I wound up
16  back (indicating).
17      Q.  What part of your body hit the ground
18  first?
19      A.  My hip and my knee, my knee and my hip
20  because I had a blood clot on my hip.
21      Q.  Your left side?
22      A.  Left side, yes.
23      Q.  Which hit first, your left knee or your
24  hip?

Page 121

1      A.  I don't know.
2      Q.  Which hurt more?
3      A.  They both did.  I couldn't walk.
4      Q.  Did one hurt more than the other that
5  led you to believe that area hit first?
6      A.  I can't make a judgment call on that.
7      Q.  Did your head hit the ground?
8      MR. PITTACORA:  Objection, asked and
9  answered.
10      THE WITNESS:  What?
11      MR. PITTACORA:  You can --
12      THE WITNESS:  I did because I started
13  getting headaches.
14  BY MS. WOODWORTH:
15      Q.  What part of your head hit the ground?
16      A.  The left side, everything on the left
17  side.
18      Q.  You said it must have because you
19  started to get headaches.  Do you remember your
20  head hitting?
21      A.  I was on the ground back when they
22  picked me up.  I'm assuming that my whole body
23  went down.  I was afraid to be touched because I
24  was hurt so bad.

31 (Pages 118 to 121)

Ph# 312-578-9323
Fx# 312-578-9235

Prendergrast  v. Kohl's                        4/9/2008                      Carmel  Prendergrast

Page 122

1    Q.  So you're assuming that you hit your
2  head?
3    A.  I did because I had headaches.  I had to
4  go to the emergency room too.
5    Q.  But you didn't lose consciousness?
6    A.  No.
7    Q.  How long were you on the ground after
8  your fall?
9    A.  Not long because somebody came to pick
10  me up.  It was a man and my husband, a woman,
11  and some kid.  I don't know.
12    Q.  What areas did you feel immediate pain
13  to?
14    A.  My hip and my knee.  I was afraid to
15  straighten my leg out, you know, move it.
16    Q.  Any pain to your back?
17    A.  Not at that time, no.
18    Q.  Did you have any abrasions?  Was there
19  any blood?
20    A.  No.  I was well clothed when I went
21  down, but my skin down my knees were bruised and
22  I had a blood clot to my hip.
23    Q.  Had that blood clot formed already
24  before this fall?

Page 123

1    A.  No.  It came as a result of the fall.
2    Q.  I see.
3        How soon did you notice that blood
4  clot?
5    A.  When I went to see Dr. Bovendram and he
6  found it.
7    Q.  When did you see Dr. Bovendram?
8    A.  11/20 something, right after the
9  accident, couple of days after.
10    Q.  November 20, 2005 would have been three
11  days after the accident?
12    A.  Yes, he noticed it.
13    Q.  Is that the first indication that you
14  had of a blood clot?
15    A.  I saw a bruise, but I didn't know it was
16  a blood clot.  He was the one who said it was
17  bad.
18    Q.  What did he do, anything to treat the
19  blood clot?
20    A.  No.
21    Q.  He said it's a bruise and it will heal,
22  it will just take some time?
23    A.  Yes.
24    Q.  As a result of this fall you hurt your

Page 124

1  left knee and the left side of your hip and a
2  blood clot was formed?
3    A.  My left shoulder, but that didn't show
4  itself until six months later.
5    Q.  Did your left shoulder hit the ground as
6  well?
7    A.  The whole left side.
8    Q.  So I'm trying to imagine how you can
9  fall so that -- did you fall --
10    A.  Twist around and go down.
11    Q.  So your left side from head to knee?
12    A.  Went down.
13    Q.  Hit the ground?
14    A.  Yes.
15    Q.  Did you drop your purse when you fell?
16    A.  I don't know what happened to that.
17    Q.  Did anyone witness your fall?
18    A.  Yes.
19    Q.  Who?
20    A.  There was a man and his wife and a young
21  son I think or a young person, and then my
22  husband I don't know if he was there.  I don't
23  remember if he had parked the car already or
24  what.

Page 125

1    Q.  You don't know if he saw you actually
2  fall?
3    A.  I don't remember if he did or not.  I
4  didn't even ask him.
5    Q.  Had he pulled away?
6    A.  I was proceeding towards the store and
7  he must have been going away.
8    Q.  So he had already driven away?
9    A.  I don't know if he had gone away yet or
10  if he was watching me.
11    Q.  He didn't say, gosh, Carmel, I saw you
12  fall, it looked like it hurt?
13    A.  No.  I can't talk for him because I
14  don't know.
15    Q.  But you've never had any conversations
16  with him where he indicated that he saw you
17  fall?
18    A.  Not really.  I asked him but he
19  didn't -- he wasn't sure.  So I don't know.
20    Q.  He indicated that he wasn't sure if he
21  saw you actually fall?
22    A.  Right.
23    Q.  Did you get the names of the man, wife,
24  and child that you believe witnessed your

32 (Pages 122 to 125)

Prendergrast v. Kohl's                     4/9/2008                     Carmel Prendergrast

Page 126

1   fall?
2       A.  I think it's in the report that Kohl's
3   took down.
4       Q.  Gerald Finnigan?
5       A.  That sounds familiar.
6       Q.  Did you have any conversations with
7   Mr. Finnigan?
8       A.  Nothing.  He just helped me up.  I told
9   him I'm really hurting.  I said don't touch me
10  because I thought I broke something.  I said
11  just wait and see.  He generally helped me into
12  the wheelchair.
13      Q.  Where was Mr. Finnigan and his wife and
14  child standing when you fell?
15      A.  Probably somewhere over here because I
16  was going this way and they were over here
17  (indicating).
18      Q.  Just for the benefit of the court
19  reporter the area that you're pointing to --
20      A.  Near the store maybe.
21      Q.  Is in front of the store on the
22  pavement?
23      A.  On the pavement.
24      Q.  Not --

Page 127

1       A.  On the sidewalk.  I'm pretty sure they
2   were on the sidewalk.
3       MR. PITTACORA:  I think actually it's in
4   front of the store's doors on the sidewalk.
5       THE WITNESS:  Right.
6       MR. PITTACORA:  You can see the doors.
7   It's difficult to make out, but you can see the
8   doors up here.
9       MS. WOODWORTH:  Okay.
10  BY MS. WOODWORTH:
11      Q.  Did he give you his phone number?
12      A.  Not me personally but he gave it to the
13  record -- the --
14      Q.  Did you ever have any conversations with
15  him after that day?
16      A.  No.
17      Q.  Never been in touch with him?
18      A.  No.
19      Q.  So he helped you into the wheelchair?
20      A.  He and the Kohl's person.
21      Q.  And who was the Kohl's person?
22      A.  I have no idea.
23      Q.  Man or woman?
24      A.  I don't know.  I think it was a man and

Page 128

1   a woman who came out, but I'm not clear on
2   that.
3       Q.  And what -- did you have any
4   conversations with this man or woman?
5       A.  I just asked them please call somebody
6   and get me to the hospital and see what's going
7   on here.  That's all.
8       Q.  Did you tell them what caused you to
9   fall?
10      A.  I think I said I tripped on this patch.
11  I'm not sure.  I don't remember what I said
12  then.  I was kind of upset that I fell.
13      Q.  You were in pain.  Did you ever go back
14  to the store and report to anyone that you
15  believed that was a dangerous condition?
16      A.  I didn't personally.  I don't know if my
17  husband did or not.
18      Q.  Were you concerned that someone else
19  might have the same fall that you had?
20      A.  Yes.
21      Q.  But you didn't go back and report it to
22  anyone?
23      A.  I didn't do it, but maybe Bob did.  I
24  don't know what he did.

Page 129

1       Q.  So it wasn't serious enough to cause you
2   to --
3       A.  I think we questioned -- I don't know if
4   he went back to see if they repaired it.  I
5   don't know if he talked to somebody or not.  I
6   have no knowledge.
7       Q.  You never went back to see if it was
8   repaired?
9       A.  I don't think I did, no.  I think Bob
10  may have.  I don't know.  I don't want to go
11  there now.
12      Q.  So you were concerned that someone else
13  might fall there?
14      A.  Right.
15      Q.  But not enough to go back and report it
16  to someone and ensure that it was fixed?
17      A.  I wouldn't say that, no.  I didn't know
18  what I should do.  What would you do?  I don't
19  know.  I mean, they knew that I fell.  So I
20  think it's their place to fix what's wrong.
21      Q.  But you weren't sure if you told them
22  what caused you to fall?
23      A.  I said I fell.  They picked me up right
24  on the spot.  I said I tripped over this.  So

33 (Pages 126 to 129)

Prendergrast v. Kohl's                                              Carmel Prendergrast
                              4/9/2008

Page 130

1  it's in the records.
2       MR. PITTACORA:  You don't know what they
3  put in the records.
4       THE WITNESS:  Oh, it's not?  I thought
5  that report from Kohl's -- that piece of paper
6  didn't it show it on there?
7  BY MS. WOODWORTH:
8       Q.  That report I showed you before it was
9  an EMS report that the ambulance filled out, and
10 when we discussed it earlier you said a man or
11 woman came out.  You weren't sure which, maybe
12 both.  You were in a lot of pain, so you didn't
13 remember the conversation that you had with
14 them.  You told them that you fell?
15      A.  They asked me where I fell, and I said
16 there.
17      Q.  And you pointed in that general
18 vicinity?
19      A.  Right.
20      Q.  But you never went back and reported to
21 a manager or any Kohl's employee --
22      A.  I did not personally, no.
23      Q.  You never reported it to any
24 municipality that this store has got a problem

Page 131

1  here?
2       A.  I didn't personally, no.
3       Q.  You never wrote a letter to Kohl's?
4       A.  No.
5       Q.  You were planning to file a lawsuit, but
6  you didn't go back and talk to anyone about this
7  condition?
8       MR. PITTACORA:  Object to the form of
9  the question.  I'm not sure she was planning to
10 file a lawsuit at that particular point, but you
11 can answer if you know the --
12      THE WITNESS:  At that time I wasn't
13 planning anything.
14 BY MS. WOODWORTH:
15      Q.  When did your husband take the photos of
16 your leg and --
17      A.  I think I documented the date on the
18 back.  All the photos have dates on it.
19      Q.  The photos that you provided to your
20 attorney had a date on the back?
21      A.  I think so.
22      Q.  Were they taken within a couple of days
23 of the incident?
24      A.  I am not sure when they were taken.

Page 132

1  They must have been because the bruise is still
2  there.
3       Q.  So at that time were you planning to
4  file a lawsuit?
5       A.  I don't remember when I decided this.
6       Q.  Would there be another purpose for
7  taking the photos other than the filing of a
8  lawsuit?
9       A.  Just to document my injuries.
10      Q.  Document it for who?
11      A.  For myself.
12      Q.  Have you ever done that in the past,
13 taken photos of your injuries?
14      A.  I have never hurt myself like this, not
15 to this extent.
16      Q.  So did anyone ask you if you needed an
17 ambulance at that time?
18      A.  I don't know if the woman in the store
19 did or the man in the store did or not.
20      Q.  But someone called an ambulance?
21      A.  Right.
22      Q.  You don't know?
23      A.  I probably asked them to call someone
24 because I didn't want to be transported in the

Page 133

1  van.  I was hurting too bad.
2       Q.  At what point did your husband come over
3  to you?
4       A.  I don't know if he parked the car and he
5  looked and I wasn't there.  I think he looked
6  out the window and I disappeared.  He didn't
7  know what happened to me.
8       Q.  So did he walk over to you when you were
9  lying on the ground or at what point did he make
10 it over to you?
11      A.  I think he was there at the same time
12 the gentleman was there.
13      Q.  So within a couple of minutes?
14      A.  Right.
15      Q.  So he had parked the car in the parking
16 lot?
17      A.  I don't know if he parked the car.  I
18 have no idea.
19      Q.  Do you recall seeing your van in front
20 of the store?
21      A.  No.  I don't know what happened to the
22 van, where it went.
23      Q.  Did he go in the ambulance with you to
24 the hospital?

34 (Pages 130 to 133)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 134

1    A.  No.
2    Q.  He drove separately?
3    A.  Yes, he did.
4    Q.  How long after your fall did the
5  ambulance arrive?
6    A.  There was some time.  I don't know the
7  exact amount of time, but there was a waiting
8  period there.
9    Q.  Ten minutes, half hour?
10    A.  I don't know.  I can't estimate a time.
11  I was hurting too badly to estimate the amount
12  of time.  I was sitting there in the wheelchair
13  in the store.
14    Q.  You can't estimate if it was ten minutes
15  or an hour?
16    A.  It was more than ten minutes, but it
17  wasn't an hour.
18    Q.  What happened when you went to the
19  hospital?
20    A.  I was in the ER, the emergency room, and
21  they just examined me and took x-rays and
22  stabilized my leg.
23    Q.  What did they take x-rays of?
24    A.  My back, my knee, and wherever else --

Page 135

1    Q.  Do you remember the x-rays that were
2  taken?
3    A.  I believe it was my knee and my back.
4    Q.  They didn't do an x-ray of your shoulder
5  at that time?
6    A.  No.  I was so stunned I didn't even feel
7  anything.  It took six months for that to
8  develop.
9    Q.  It took six months for shoulder pain to
10  develop?
11    A.  Well, I was having pain all the time,
12  but to seek help for it, yes.
13    Q.  What else did they do at the ER besides
14  the x-ray of your back and your knee?
15    A.  I was in there a while.  I don't
16  remember anything other than -- I don't know.
17  They just tried to make me comfortable.
18    Q.  Did they release you that day?
19    A.  Yes.
20    Q.  Nothing broken?
21    A.  No evidence showed any breaks.
22    Q.  Nothing fractured?
23    A.  Nothing fractured.
24    Q.  You had some bruises?

Page 136

1    A.  Bad bruises.
2    Q.  And you were released?
3    A.  Yes.
4    Q.  With pain medication?
5    A.  Not that I remember.
6    Q.  They didn't prescribe Vicodin for you at
7  that time?
8    A.  I don't remember.
9    Q.  You just took over the counter
10  medication for the pain?
11    A.  I think I probably just took -- I don't
12  know what I took.
13    Q.  Did your husband take you home from the
14  hospital?
15    A.  Yes.
16    Q.  What time did you get home?
17    A.  To the best of my recollection in the
18  late afternoon right before dinner.
19    Q.  What did you do when you got home?
20    A.  Had something to eat, and I was just
21  talking to my family, and at about 7:30 I didn't
22  feel well.
23    Q.  You hung out on the couch, watched some
24  T.V., and went to bed?

Page 137

1    A.  I didn't go to bed yet.  I wasn't
2  feeling well.  My husband looked at me, and he
3  said I looked terrible.  I couldn't breath.  I
4  was pale.  They called the paramedics, and they
5  took me back to the hospital.
6    Q.  What time was this?
7    A.  After supper some time about 7:00 I
8  think or 7:30.
9    Q.  You were feeling shortness of breath?
10    A.  I was white as a sheet, and I don't know
11  if I had shortness of breath.  I was having
12  chest pains.
13    Q.  You said I couldn't breath?
14    A.  Couldn't breath and chest pains
15  probably.
16    Q.  Was this similar to the heart
17  palpitations you had previously?
18    A.  No, this was severe.
19    Q.  More severe than before?
20    A.  I thought I was having a heart attack.
21  I never turned white like that.  My lips were
22  purple and I was white as a sheet.
23    Q.  And what happened when you went back to
24  the hospital?

35 (Pages 134 to 137)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 138

1    A.  The same doctor who saw me in the
2  afternoon took care of me in the evening.
3    Q.  And who was that doctor?
4    A.  I don't remember his name, same one, but
5  I remember his face, and they just checked my
6  heart and did an EKG and all of that stuff to
7  make sure that I was ok.
8    Q.  Did they find anything wrong at that
9  point?
10    A.  Not that I know of.  They didn't say
11  anything.
12    Q.  So did they release you that night?
13    A.  I signed myself out.
14    Q.  And you went home?
15    A.  Yes.
16    Q.  And went to bed?
17    A.  Yes, had something to eat a little bit
18  and then I went to bed.
19    Q.  Okay.
20    MR. PITTACORA:  Nancy, quick break.
21    MS. WOODWORTH:  Sure.
22        (Whereupon, a recess was
23        taken.)
24

Page 139

1        (Whereupon Deposition
2        Exhibit B was marked for
3        identification.)
4  BY MS. WOODWORTH:
5    Q.  Mrs. Prendergast, I would like to show
6  you what I'm going to mark as Defendant's
7  Exhibit B.  Do you recognize the two photographs
8  on this page?
9    A.  Yes.
10    Q.  Who took those photographs?
11    A.  My husband.
12    Q.  When did he take those photographs?
13    A.  I don't know if this was the day of or
14  day after.  I'm not sure.
15    Q.  Does that photograph fairly and
16  accurately depict the area where you fell in
17  front of the Kohl's store?
18    A.  Yes, and the climate of the day too.
19    Q.  Both of those photographs fairly and
20  accurately depict, okay.
21    A.  This is clearer than the other one you
22  have.
23    MS. WOODWORTH:  I'm going to fold this
24  in half so that this photo doesn't go along with

Page 140

1  the deposition, but the next photograph I'm
2  going to mark as the Defendant's Exhibit C.
3        For the record the photograph that
4  I'm cutting off is the photograph of
5  Mrs. Prendergast partially clothed showing her
6  injuries.
7        (Whereupon, Deposition
8        Exhibit C was marked for
9        identification.)
10  BY MS. WOODWORTH:
11    Q.  Please take a look at what's marked as
12  Exhibit C.  Do you recognize that photograph?
13    A.  Yes.
14    Q.  Is that also a photograph that your
15  husband took the day of or the day after the
16  incident at the Orland Park store?
17    A.  I'm assuming it is.
18    Q.  I'll represent to you that these are the
19  photos that were provided by your attorneys.
20    A.  Okay.  That's the one.
21    Q.  What's marked as Defendant's Exhibit C,
22  does that fairly and accurately depict the area
23  where you fell?
24    A.  Yes.

Page 141

1    Q.  Can you describe for me the color of the
2  circular patch of cement?
3    A.  Well, it looks like it's tan cement with
4  brownish on the one left side of the circle.  I
5  don't know what that is.  Then there is white
6  patching coming up to the circle from the
7  streaked curb.
8    Q.  Okay.  You were just describing for me
9  the photograph in Defendant's Exhibit C.?
10    A.  C.
11    Q.  I would also like for you to look at
12  what's marked Defendant's Exhibit B, the second
13  photograph, and could you describe --
14    A.  This one?
15    Q.  Yes.  Could you describe what's in that
16  photograph?
17    A.  It's taken from the curb site, and there
18  is patching coming up to the circle, same brown
19  stuff there and then there is patching -- I know
20  it goes all the way up to the north to the
21  planter by the door.
22    Q.  Is there a differentiation in color
23  between the sidewalk adjacent to the circle and
24  the circle itself?

36 (Pages 138 to 141)

Page 142

1     A.  Are you talking --
2     Q.  I'm asking you if there is a
3  differentiation in color between the circle and
4  the area next to it?
5     A.  Yes.  It's where it's patched there is a
6  discoloration.
7     Q.  And there is also a discoloration that
8  leads from the yellow curb all the way up to the
9  store where --
10    A.  Right, correct.
11    Q.  Where the pavement was originally
12  cracked and it was patched over?
13    A.  Correct.
14    Q.  Is the pavement rough all the way along
15  where the crack has been patched over that leads
16  up to the store or just in the circle?
17    A.  I never had the opportunity to go that
18  far on that.  After that I was picked up in a
19  wheelchair.
20    Q.  By your view of it you stated earlier
21  that the circle looked rough.  Did the other
22  area look rough as well?
23    A.  It's hard to make a judgment call on a
24  picture.  From this picture it does.

Page 143

1     Q.  Well, you stated before that based on
2  your recollection of looking at it that it
3  looked rough?
4     A.  Right.
5     Q.  Not based on looking at the picture?
6     A.  The circle is rough I know that.
7     Q.  You're not sure if the other area is
8  rough?
9     A.  I'm not -- I don't have firsthand
10  knowledge of the -- I can't recall the rest of
11  the patching, but the circle I know was.  I hope
12  that answered your question.
13    Q.  So the fact that the circle had tan
14  cement with brown on the left side of the circle
15  and white patching, that made it even more
16  visible for you to see?
17    A.  Right.
18    Q.  It stood out?
19    A.  I don't know if it stood out but it's --
20  it's there if I walked over it like you are
21  walking over whatever.
22    Q.  It's plainly visible?
23    A.  Plainly visible.
24    Q.  Before the break we were talking about

Page 144

1  the medical care that you received after the
2  incident.  You walked us through what happened
3  on your first ER visit and your subsequent ER
4  visit later that evening.  Could you tell me
5  what tests they did for you when you went back
6  to the ER that night?
7     A.  I think they did an EKG.  I'm not sure,
8  and I was hooked up to some machine, and I don't
9  know if they drew blood or blood pressure.  They
10  were monitoring my heart.  I'm pretty sure
11  that's what they did.  That's all I can
12  recall.
13    Q.  The record from the Cook County EMS
14  report stated that you had movement and feeling
15  in your left foot.  Is that what you recall?
16    A.  Correct, correct.
17    Q.  But you had pain on moving your foot
18  from side to side?
19    A.  My left leg, yes.
20    Q.  So you went home on the evening of
21  November 17th?
22    A.  Correct.
23    Q.  And what did you do when you got home?
24    A.  I just told you that.

Page 145

1     Q.  You went to bed?
2     A.  No.  Oh, you mean --
3     Q.  After your second visit.
4     A.  No, I think I stayed up for a little bit
5  and then just talked to family and relaxed and
6  probably ate something and went to bed.  That's
7  the best I can remember.
8     Q.  Do you remember the day after the
9  accident?
10    A.  I was in a lot of pain.
11    Q.  What was causing you pain?
12    A.  All my bruises, my hip, my leg, and then
13  I started with the headaches and my back.  It
14  was exasperated because of the fall.  It was
15  doing better.  Then everything started bothering
16  me.
17    Q.  Had you ever been to your eye doctor
18  before that about the headaches you were
19  experiencing?
20    A.  I don't think so.  I'm trying to
21  remember.
22    Q.  I'm just curious.  What led you to go to
23  the eye doctor about the headaches?
24    A.  Because I was concerned because I had

Prendergrast v. Kohl's                          4/9/2008                          Carmel Prendergrast

Page 146

1   pain with my head here, and that's why I was
2   concerned. I was concerned with my vision. I
3   didn't want anything to happen to my eyes.
4       Q. Were you concerned as a result of the
5   fall your vision might be impaired?
6       A. If there was an injury to the head, yes,
7   and I don't know what was causing the
8   headaches.
9       Q. And what did your eye doctor tell you
10  about your vision?
11      A. I went to see Dr. Will first about my
12  eyes I think. Not my eyes, my head, my
13  headaches.
14      Q. And did your eye doctor tell you that
15  there was any effect on your vision?
16      A. No. He just checked my head and my eyes
17  to see what was going on.
18      Q. And confirmed that your vision was
19  okay?
20      A. That it was okay so far.
21      Q. So the fall didn't have any impact on
22  your vision?
23      A. Not that I know of yet.
24      Q. After that did you seek treatment from

Page 147

1   your primary care doctor for headaches?
2       A. I went to see her before I saw the eye
3   doctor.
4       Q. You had had headaches before this time
5   that you treated for?
6       A. But not like this. These were powerful
7   almost like migraines but they hurt.
8       Q. But you didn't take Vicodin for them?
9       A. No.
10      Q. But before you were taking Vicodin for
11  pain?
12      A. Not for my headaches. When I took the
13  Vicodin according to the prescription it was for
14  my back or whatever at that time, whatever the
15  doctor prescribed it for.
16      Q. But no prescription pain killers for the
17  headaches?
18      A. No.
19      Q. So you -- so the next day you woke up.
20  You were in some pain, and what did you do that
21  day?
22      A. I don't remember what I did. I can't
23  remember what I do day-to-day. I try to go
24  about my normal routine and as much as I could

Page 148

1   accomplish. I couldn't do too much because I
2   was in a lot of discomfort.
3       Q. You were in discomfort but you weren't
4   confined to your bed?
5       A. I don't remember, but I was hobbling
6   because my knee was bandaged. It was hard to
7   maneuver.
8       Q. When was the first time you went back to
9   see a doctor after the 17th?
10      A. It was the 22nd, I think.
11      Q. And who did you go see?
12      A. At Rush.
13      Q. Ed Rush?
14      A. No, at Rush University Hospital.
15      Q. Who did you see at Rush Hospital?
16      A. Bouvendram.
17      Q. This was on the 22nd -- November 22,
18  2005?
19      A. I think this was the date. I'm not
20  sure.
21      Q. What was your complaint to
22  Dr. Bovendram?
23      A. My hip, my leg, and my back.
24      Q. What did he do for you?

Page 149

1       A. He checked it out and made sure
2   everything was okay. I don't know if he sent me
3   to somebody else. I can't remember.
4       Q. Did he prescribe you any medicine?
5       A. I don't think so. I can't recall.
6       Q. No further tests done?
7       A. I don't know. I don't remember.
8       Q. On the 22nd you also visited Dr. Will at
9   the Christ Women's Health Center, and she did a
10  cartoid ultrasound?
11      A. Yes.
12      Q. That wasn't related to your fall, was
13  it?
14      A. I don't think so. I don't know, unless
15  she was looking at what was causing my
16  headaches. I don't know. I don't know what her
17  reason was there.
18      Q. When was your next trip to see a doctor
19  after the 22nd?
20      A. I think it was the 25th. I'm not sure.
21  I know it was Dr. --
22      Q. To who?
23      A. I don't know. Was it Dr. Pevese?
24      Q. Can you spell that name?

38 (Pages 146 to 149)

Page 150

1      A.  P-e-v-e-s-e.
2      Q.  Where is Dr. Pevese?
3      A.  He is in Oak Lawn.
4      Q.  Is that a hospital?
5      A.  No, he is at Christ.
6      Q.  And what did he see you for?
7      A.  I was having pain, severe, severe pain
8   in my right groin area and my hip on my right
9   side.
10     Q.  Now, before you --
11     A.  I'm not sure if that was the date or
12  not.  You've got it in my records there.
13     Q.  Now, before your pain was on the left
14  side, and this is pain on the right side.  So
15  this isn't attributed to your fall, is it?
16     A.  Sure, it is.
17     Q.  Oh, it is.
18         How did you hurt your right side?
19     A.  If I went down -- it's all associated
20  with the fall.  Everything I went through is
21  associated with the fall because I didn't have
22  pain there before.
23     Q.  Okay.  Well, I'm just trying to get a
24  feel for how you injured the right side of your

Page 151

1   body when you fell and hit the ground on your
2   left side?
3      A.  Well, if I landed on my left, I must
4   have gone down on my bottom.  I don't know.  I
5   don't know how I fell.  I just fell and I hurt
6   myself.
7      Q.  You don't remember any part of your
8   right side of your body hitting the ground?
9      A.  My tailbone.
10     Q.  That would have been on the left side
11  where the blood clot happened?
12     A.  That's not my tailbone.  That's my hip.
13  I remember my tailbone hitting down.  That's my
14  butt going down too.
15     Q.  I'm trying to get a sense of how your
16  right side of your body was injured.
17         What did Dr. Pevese do for you?
18     A.  He checked me out to make sure
19  everything was okay, and then he sent me to
20  Dr. Klompian, and Dr. Klompian ordered a CT
21  scan.
22     Q.  Is Dr. Klompian also at Christ?
23     A.  Yes.
24     Q.  Can you spell that?

Page 152

1      A.  K-l-o-m-p-i-a-n, I think.
2      Q.  And you said you had a CT scan?
3      A.  Uh-huh.
4      Q.  And what did that show?
5      A.  I don't remember.  The pelvic area to
6   see if I had injured anything.
7      Q.  Do you know the results?
8      A.  I don't know offhand.  I don't remember
9   what he found.
10     Q.  So you don't remember him finding any
11  significant injuries?
12     A.  I can't remember what the results of the
13  CT scan were.
14     Q.  When did you go back again for
15  treatment?
16     A.  After the 25th.
17     Q.  To whom?  I'm asking who you went to
18  next?
19     A.  I don't remember.  I don't know if I
20  went to see Dr. Bovendram again in January or
21  not or December rather.  I can't recall.
22     Q.  Your records indicated on
23  December 6th, '05 you had an ultrasound of your
24  pelvis?

Page 153

1      A.  That's probably --
2      Q.  Is that what you were telling me about
3   before?
4      A.  Yes.
5      Q.  So with your gynecologist that wouldn't
6   be related to your fall, would it?
7      A.  I don't know if that's her routine test
8   or what that was at that time.  I think that was
9   routine, my routine yearly checkup on that one.
10  Who is the doctor on that one?
11     Q.  My question for you is did you have any
12  injuries that caused you to seek treatment from
13  a gynecologist as a result of this fall?
14     A.  Oh, the pain in my groin, but they
15  didn't know what was causing it after the
16  injuries.
17     Q.  But that's not your insides.  I mean,
18  you don't go to a gynecologist for that.
19     A.  Well, if you think you have a problem
20  you will.
21     Q.  Okay.  So I just want to make sure I'm
22  clear.  We've got your left side hurt, your
23  right side, and your gynecological areas, and
24  you're attributing all of this to the fall?

Real-Time Reporters, Inc.                    Ph# 312-578-9323
Real-TimeReporters.com                       Fx# 312-578-9235

Prendergrast  v. Kohl's                                4/9/2008                                Carmel  Prendergrast

Page 154

1    A.  Just my right groin area.
2    Q.  Nothing on the inside?
3    A.  When he checked the inside he said that
4  was okay.  So that's why he sent me to
5  Klompian.
6    Q.  I just want to make sure I'm clear that
7  you are not claiming any gynecological problems
8  as a result of this fall?
9    A.  We ruled that out.
10    Q.  That's been ruled out, okay.
11        On January 23rd, '06 or just over
12  two months after the incident, how were you
13  feeling a couple of months after this?
14    A.  I was still in pain, a lot of pain.
15    Q.  Were you taking any pain medication?
16    A.  No.  I don't think -- I don't know if I
17  was prescribed any extra pain medicine for
18  this.
19    Q.  Any over the counter medication?
20    A.  I take a baby aspirin every day.
21    Q.  But the pain wasn't severe enough to
22  cause you to get prescription medication?
23    A.  I still had some left from '03 and '04.
24  So if I had to take it, I asked if I could, and

Page 155

1  he said yes.
2    Q.  What were you taking?
3    A.  There was some Vicodin left.
4    Q.  Were you taking Vicodin?
5    A.  I don't remember.
6    Q.  Earlier you stated that you hadn't taken
7  it in ten years.
8    A.  I didn't say it.  I said I hadn't filled
9  it in a long time, but I only take it if I need
10  it.
11    Q.  So how many pills are in a bottle?
12    A.  If I don't take it very often, it's not
13  going to go down that far.
14    Q.  So the severe wasn't so bad that you
15  took it more than once or twice a month?
16    A.  Right.
17    Q.  At that time did the doctors continue to
18  talk to you about your weight contributing to
19  your back pain?
20    A.  No.
21    Q.  A couple of months after the incident,
22  January 27th, '06, now you've gone back to the
23  doctor, Dr. Rawal, about right lower back
24  pain?

Page 156

1    A.  Who?
2    Q.  R-a-w-a-l.  Do you remember going back
3  and having pain on the right lower back?
4    A.  That was in my groin area.  I went to
5  see Klompian.
6    Q.  You don't recall this other visit?  You
7  don't recall right back pain?  It was your left
8  side?
9    A.  I don't know who Rawal is.  I'm sorry.
10    Q.  I'm not asking you if you know who Rawal
11  is.  I'm asking if you were having pain in your
12  right lower back?
13    A.  In January of '06?
14    Q.  Yes.
15    A.  Probably, yes.  Yes, I was probably.  To
16  the best of my recollection I think so.  I'm not
17  sure.  I must have if I went to see a doctor.
18    Q.  I wanted to ask you about the problems
19  that you were having with leakage in your left
20  eye.  Do you remember anything about that in the
21  March of '06 time period?  Midwest Eye
22  Professionals did a new patient exam for you on
23  March 8, 2006.  They said you had a history of
24  macular edema with leakage in the left eye.

Page 157

1    A.  He said that I had -- what did he say
2  when I went to see him?  I had inflammation in
3  the back of my eye, so he took care of it with
4  medication.
5    Q.  Are you claiming that resulted from the
6  fall at Kohl's?
7    A.  But I just want to make sure that I'm
8  okay.  I was very concerned about my eyesight.
9    Q.  The reason I'm asking is because we have
10  a number of bills from different providers.  So
11  I want to make sure what's related to the
12  incident and what's not.
13    A.  He was there to make sure there was no
14  damage from the fall.
15    Q.  On March 17, 2006, you indicated to
16  Dr. Will at Christ Women's Health Center that
17  you felt a pull to the left when you walked.  Do
18  you remember anything about that?
19    A.  No, I don't remember saying that.
20    Q.  Dr. Will indicated that you had vertigo.
21  Had you ever been diagnosed with vertigo
22  before?
23    A.  She never told me that.
24    Q.  How long did you continue to seek

Real-Time Reporters, Inc.
Real-TimeReporters.com

Ph# 312-578-9323
Fx# 312-578-9235

Page 158

1   treatment for the injuries that you claimed
2   resulted from this fall at Kohl's?
3       A.  I'm still being treated.
4       Q.  What are you still being treated for?
5       A.  My back and my knee.
6       Q.  Your back?
7       A.  And my knee.
8       Q.  And your left knee?
9       A.  Uh-huh.
10      Q.  What part of your back?
11      A.  My lumbar.
12      Q.  What's your lumbar?
13      A.  Just what you said in the reports.
14      Q.  Well, I am asking you what lumbar means
15  to you.  What part of your back?
16      A.  4, 5.
17      Q.  Point to what area of your back hurts.
18      A.  (Indicating).
19      Q.  Your lower back?
20      A.  Uh-huh.
21      Q.  One side or the other?
22      A.  My left side.
23      Q.  So as you sit here today you have pain
24  in your lower left back and your left knee that

Page 159

1   you think resulted from your fall at Kohl's?
2       A.  And it has exasperated my injuries,
3   yes.
4       Q.  Is it the result of your injuries that
5   you still feel today?
6       A.  I still can't lay and sleep on my right
7   side or left shoulder without pain on my back.
8           MR. PITTACORA:  I don't want to testify
9   for the witness, but I think she means
10  exacerbated.  Exasperated means you're
11  frustrated.
12          THE WITNESS:  All right.  Thank you.  I
13  won't say that again.
14  BY MS. WOODWORTH:
15      Q.  Mrs. Prendergast, when did you first
16  start experiencing pain to your shoulder?
17      A.  I would say that I had pain January,
18  February, March.  I couldn't wear a bra.  The
19  strap would just dig in there, and it would just
20  dig, dig, dig.  I went to see the doctor,
21  Dr. Blair, and the first thing he said was did
22  you fall recently, and he said you have a
23  problem.
24      Q.  When was the first time that you sought

Page 160

1   treatment for your shoulder?
2       A.  I think it's March.
3       Q.  My records indicate that you sought
4   treatment six months after the accident.
5       A.  Six months is it June, July?  I don't
6   remember.  I don't remember the month.  All I
7   know is that I saw him and he had to give me an
8   injection in my shoulder.
9       Q.  So six months post accident was the
10  first time that you had an x-ray of your
11  shoulder?
12      A.  He didn't x-ray.  He just took care of
13  it.  He didn't know what it was, but I lived
14  with it for that long before I gave in to the
15  pain.
16      Q.  So your last visit to a doctor for low
17  back pain or left knee pain was when?
18      A.  Two weeks ago, three weeks ago.
19      Q.  Who did you see?
20      A.  Dr. Lucas at Palos Heights.
21      Q.  What caused you to go in and visit?
22      A.  Just wanted to take care of the pain.
23      Q.  So what did they do to take care of the
24  pain?

Page 161

1       A.  He adjusted my back.
2       Q.  What do you mean he adjusted your
3   back?
4       A.  He is a chiropractor.
5       Q.  Oh, so you are seeing a chiropractor
6   now?
7       A.  Yes.
8       Q.  What facility is Dr. Lucas at?
9       A.  Lucas Chiropractic Center.
10      Q.  How many times have you seen him?
11      A.  Maybe two months or more.
12      Q.  You've seen him for the past two
13  months?
14      A.  What is this -- this is March --
15      Q.  This would be April.
16      A.  I've been seeing him for a while.
17      Q.  For a couple of months?
18      A.  Yes.
19      Q.  Or longer?
20      A.  For a couple of months.
21      Q.  Did you see any other chiropractor?
22      A.  Previous to him?
23      Q.  Yes.
24      A.  Not in -- in regards to this

41 (Pages 158 to 161)

Prendergrast v. Kohl's                    4/9/2008                    Carmel Prendergrast

Page 162

1  condition --
2      Q.  Yes.
3      A.  Please clarify the question.
4      Q.  My question for you is when did you
5  first seek chiropractic treatment as a result of
6  this fall at Kohl's?
7      A.  I'm not sure if it was in December --
8  November or December.  I'm not sure.  I don't
9  know when I started seeing Dr. Lucas.  I have to
10  look at my records.
11      Q.  Was it --
12      A.  Within the past year.
13      Q.  So approximately a couple of years after
14  the accident in '07?
15      A.  Right.
16      Q.  So more than two years after the
17  accident you're seeing a chiropractor for --
18      A.  For relief, right.
19      Q.  What is he doing for you?
20      A.  Well, I don't have to get any injections
21  in my back, and the pain is starting to go away
22  a little bit.  So it's helping my body along.
23      Q.  How many days a week do you go?
24      A.  I'm down to once a month now.  If I need

Page 163

1  to go back more often, I can go back.
2      Q.  You've had these injections in your back
3  in the past?
4      A.  Dr. Bovendram.
5      Q.  How often did he do injections in your
6  back?
7      A.  About once a year.  I only had three or
8  four I think.  I'm trying to remember.  They can
9  only give them twice a year.
10      Q.  But you're getting them once a month?
11      A.  No.
12      Q.  Oh, you're seeing him once a month?
13      A.  No, Dr. Lucas.
14      Q.  You're seeing Dr. Lucas once a month?
15      A.  I'm seeing him on an as needed basis
16  right now.  I'm getting injections.
17      Q.  Is it helping?
18      A.  I think so somewhat.
19      Q.  How are you feeling as we sit here
20  today?
21      A.  Well, that's why I'm getting up often.
22  I don't want to sit here too long.  It's okay.
23  It's tolerable.  Put it that way.  You learn to
24  live with it.

Page 164

1      Q.  Just as you have the last 20 years?
2      A.  Uh-huh.  This just increased my pain
3  level.
4      Q.  We talked briefly before that you
5  believe your husband went back either later that
6  day or the following day to take the
7  photographs; is that right?
8      A.  Correct.
9      Q.  Was he with you at the hospital?
10      A.  Yes.
11      Q.  So would he have had --
12      A.  Was he with me at all times, no.
13      Q.  He left the hospital?
14      A.  I don't know.  He left my room where I
15  was for a while.
16      Q.  So he may have left the hospital, gone
17  home, got his camera, and gone back to Kohl's to
18  snap the pictures that day?
19      A.  I don't know.  You will have to ask
20  him.
21      Q.  So when were those photos developed?
22      A.  I don't remember.
23      Q.  How many photos did he take?
24      A.  Whatever.  I don't know.

Page 165

1      Q.  Did you turn all of them over to your
2  attorney?
3      A.  I'm pretty sure he has them all.
4          MR. PITTACORA:  I gave you what I got.
5          THE WITNESS:  Can I stand up for a
6  while?
7          MS. WOODWORTH:  Yes.
8              We can go off the record.
9                  (Whereupon, a discussion
10                  was held off the record.)
11  BY MS. WOODWORTH:
12      Q.  When was the first time you went back to
13  the Kohl's store at Orland Park after your
14  November 17, 2005 incident?
15      A.  I do not remember.  I never went in.  If
16  I did go back with Bob, I rode in the car and I
17  just looked.  I didn't get out.  It was maybe
18  within the last year.
19      Q.  Within the past year was the first time
20  you had been back?
21      A.  I think so.
22      Q.  Now, before you stated you might have
23  gone back afterwards to look at the area where
24  you fell.

42 (Pages 162 to 165)

Page 166

1     A.  But I don't remember exactly when I did
2  go back.
3     Q.  You don't know if that -- I mean, this
4  fall occurred in '05.  You don't know if it was
5  back in '05 or '06 or recently as in the past
6  year?
7     A.  It wasn't '05 because that happened in
8  November.  It might have been some time in
9  '06.
10     Q.  Maybe '06?
11     A.  Maybe.  I don't know.
12     Q.  Were you kind of curious to go back and
13  look at the area where you fell?
14     A.  No.  I say I never want to go back to
15  that place after I fell.  It hurt too much.
16     Q.  So you've never gone back and looked at
17  the area where you fell?
18     A.  I never got out of the car to look.
19     Q.  Well, I just asked you if you looked,
20  and you said no.
21     A.  I said I never got out of the car to
22  look, but I was in the car.
23     Q.  So you have looked from your car at the
24  ground where you fell?

Page 167

1     A.  Right.
2     Q.  Some time in '06?
3     A.  Either '06 or '07.
4     Q.  So did you pull up to the curb right
5  where your husband dropped you off on that day
6  in '05?
7     A.  I don't remember.  I wasn't driving.
8     Q.  What car was your husband driving when
9  you guys went back there?
10     A.  I'm not sure.
11     Q.  Have you only been back that one time?
12     A.  Yes.
13     Q.  But you specifically remember looking
14  down at the area where you fell from your car?
15     A.  Looking at it, yes.
16     Q.  How far away were you parked from it?
17     A.  I don't think we were parked.  I think
18  we just rolled by.
19     Q.  So did you just stop or did you just
20  drive?
21     A.  By the curb there.
22     Q.  So you did stop by the curb and looked
23  at it?
24     A.  I don't know if we stopped.

Page 168

1     Q.  Do you know whether the car was stopped
2  when you looked at the ground?
3     A.  If there was no car in front of him, he
4  probably stopped but there was a car -- if there
5  was traffic he didn't.
6     Q.  But you don't remember?
7     A.  No.
8     Q.  So you may have just been passing by and
9  glanced out the window at it?
10     A.  He probably slowed down so I can see
11  it.
12     Q.  What did you see?
13     A.  Just what you see in the picture.
14     Q.  So nothing has been changed?
15     A.  I don't know if they tried to patch it
16  or if that's the way it is.  I don't know.
17     Q.  You guys didn't comment on it, whether
18  it looked the same or different?
19     A.  I think it looks just like that now.  So
20  probably they haven't done anything to it.
21     Q.  So you didn't decide to stop and get out
22  and let them know that, hey, that's still a
23  dangerous area?
24     A.  No.

Page 169

1     Q.  Didn't talk to a manager?
2     A.  No.  I told them when I was in -- when I
3  was in the wheelchair that day it was a bad
4  spot.
5     Q.  Two years later you don't think it's
6  been fixed?
7     A.  I don't know.  I have not been back
8  there.
9     Q.  2006, 2007 was at least a year probably.
10     A.  I have not been back recently to see to
11  check.
12     Q.  Was the entire circle -- circular patch
13  rough or just some parts of it?
14     A.  It's look like the whole patches to
15  me.
16     Q.  I'm not asking you what the picture
17  looks like.  I'm asking you what you remember.
18     A.  From what I recall that's an inaccurate
19  description of what it looks like.
20     Q.  From what you recall was the entire
21  circle rough or just a portion of it?
22     A.  All of it was to the best of my
23  knowledge.
24     Q.  What does it feel like to walk on what

43 (Pages 166 to 169)

Page 170

1  you describe as rough cement?
2      A.  Rough cement catches on to your shoes.
3      Q.  How does it catch your shoe?
4      A.  If you have rubber soles it catches, and
5  if you have others like you wear it just scuffs
6  your shoes up.
7      Q.  Have you ever walked on gravel before?
8      A.  Yes.
9      Q.  Is that rough?
10     A.  Not as rough as gravel but rough.
11     Q.  You've never been caused to fall by
12  rough gravel before?
13     A.  No.
14     Q.  Have you ever heard of anyone else
15  falling in that area?
16     A.  I'm not -- I'm not privy to their
17  newspapers and their reports.
18     Q.  That wasn't my question.  My question
19  was whether you heard of anyone else falling in
20  that area?
21     A.  In Orland Park, no.
22         MR. PITTACORA:  I think by that area she
23  means this particular area.
24         THE WITNESS:  Not to my knowledge.

Page 171

1  BY MS. WOODWORTH:
2      Q.  I would like to give you what I'm going
3  to mark as Exhibit D.  These are your answers to
4  interrogatories.  These are questions that
5  Kohl's sent to you to answer about the accident.
6             (Whereupon, Deposition
7              Exhibit D was marked for
8              identification.)
9  BY MS. WOODWORTH:
10     Q.  Do you remember ever seeing these
11  before?
12     A.  Yes.
13     Q.  Can you flip to page nine?
14         MR. PITTACORA:  Second to the last
15  page.
16  BY MS. WOODWORTH:
17     Q.  Is that your signature?
18     A.  Yes, it is.
19     Q.  So you verified those responses are true
20  and accurate to the best of your ability?
21     A.  Yes, to the best of my ability.
22     Q.  And you still believe that those are
23  true and accurate now?
24     A.  Yes.

Page 172

1      Q.  There is nothing that you want to
2  change?
3      A.  No.
4         MR. PITTACORA:  Before you answer that
5  if you want to look at the answers to the
6  questions and make sure there is nothing in
7  there that you think needs to be amended or
8  changed.
9         THE WITNESS:  Okay.
10        MR. PITTACORA:  Don't feel like you have
11  to answer the question without doing that.
12        THE WITNESS:  Okay.
13        MR. PITTACORA:  Off the record.
14            (Whereupon, a discussion
15             was held off the record.)
16        MS. WOODWORTH:  Could you read back the
17  question?
18            (Whereupon, the record was
19             read by the court
20             reporter.)
21        THE WITNESS:  No.
22  BY MS. WOODWORTH:
23     Q.  I wanted to ask you about the care that
24  you provide for your son.  What's a typical day

Page 173

1  like for your son?
2      A.  His whole day is involved in just
3  keeping his spasms under control.  So he
4  exercises, eats, reads, listens to the radio.
5  Just tries to stay out of pain and spasm.
6      Q.  So is he home on a day-to-day basis?
7      A.  Yes.  Right now he is home bound at this
8  time.
9      Q.  And do you do the exercises with him?
10     A.  I help him.
11     Q.  What type of exercises does he do?
12     A.  He does them and I just observe and
13  comment, a lot of stretching.  He predominantly
14  does it by himself and I just set up his --
15  whatever he needs for that particular
16  exercise.
17     Q.  Is there anything that you can't do for
18  your son now that you could do for him before
19  this incident?
20     A.  Well, when he was lifting the weights I
21  was able to help him with that.  Now I am not
22  even going to try that.  I'm going to -- the
23  massages I have to give him, sometimes I can.
24  Sometimes I can't.  It depends on how he feels

44 (Pages 170 to 173)

Prendergrast  v. Kohl's                              4/9/2008                              Carmel  Prendergrast

Page 174

1  and how I feel.
2      Q.  How often before the incident did you
3  give your son massages?
4      A.  Just on a daily basis.
5      Q.  Just rub his back for him?
6      A.  There is special ways of doing it for
7  someone who has his disease.
8      Q.  For a while there you laid back on
9  those.  Did someone else come in and do those
10  for him?
11      A.  I was trying to teach my husband.
12      Q.  Did you ever have to hire someone?
13      A.  Not to help with him but to help around
14  the house, but my husband does all the shopping.
15      Q.  Who did you hire to come to the house?
16      A.  Friends.
17      Q.  You paid them?
18      A.  Small amounts.
19      Q.  Who?
20      A.  One of my friends.
21      Q.  What's her name?
22      A.  Jenny.
23      Q.  What's her last name?
24      A.  Bannis.

Page 175

1      Q.  Spell it.
2      A.  B-a-n-n-i-s.
3      Q.  Where does she live?
4      A.  I think it's -- Alsip, I think.
5      Q.  Is that the street?
6      A.  No, town.
7      Q.  E-l-s-o-p?
8      A.  A-l-s-i-p.
9      Q.  What's Jenny's husband's name?  Is she
10  married?
11      A.  Yes.
12      Q.  What's her husband's name?
13      A.  Mike.
14      Q.  What's her phone number?
15      A.  I don't know it offhand.  I have it
16  programmed at home on the phone.
17      Q.  It's not programmed in your cell
18  phone?
19      A.  I don't think so.  I think it's in
20  Bob's.  I just got a new cell phone.  I told you
21  I'm not fully acclimated to it.
22      Q.  Can you provide her phone number to your
23  lawyer?
24      A.  Sure.

Page 176

1      Q.  What street does she live on?
2      A.  Love.  I think it's Love.
3      Q.  How many times did you pay Jenny to come
4  to your house to assist you?
5      A.  I can't recall.  Maybe --
6      Q.  Couple of times?
7      A.  Couple of times, yeah.
8      Q.  How much did you pay her?
9      A.  I don't remember now.  That was just
10  between us.  Sometimes she volunteered her
11  services because she's a friend and sometimes I
12  would pay her.
13      Q.  20 bucks, 50 bucks?
14      A.  Yeah about 20, 25.
15      Q.  Did she maybe stay for an hour, help you
16  clean up around the house?
17      A.  Right.
18      Q.  Anything else?
19      A.  She helps with Jim sometimes.
20      Q.  What does she do for him?
21      A.  She does some exercises with him when
22  she can.
23      Q.  So she came maybe two or three times
24  that you paid her for?

Page 177

1      A.  And then the other times it's like a
2  volunteer.
3      Q.  Anyone else?
4      A.  No.  To the best of my knowledge that's
5  what I remember.  There may be more.  Who knows.
6  I don't know.  I don't keep track.
7      Q.  I just want to be sure that I'm clear
8  what you are and aren't able to do for your son.
9      A.  My husband assumes a lot of things for
10  me that I normally would do.
11      Q.  Still today?
12      A.  Oh, yeah.
13      Q.  What's he doing now?
14      A.  He does all the shopping, and I use to
15  garden.  I can't do that anymore.  He does the
16  gardening.
17      Q.  Did your back pain over the last 20
18  years effect your ability to garden?
19      A.  To a certain extent but, I mean, I just
20  went out the other day and I can't do it at all.
21  I tried it.
22      Q.  Do you attribute any of that to your
23  age?
24      A.  Age means nothing.  It's how you think.

45 (Pages 174 to 177)

Page 178

1   No, I don't think so.
2       Q.  Do you attribute any of that to your
3   weight?
4       A.  Weight doesn't have anything to do with
5   your back problem if you read about it.
6       Q.  Oh, is that right?
7       A.  Maybe there is one doctor who will say
8   that, but there are other doctors who will say
9   it's how you maneuver your body and how you
10  strengthen your body.
11      Q.  Has a doctor ever told you that being
12  overweight doesn't effect a person's back or is
13  this literature that you read on your own?
14      A.  I've read it.
15      Q.  So no physician that you've visited has
16  ever said --
17      A.  Not recently.
18      Q.  I'm not talking about just recently.
19  I'm talking about ever has a doctor ever saying
20  being overweight doesn't effect a person's
21  back?
22      A.  I remember doctor telling me that, and
23  he was huge.  He was overweight himself.
24      Q.  How about the opposite?  Do you recall

Page 179

1   doctors telling you that you needed to lose
2   weight and it would help your back problems?
3       A.  They said it might help.
4       Q.  Do you believe them?
5       A.  I mean, I've gotten heavy now, but I've
6   gotten thinner.
7       Q.  How tall are you?
8       A.  About 5, 6, 5, 5 and a half.
9       Q.  How much do you weigh?
10      A.  180.  I'm overweight now I know.
11      Q.  What's the most you weighed?
12      A.  This was -- no, I think I was over 200
13  at one time.
14      Q.  How many years ago?
15      A.  Oh, long.
16      Q.  Ten years ago?
17      A.  Yeah.  It's the health of your body and
18  the strength of your muscle that controls your
19  back not your weight.
20      Q.  Okay.  So just so I'm clear, you don't
21  feel that an overweight person -- strike that.
22          Is it your testimony that you don't
23  believe weight contributes to back pain?
24      A.  To a certain extent.  That's not the

Page 180

1   complete problem.
2       Q.  How obese does a person have to be in
3   your mind --
4           MR. PITTACORA:  I'm going to object on
5   the grounds that it's calling for speculation.
6   She's not a doctor or a medical professional.
7   So I mean her opinion is -- you can give your
8   opinion, but you're not a doctor.
9           MS. WOODWORTH:  I'll withdraw the
10  question.
11  BY MS. WOODWORTH:
12      Q.  Have you ever tried to heed your
13  doctor's advice to lose weight to reduce your
14  back pain?
15      A.  Yes.
16      Q.  And were you successful in losing the
17  weight?
18      A.  To some extent.
19      Q.  Did that help your back pain?
20      A.  Some.
21      Q.  You didn't notice any difference?
22      A.  (Nonverbal response.)
23      Q.  I tell you what.  I'm going to review my
24  notes, but I think that's about all that I have

Page 181

1   for you?
2           (Whereupon, a recess was
3           taken.)
4   BY MS. WOODWORTH:
5       Q.  Mrs. Prendergast, do you remember in
6   September of '05 having a lumbar epidural?
7       A.  Yes.
8       Q.  And what problems were you having at
9   that time?
10      A.  I'm trying to remember.  I mean, that
11  was like every six months I would go and be
12  checked; and if I had severe pain or if I had
13  pain that I couldn't conquer with my exercises,
14  then I would get an injection.
15      Q.  So --
16      A.  And I wanted to stay ahead of being in
17  severe pain.
18      Q.  So in September of '05 your pain was
19  severe enough that they did a lumbar epidural?
20      A.  It was bothering me, yes.
21      Q.  Then in October of '05 you were
22  diagnosed with left spinal stenosis.  Do you
23  recall that?
24      A.  I don't know who diagnosed it.

46 (Pages 178 to 181)

Prendergrast v. Kohl's
4/9/2008
Carmel Prendergrast

Page 182

1    Q.  And you had another lumbar epidural?
2    A.  They could never give me two a month
3  apart.  Something is wrong there.  That's not
4  accurate.  They give those shots every six
5  months -- I mean twice a year and that's it.
6    Q.  So you recall it was either September or
7  October.  Do you recall having left knee pain
8  before your fall at Kohl's in the months leading
9  up to it?
10   A.  I might have had some discomfort but
11  they checked it out.  There was nothing wrong.
12   Q.  And after the accident they checked it
13  out and there were no bruises, no fractures, no
14  dislocations, right?
15   A.  There was no fractures, but there was a
16  bursa.
17   Q.  There was a what?
18   A.  An injury from within.
19   Q.  And what are you calling that?
20   A.  A bursa.
21   Q.  Can you spell that?
22   A.  I don't know how to spell that.
23       MR. PITTACORA:  I think it's
24  b-u-r-s-a.

Page 184

1    A.  Right.
2       MS. WOODWORTH:  All right.  I am all
3  done.  Thank you.
4       MR. PITTACORA:  I don't have anything.
5  We'll reserve.
6       (AND FURTHER DEPONENT SAITH NOT.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 183

1  BY MS. WOODWORTH:
2    Q.  The records I have indicate that
3  September 9, 2005, you went to Rush University
4  Medical Center to their radiology department for
5  consultation indicating you had left knee pain.
6    A.  He sent me there to make sure everything
7  was okay.
8    Q.  Were you having trouble walking as a
9  result of that pain?
10   A.  No.
11   Q.  No limp?
12   A.  No.
13   Q.  And at that time they also did an MRI of
14  your spine at Chicago Ridge Radiology,
15  September 12, 2005.
16   A.  That's probably in preparation for the
17  injections.  He won't do it without.
18   Q.  And the reason -- the clinical
19  indication for that MRI was low back pain.  Do
20  you recall that?
21   A.  Uh-huh, yes.
22   Q.  So this is less than two months before
23  your fall and you're having low back pain and
24  left knee pain, correct?

Page 185

1          I hereby certify that I have
2  read the foregoing transcript of my deposition
3  given at the time and place aforesaid,
4  consisting of pages 1 through 186 inclusive, and
5  I do again subscribed and make oath that the
6  same is a true, correct and complete transcript
7  of my deposition given as aforesaid, with
8  corrections, if any, appearing on the attached
9  correction sheet(s).
10
11  _____ Correction sheet(s)
12  attached.
13
14
15  _____
16        CARMEL PRENDERGAST
17
18
19
20
21
22
23
24

47 (Pages 182 to 185)

Prendergrast v. Kohl's                           4/9/2008                        Carmel Prendergrast

Page 186

```
 1    STATE OF ILLINOIS)
                      ) SS.
 2    COUNTY OF COOK  )
 3
 4
 5
 6           I, SHERRY L. JONES, a
 7    Certified Shorthand Reporter for the State of
 8    Illinois, do hereby certify that the foregoing
 9    was reported by stenographic and mechanical
10    means, which matter was held on the date, and at
11    the time and place set out on the title page
12    hereof and that the foregoing constitutes a true
13    and accurate transcript of same.
14           I further certify that I am not
15    related to any of the parties, nor am I an
16    employee of or related to any of the attorneys
17    representing the parties, and I have no
18    financial interest in the outcome of this
19    matter.
20
21
22    _____
23    C.S.R. No. 084-004024
24
```

48 (Page 186)