IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARMEL PRENDERGAST,           )
                              )
            Plaintiff,        )
                              )
      -vs-                    ) No. 07-CV-06749
                              )
KOHL'S DEPARTMENT             )
STORES, INC.,                 )
                              )
            Defendant.        )

        The deposition of DARRYL SMITH, called by

the plaintiff for examination, pursuant to notice

and pursuant to Federal Rules of Civil Procedure

for the United States District Courts pertaining

to the taking of depositions, taken before DIANA

DEBRA SABO, Certified Shorthand Reporter and

Notary Public within and for the County of Will

and State of Illinois, at 7550 West Bormet Drive,

Suite 205, Mokena, Illinois, on the 25 day of

June, 2008.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARMEL PRENDERGAST,                )
                Plaintiff,          )
        -vs-                        )  No  07-CV-06749
KOHL'S DEPARTMENT                   )
STORES, INC                         )
                Defendant.          )

The deposition of DARRYL SMITH, called by the plaintiff for examination, pursuant to notice and pursuant to Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before DIANA DEBRA SABO, Certified Shorthand Reporter and Notary Public within and for the County of Will and State of Illinois, at 7550 West Bormet Drive, Suite 205, Mokena, Illinois, on the 25 day of June, 2008.

EUNICE SACHS & ASSOCIATES
(708) 709-0500

---

**Page 2**

APPEARANCES:

PITTACORA & CROTTY, L.L.C., by
MR. JAMES R. PITTACORA,
9550 West Bormet Drive
Suite 205
Mokena, Illinois  60448

        Appeared on behalf of the Plaintiff;

SEGAL, McCAMBRIDGE, SINGER & MAHONEY, LTD., by
MS. NANCY S. WOODWORTH,
Sears Tower
233 South Wacker Drive, Suite 5500
Chicago, Illinois  60606

        Appeared on behalf of the Defendant.

*   *   *   *   *   *   *   *   *   *

EUNICE SACHS & ASSOCIATES
(708) 709-0500

---

**Page 3**

WITNESS:                                    Page

DARRYL SMITH

        Examination by Mr. Pittacora     6-54

        Examination by Ms. Woodworth    54-63

        Examination by Mr. Pittacora    63-80

        Examination by Ms. Woodworth    80-82

*   *   *   *   *   *   *   *   *   *

EXHIBITS:
        Deposition Exhibit No. 1          25
        Deposition Exhibit No. 2

*   *   *   *   *   *   *   *   *   *

EUNICE SACHS & ASSOCIATES
(708) 709-0500

---

**Page 4**

(Witness sworn.)

        MR. PITTACORA:  This deposition -- actually, for the record, Mr. Smith, my name is Jim Pittacora.  I'm the attorney for the plaintiff, Carmel Prendergast.

        This deposition is being taken pursuant to notice and by agreement of the parties.  And in fact, it's pursuant to a Federal Rules of Civil Procedure Rule 30 B Notice.  This deposition is being taken in accordance with the Federal Rules of Civil Procedure.

        I'm going to go through some brief ground rules about the process today, just so we can get a clean record and we understand each other.

        Have you ever given a deposition before.

        THE WITNESS:  No, I have not.

        MR. PITTACORA:  Okay.  I'm sure your attorney told you this.  All your answers must be verbal.  The court reporter can't take down head nods or gestures.  So if at all possible, make sure all your answers are verbal.

EUNICE SACHS & ASSOCIATES
(708) 709-0500

5

1      The other thing is the court
2  reporter -- it will be a difficult process if
3  we're talking over each other. And there's going
4  to be several times where you're going to know the
5  question I'm going to ask and you're going to want
6  to start to answer it. I ask you that you allow
7  me to finish the question so the court reporter
8  can take it down and then you give your answer,
9  and I'll extend the same courtesy to you so she
10  can take everything down that you're saying.
11  Okay?
12      THE WITNESS: Okay. I understand.
13      MR. PITTACORA: If you don't understand a
14  question, because sometimes I'm going to ask a bad
15  question or it's going to be -- it's not going to
16  make sense, let me know; I'll repeat it or
17  rephrase it. If you answer it, we're all going to
18  assume that you understood the question and then
19  obviously you answered it.
20      The last general rule is if you need
21  to take a break for any reason, use the washroom,
22  get something to drink, talk to your attorney, get
23  some fresh air, whatever the case may be, let us
24  know and we will accommodate any break you want to

EUNICE SACHS & ASSOCIATES
(708) 709-0500

6

1  take, as many as you want to take. The only
2  general rule is you should answer the question
3  that's pending and then let us know you want to
4  take a break.
5      THE WITNESS: Okay. Sounds good.
6  WHEREUPON:
7      DARRYL SMITH
8  called as a witness herein, after having been first
9  duly sworn, was examined upon oral interrogatories
10  and testified as follows:
11      E X A M I N A T I O N
12      BY MR. PITTACORA:
13
14      Q.  Mr. Smith, are you on any medication
15  today that could affect your ability to testify
16  truthfully or honestly?
17      A.  **No, I am not.**
18      Q.  Okay. Can I get your date of birth.
19      A.  **4-2-67.**
20      Q.  And can I get your current home address.
21      A.  **20137 Redwood Avenue, and that's in**
22  **Lynwood, L-y-n-w-o-o-d, Illinois  60411.**
23      Q.  How long have you lived at that address?
24      A.  **Two years.**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

7

1      Q.  And do you own or rent?
2      A.  **The bank owns it, so paying the mortgage.**
3      Q.  But technically you own it, but you have
4  a mortgage?
5      A.  **Yes, yes.**
6      Q.  You're currently employed by Kohl's
7  Department Store?
8      A.  **Correct.**
9      Q.  And is that in the Orland Park location?
10      A.  **Correct.**
11      Q.  What is your current job title or your, I
12  guess, job responsibility?
13      A.  **One of the assistant store managers.**
14      Q.  And how long have you held that position?
15      A.  **August of 2005.**
16      Q.  So 8-05 you became the store -- assistant
17  store manager of Kohl's?
18      A.  **Correct.**
19      Q.  And that title hasn't changed from August
20  of 2005 until today?
21      A.  **Correct.**
22      Q.  Responsibilities been generally the same
23  from August of 2005 until today?
24      A.  **Correct.**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

8

1      Q.  And briefly describe for us what those
2  job responsibilities and duties are.
3      A.  **Just running the store. I'm the**
4  **hard-lines manager, so I have to -- we are two**
5  **levels. So I manage the lower level and then the**
6  **other young lady manages the upper level. And it**
7  **entails merchandising; working with your teams;**
8  **assigning tasks; you know, helping our customers.**
9      Q.  You mentioned hard-lines manager. Is
10  that h-a-r-d?
11      A.  **Correct.**
12      Q.  And what does that specifically mean? Is
13  that like a product line or --
14      A.  **Yes, it's -- there's apparel goods, which**
15  **are women's clothes, men's clothes; and then**
16  **there's the hard-lines goods which they consider**
17  **housewares, domestics, shoes.**
18      Q.  So pretty much nonclothes-related type
19  product?
20      A.  **Correct.**
21      Q.  You said there's another young lady
22  that's also an assistant store manager?
23      A.  **Yes.**
24      Q.  And what's her name?

EUNICE SACHS & ASSOCIATES
(708) 709-0500

9

1    A.   Beth, B-e-t-h, Minor, M-i-n-o-r.
2    Q.   And how long -- if you know, how long has
3  she been an assistant store manager of Kohl's?
4    A.   Fifteen, sixteen years.
5    Q.   And she's still an assistant store
6  manager today?
7    A.   Correct.
8    Q.   I assume if there's two assistant store
9  managers, then, there's probably a store manager?
10   A.   Correct.
11   Q.   Who is the store manager?
12   A.   His name is Mark Paulki.
13   Q.   Could you spell that, please.
14   A.   P-a-u-l-k-i, Paulki.
15   Q.   And is he your direct boss or your direct
16  supervisor?
17   A.   Yes.
18   Q.   So you would report directly to him?
19   A.   Yes.
20   Q.   How long has Mr. Paulki been your direct
21  supervisor?
22   A.   Little over a year, year and a half.
23   Q.   And you understand that the accident at
24  issue in this case occurred in November of 2005;

11

1    A.   No, I have not.
2    Q.   How about have you ever been accused or a
3  party to a lawsuit involving civil fraud or
4  dishonesty?
5    A.   No, I have not.
6    Q.   And you've already told us you've never
7  given a deposition before today; correct?
8    A.   Correct.
9    Q.   Can you tell me or tell us briefly your
10  educational background posthigh school.  So
11  college and beyond.
12   A.   Oh, I have my bachelor's degree in
13  business.
14   Q.   B.S.  Is that business administration?
15   A.   Yes, or management, yes.
16              (There was a short
17              interruption.)
18  BY MR. PITTACORA:
19   Q.   So you have got a B.S. in business
20  administration or management; correct?
21   A.   Correct.
22   Q.   What institution?
23   A.   The University of Toledo, and that's in
24  Toledo, Ohio.

10

1  correct?
2    A.   Correct.
3    Q.   So Mr. Paulki was not the store manager
4  at the time the accident occurred; is that
5  correct?
6    A.   Correct.
7    Q.   Who was the store manager at that time?
8    A.   Matt Johnson or Matthew Johnson.
9    Q.   Do you know when he left Kohl's -- well,
10  did he leave Kohl's?
11   A.   Yes, he went to J.C. Penney's, I believe.
12   Q.   Do you know when that was?
13   A.   Right before Mark took over.  So little
14  over a year, year and a half ago.  So then we were
15  without maybe two months until he took over.
16   Q.   Okay.  I'm going to back up and ask you
17  some more general background questions, and don't
18  take any offense by the questions I'm asking
19  because I ask these of everybody at every
20  deposition.  Have you ever been convicted of a
21  felony?
22   A.   No, I have not.
23   Q.   Have you ever been convicted of a crime
24  involving fraud or dishonesty?

12

1    Q.   When did you earn that degree?
2    A.   '92.
3    Q.   Anything postgraduate?
4    A.   Currently obtaining my M.B.A.
5    Q.   And what institution are you attending?
6    A.   Westwood, Westwood College.
7    Q.   What are you studying or a master's of
8  business administration?
9    A.   Yes, my M.B.A. in management.
10   Q.   And when do you anticipate earning your
11  degree from Westwood for --
12   A.   This December.
13   Q.   I'm going to ask you some questions about
14  your preparation for today's deposition.  I don't
15  want you to tell me anything that you have
16  discussed with your attorney.  So I'm going to ask
17  you some general questions.  I assume that you met
18  with Miss Woodworth to discuss your deposition
19  today; correct?
20   A.   Correct.
21   Q.   When did you meet with her?
22   A.   I'd say it was a few weeks back.  So I'd
23  say three or four weeks ago.
24   Q.   Was anyone else present at this meeting

13

1 besides yourself, Nancy, and maybe a paralegal or
2 somebody working with Nancy's firm?
3 **A. No, no one was present.**
4 **Q.** Okay.
5 **A. No one else was present.**
6 **Q.** Did you review any documentation in
7 preparation for your deposition today?
8 **A. Just the -- Mrs. Prendergast, just the**
9 **incident itself.**
10 **Q.** An incident report you mean or --
11 **A. Yes, yes.**
12 **Q.** No Complaint, no Answers to
13 Interrogatories, nothing like that?
14 **A. No.**
15 **Q.** Any photos?
16 **A. No.**
17 **Q.** Okay. Did you discuss your deposition
18 today with anyone beside Nancy? So in other
19 words, anyone within Kohl's Department Store did
20 you discuss your deposition today?
21 **A. No.**
22 **Q.** Obviously, I'm sure you told your boss
23 you were --
24 **A. Yeah, he just knows I'm coming. Okay.**

14

1 **Sorry. He just knows I'm coming.**
2 **Q.** But nothing about the content or what he
3 anticipated you to testify about or --
4 **A. No.**
5 **Q.** Okay. Do you know what Mrs. Prendergast
6 has alleged against Kohl's in this case?
7 **A. From what I gathered, that she tripped on**
8 **a patch of the sidewalk and fell and hurt herself.**
9 **Q.** And again, we understand that that took
10 place in November of 2005; correct?
11 **A. Correct.**
12 **Q.** Specifically, the accident -- would you
13 agree or disagree that the accident occurred on
14 November 17, 2005?
15 **A. That's correct.**
16 **Q.** Okay. Did you personally witness
17 Mrs. Prendergast fall on November 17, 2005?
18 **A. No, I did not personally see her fall.**
19 **Q.** Okay. However, it's fair to assume that
20 you were working at Kohl's on the day of the
21 accident, November 17, 2005; correct?
22 **A. Yes, I was working, correct.**
23 **Q.** And were you working in the capacity as
24 the assistant store manager?

15

1 **A. Yes.**
2 **Q.** And I think you told us that you were the
3 assistant store manager for the first floor of
4 Kohl's; correct?
5 **A. Correct.**
6 **Q.** And the area in which Mrs. Prendergast
7 fell, are you familiar with that area?
8 **A. Yes.**
9 **Q.** Is it fair to say that that area
10 approaches the entranceway at Kohl's on the first
11 floor of Kohl's?
12 **A. Correct. What's -- the floors are**
13 **reversed. The first floor is the lower. The**
14 **upper -- we consider it the upper level.**
15 **Q.** Okay. So the area approaching the door
16 where Mrs. Prendergast fell, that would enter onto
17 the second floor of Kohl's?
18 **A. Correct.**
19 **Q.** And the first floor would be below it?
20 **A. Yes.**
21 **Q.** Is there a particular reason why you were
22 dispatched to the scene of the accident after the
23 fall as opposed to, I think you said, Beth Minor?
24 **A. Yeah, I was the manager on duty.**

16

1 **Q.** So Beth Minor wasn't working at that
2 time?
3 **A. Yes, she was.**
4 **Q.** She --
5 **A. Oh, go ahead. Sorry.**
6 **Q.** So she was working on the day of the
7 accident?
8 **A. Correct.**
9 **Q.** So explain to me, then, why you versus
10 Beth Minor were dispatched.
11 **A. It's whoever called, if they were paged,**
12 **then whatever manager is closest by would react.**
13 **Q.** So you were the closest manager at the
14 time, so you went out to the sidewalk area and
15 took inventory of what was happening?
16 **A. Correct.**
17 **Q.** Did you have -- I take it you arrived at
18 the scene of the accident after Mrs. Prendergast
19 fell; is that correct?
20 **A. Correct.**
21 **Q.** When you first walked out of the store to
22 the area where Mr. -- Mrs. Prendergast fell, what
23 did you see?
24 **A. When I walked out, nothing. There was**

17

1  just the normal view:  the concrete, the sidewalk,
2  nothing out of the ordinary.
3      Q.  Where was Mrs. Prendergast in relation to
4  the front door of Kohl's when you walked out the
5  door?  Was she still on the ground, was she in a
6  wheelchair, was she in an ambulance?
7      A.  She was inside the store, and I believe
8  someone else had got her a chair close by the
9  front door.  So she was inside the building.
10     Q.  So she was inside the front door of the
11  store?
12     A.  Correct.
13     Q.  She was sitting in a chair?
14     A.  I believe either she was sitting or we
15  got her a chair.  That's where Beth came in.  So
16  we kind of worked together.
17     Q.  So you arrived first and then Beth
18  arrived shortly after?
19     A.  Yes, but it was almost simultaneously,
20  because then I went outside and she went to get
21  her the chair.
22     Q.  Okay.  And what was the first thing you
23  did, then, when you arrived, went outside?
24     A.  Well, I believe we called the paramedics.

EUNICE SACHS & ASSOCIATES
(708) 709-0500

18

1      Q.  Okay.  And why did you call the
2  paramedics?
3      A.  She was requesting it, I believe, at the
4  time.
5      Q.  Okay.  And after you called the
6  paramedics, what did you do next?
7      A.  Beth filled out the incident report, and
8  then I just went out to observe the scenery just
9  to make sure there was nothing that, you know,
10  obscure.
11     Q.  What did you observe?  Was there anything
12  obscure or was there anything noteworthy about the
13  area where Mrs. Prendergast fell?
14     A.  No, there wasn't anything.
15     Q.  Do you know if there were any witnesses
16  that saw Mrs. Prendergast fall on November 17,
17  2005?
18     A.  There was a gentleman that approached me
19  when I went outside that said that he had saw.
20     Q.  Do you know this gentleman's name?
21     A.  I do not.  I can't recall his name, but
22  there was a gentleman, but I'm not sure of his
23  name.
24     Q.  Does Jerome Finnigan jar your memory?

EUNICE SACHS & ASSOCIATES
(708) 709-0500

19

1  Could that have been the person that you spoke
2  with?
3      A.  It could be, yes.
4      Q.  Okay.  What did this person -- I take it
5  you said it was a man; correct?
6      A.  Correct.
7      Q.  What did this gentleman say to you when
8  you went out and viewed the accident scene?
9      A.  Because there was like so much going on
10  with -- my concern was about her.  So I just heard
11  him kind of saying, hey, I saw the incident.  I
12  saw her fall.  She just tripped over her own feet,
13  and that was all he said.
14     Q.  So he said to you she tripped over her
15  own feet?
16     A.  Yeah.
17     Q.  He didn't say anything else?
18     A.  Um-um.
19     Q.  Did you take a statement down at the time
20  of the accident?  I mean, did you say to him I'd
21  like you to prepare a statement or sign a
22  statement that we prepared?
23     A.  I did not say that to him, no.  But I
24  believe he gave his information willingly, just

EUNICE SACHS & ASSOCIATES
(708) 709-0500

20

1  his name and phone number.
2      Q.  And did you say anything else to him, and
3  did he say anything else to you after this first
4  exchange?
5      A.  No.
6      Q.  What did you do next after you spoke with
7  Mr. Finnigan or the gentleman who we believe to be
8  Mr. Finnigan?
9      A.  Just went back in to attend to
10  Mrs. Prendergast with Beth, who is the other
11  assistant manager just to see how everything was
12  going and then wait for the ambulance.
13     Q.  How long do you think it took between the
14  time that you called the ambulance and the time
15  that the ambulance actually arrived?
16     A.  If I had to guess, five to seven minutes.
17     Q.  So pretty quickly?
18     A.  Yeah.
19     Q.  And what did you do next?  Did the
20  ambulance -- did you have any interaction with
21  Mrs. Prendergast prior to the ambulance arriving?
22     A.  Just to -- I think we got an ice pack,
23  just to see how she was doing and just to -- Beth
24  took her statement, and then that was really all

EUNICE SACHS & ASSOCIATES
(708) 709-0500

21

1  the interactions that I had.
2      Q.  So no real exchange of conversation, no
3  questions about how are you feeling, are you
4  experiencing pain, nothing like that?
5      A.  Well, Beth had already took her report
6  down so -- and then we knew she needed medical
7  treatment, so that was to the extent of it.  We
8  just wanted to make sure she was comfortable until
9  they arrived and got her an ice pack and those
10  sort of things.
11      Q.  And did you stay when the ambulance
12  arrived?
13      A.  Yes.
14      Q.  And what did you view or what did you
15  witness the ambulance do?  I mean, did they load
16  her in, did they give any medical treatment at the
17  scene?
18      A.  I believe they did take her -- yeah, take
19  her away.
20      Q.  And did you ask where they were taking
21  her?
22      A.  No, no, I did not.
23      Q.  Did you witness them administer any
24  medical care at the scene?  I mean, did they take

22

1  her vitals, did they take her blood pressure, did
2  they take her pulse, anything like that?
3      A.  I believe they did -- yes, that's just a
4  general routine, so I believe they did do that.
5      Q.  And what did you do next then?
6      A.  Really that was it.  So we just kind of
7  left it in their hands and whatever her and her
8  husband wanted to do and just left it at that.
9      Q.  Did you interview anyone else at the
10  scene or speak with any other witnesses other than
11  the one you've just discussed for us earlier
12  today?
13      A.  No.
14      Q.  Did you personally fill out or prepare
15  any incident report for Kohl's?
16      A.  Did I fill it out?  I believe Beth and I
17  both did.  So I might have took -- either called
18  it in; Beth filled it out and I believe I called
19  it in, called the incident in to how we're
20  supposed to, just standard procedure.
21      Q.  Okay.  So it is Kohl's standard procedure
22  to prepare an incident report if somebody falls or
23  is injured in the store?
24      A.  Correct.

23

1      Q.  And is there some form or form document
2  or, you know, some preprinted form that you guys
3  complete?
4      A.  Yes.
5      Q.  And has that been the -- that was the
6  practice in November of 2005?
7      A.  Correct.
8      Q.  Is that still the practice today?
9      A.  Correct.
10      Q.  Has that form changed at all from
11  November 2005 until today?
12      A.  No.
13      Q.  Has the process changed for reporting or
14  addressing an accident changed from November
15  of 2005 to today?
16      A.  No.
17      Q.  Did you or anyone under your supervision
18  take photographs of the scene of the accident at
19  or around the time of the accident?
20      A.  Yes, I did.
21      Q.  You personally did?
22      A.  Yeah.
23      Q.  And when did you take those photographs?
24      A.  When I had -- I believe it was either

24

1  after she had gone, but then I went out to inspect
2  and make sure after her husband, I believe, told
3  me where she fell, looked at the scenery.  So then
4  I took pictures of that area.
5      Q.  Okay.  And did you have any other
6  interaction or dialogue with Mr. Prendergast?
7      A.  No.
8      Q.  And is it Kohl's common practice to take
9  pictures of an area where an accident occurs?
10      A.  Correct, yes, it is.
11      Q.  Okay.  I do have the photos that your
12  attorney produced in response to discovery, but
13  they're pretty difficult to view because they're
14  black and white.  So what I am going to do is I
15  will mark these as -- take a break for a minute.
16  I want to make a copy of this.
17          MR. PITTACORA:  So go off the record for
18  a second.
19              (A discussion was had that was
20              off the record.)
21          MR. PITTACORA:  I'm going to hand you,
22  Mr. Smith, what I am going to mark as exhibit,
23  Plaintiff's Exhibit 1.
24

25

1           (Deposition Exhibit No. 1 for
2           Identification was so marked by
3           counsel.)
4    BY MR. PITTACORA:
5        Q.  And ask you if you recognize those
6    photographs.
7        A.  **Yes, I do.  That's the front entrance to**
8    **the upper level.**
9        Q.  And I'm also going to hand you,
10   Mr. Smith, the color photographs because they're
11   obviously much easier to read, although I'm not
12   going to mark those as an exhibit.
13       A.  **Okay.**
14       Q.  But feel free to refer to either one;
15   they're copies of the same thing.
16           MS. WOODWORTH:  Can we clarify for the
17   record where these photos came from.
18           MR. PITTACORA:  Yes.
19           MS. WOODWORTH:  PR on the bottom.
20           MR. PITTACORA:  Yes.  For the record,
21   these are the photographs that the plaintiff took
22   shortly after the accident.  The accident
23   occurred, I believe, on November 17, 2005, and
24   these photographs were taken by the plaintiff's

EUNICE SACHS & ASSOCIATES
(708) 709-0500

26

1    husband shortly after the accident.
2    BY MR. PITTACORA:
3        Q.  Just so you know, these were not taken by
4    you.
5        A.  **Okay.**
6        Q.  I do have the photographs that you took,
7    but they're very illegible because they're copies
8    of copies --
9        A.  **Okay.**
10       Q.  -- so --
11           And I'll ask you, again, do you
12   recognize the photographs that I have marked as
13   Exhibit 1?
14       A.  **Yes.**
15       Q.  And feel free to look through all of
16   them.
17           MR. PITTACORA:  And again, for the
18   record, Exhibit 1 are plaintiff's photographs with
19   the Bates range of PR 00070 through 74.
20           THE WITNESS:  Okay.  Yes, these are --
21   I -- these are the pictures.
22   BY MR. PITTACORA:
23       Q.  And Mr. Smith, is it fair to say that
24   these pictures depict the area where

EUNICE SACHS & ASSOCIATES
(708) 709-0500

27

1    Mrs. Prendergast reported that she fell?
2        A.  **Correct.**
3        Q.  And to the best of your knowledge, did
4    these pictures depict the area where
5    Mrs. Prendergast reported she fell accurately and
6    fairly?
7        A.  **Yes.**
8        Q.  I direct your attention to PR 00070 of
9    Exhibit 1, and feel free to find the corresponding
10   color photo if it's easier for you to refer to.
11   Could you describe what's depicted on PR 00070 of
12   Exhibit 1.
13       A.  **It's the front, the upper level sidewalk**
14   **as you're -- as you are going into the entranceway**
15   **coming off of the curb of the parking lot into the**
16   **store.**
17       Q.  So it's fair to say that this is a
18   sidewalk immediately in front of the front
19   entrance of the Kohl's Department Store which
20   would enter into the second level?
21       A.  **Correct.**
22       Q.  In the middle of the photograph could you
23   describe what you view there.
24       A.  **In the middle it's -- you just see the**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

28

1    **concrete squares divided into squares, and it**
2    **looks like one of them there was something there**
3    **but that has been patched.**
4        Q.  Okay.  So it looks like there's a circle
5    in the middle of the photograph that has been
6    patched; is that fair to say?
7        A.  **Yes.**
8        Q.  So can we refer to that area for purposes
9    of our questions as the patched area of the
10   cement?
11       A.  **Okay.  Yes.**
12       Q.  Do you know when that area was patched
13   last by Kohl's or if it was patched by Kohl's?
14       A.  **I couldn't tell you when.  It was that**
15   **way when I was there so --**
16       Q.  So it was that way when you started in
17   August of 2005?
18       A.  **Correct.**
19       Q.  And let me back up a little bit.  Where
20   did you work or where were you employed prior to
21   August of 2005?
22       A.  **With Best Buy.**
23       Q.  And what was your position at Best Buy?
24       A.  **Operations manager/customer service**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

29

1   manager.

2       Q.   And where was that Best Buy location at?

3       A.   Indianapolis, Indiana.

4       Q.   How long did you hold that position?

5       A.   Worked for Best Buy four years.

6       Q.   So is it fair to say about August of 2001

7   through August of 2005?

8       A.   Yes.

9       Q.   And prior to your tenure at Best Buy,

10  where were you employed?

11      A.   With Target.

12      Q.   And in what capacity or what was your job

13  title?

14      A.   H.R. manager.

15      Q.   And where was that Target location at?

16      A.   Target and Best Buy were both in Ohio,

17  except for the last year of Best Buy was in

18  Indianapolis, Indiana.

19      Q.   So for your first three years at Best Buy

20  you worked in Ohio, and then your last year you

21  were transferred to Indianapolis?

22      A.   Correct.

23      Q.   So you worked at Target.  You were the

24  H.R. manager in Ohio for how long?

30

1       A.   For two years.

2       Q.   So is it fair to say August of 1999

3   through August of 2001?

4       A.   Right.

5       Q.   And prior to August of '99 where were you

6   employed?

7       A.   Worked at the local cable company,

8   Buckeye Cable System.

9       Q.   And what was your job title there?

10      A.   I was in sales.

11      Q.   I take it that was in Ohio?

12      A.   Correct, yes, in Ohio.

13      Q.   Columbus?

14      A.   Toledo, Ohio.

15      Q.   I heard buckeye and just figured it would

16  be Columbus.

17           And how long did you work at Buckeye

18  Cable in Toledo, Ohio?

19      A.   Little under two years.

20      Q.   So is it fair to say 8 of '97 through 8

21  of '99?

22      A.   Yeah.

23      Q.   And prior to Buckeye Cable, where did you

24  work?

31

1       A.   Oh, you know, I have it reversed.

2   Admiral Financial was the two years there.  Before

3   Admiral Financial it was Buckeye Cable.

4       Q.   Okay.  So how long at Admiral Financial?

5       A.   About the two years.

6       Q.   Two years?

7            And then what was your job title?

8       A.   I was a mortgage broker.

9       Q.   So you had that from 8-97 to 8-99?

10      A.   Right.  And then prior to that was that

11  Buckeye Cable because that's who recruited me to

12  come over to work for them.  Now I got it

13  straight.

14      Q.   So Buckeye Cable, how long were you

15  there?

16      A.   Little under two years there.

17      Q.   So about 8-95 to 8-97?  Does that sound

18  right?

19      A.   Yeah.

20      Q.   And we know you graduated in 1991 or --

21      A.   Or '92.

22      Q.   '92?

23      A.   '92.

24      Q.   '92.  Did you have a job from '92 to '95?

32

1       A.   Yeah, I worked at General Mills till

2   about '95, '96.

3       Q.   And did you get that job right out of

4   college?

5       A.   Through college, yeah, through college

6   like in '88 or '89.

7       Q.   So about 1988 through early 1995?

8       A.   Yeah.

9       Q.   And what was your job title there?

10      A.   Just various different: line operator.

11  I was on their design team when they went to high

12  involvement work system.  So just different --

13  various different roles.  They like moving people

14  around to work, you know, the high involvement to

15  get trained on everything.

16      Q.   Any management responsibility at General

17  Mills?

18      A.   The line operator.  You're basically

19  running the lines.  So the four, five people

20  that's on your line, they -- they sort of report

21  to you because you're letting them know what to

22  do.  So that was the leadership role there.

23      Q.   Okay.  So I think we've covered -- is it

24  fair to say we've covered all your employment from

1 college to the present?

2     **A. Uh-hum, yes.**

3     Q. Back to Exhibit 1, which are the

4 photographs. I think you testified that the

5 concrete area -- this is depicted in PR 00070 of

6 Exhibit 1 -- was in the same condition as when you

7 arrived in August of 2005 at Kohl's?

8     **A. Correct.**

9     Q. So you don't know when it was repaired or

10 patched?

11     **A. No, I do not.**

12     Q. Does Kohl's have responsibility for

13 maintaining this sidewalk area in front of the

14 store?

15     **A. Yes.**

16     Q. So that wouldn't have been handled by the

17 Village of Orland Park or public works or anything

18 like that?

19     **A. I don't believe so.**

20     Q. Since you arrived at Kohl's in August of

21 2005, are you aware of any accidents, other than

22 Mrs. Prendergast's accident, that happened or

23 occurred at the area that's depicted in Exhibit 1,

24 PR 00070?

1     **A. No, I have not.**

2     Q. How about since Mrs. Prendergast's

3 accident in November of 2005? Are you aware of

4 any accidents at the location or at the area

5 depicted in Exhibit 1, PR 00070?

6     **A. No, I have not.**

7     Q. Are you aware of any customer complaints,

8 anyone complaining that the -- that the patched

9 area is rough or uneven?

10     **A. No, no complaints.**

11     Q. Nobody's ever complained to you?

12     **A. No.**

13     Q. Are you aware if anyone ever complained

14 to Beth Minor about this area?

15     **A. From what -- to my knowledge, no.**

16 **Because we talk as a management group. So if**

17 **something was out of the ordinary, the other**

18 **managers would know.**

19     Q. How large is that what we'll call that

20 patched area? How large is it, if you know?

21     **A. I'd say maybe it's a foot, 12, 13 inches**

22 **or so in diameter.**

23     Q. In fact, did you measure it or did you

24 use any measuring device to measure it when you

1 took the photographs back in November of 2005?

2     **A. No, I did not.**

3     Q. But your best estimate now is it's about

4 a foot in diameter I think you said?

5     **A. Correct.**

6     Q. Would you characterize that as a large

7 patched area of cement?

8     **A. Not particularly. Just -- it's just a**

9 **patched area.**

10     Q. Would you characterize it as small?

11     **A. I guess in comparison to the sidewalk,**

12 **yes, I'd say it was small.**

13     Q. Is it also fair to say it looks as though

14 there's a crack that starts from the curb, runs

15 through what appears to be the center of the

16 patched area, and then goes up to, I believe,

17 that's a garbage can outside the front door of

18 Kohl's?

19     MS. WOODWORTH: I'm going to object to

20 that characterization. Mr. Smith can use his own

21 words to describe what's in the photo.

22     MR. PITTACORA: You can answer, if you

23 understand my question.

24     THE WITNESS: Oh, it just looks like a

1 sidewalk with concrete just like any other normal

2 sidewalk.

3 BY MR. PITTACORA:

4     Q. Okay. But do you see -- does it appear

5 that there's a crack that starts at the base of

6 the curb and runs through or comes into the circle

7 patched area of cement and then continues on up

8 into -- I assume this is a garbage can outside the

9 front door?

10     **A. I believe that is the garbage can.**

11 **There's a line that goes through.**

12 **So there is a line through the patch on the**

13 **sidewalk.**

14     Q. Okay. And is it fair to say that that

15 line starts at the curb, continues through the

16 circle patched area, all the way up to the garbage

17 can, which is -- looks like it's immediately out

18 in front of the Kohl's door; correct?

19     **A. Yes.**

20     Q. And it's a jagged line; correct?

21     **A. Yes.**

22     Q. So it's not a straight line?

23     **A. It's -- yes, it's a curved line.**

24     Q. Okay. And does it appear that it's a

37

1  crack or how would you -- how would you describe
2  or characterize the line?
3      **A.  See, I would look at it because the**
4  **parking lot is the same way as far as concrete**
5  **itself and pavements do have lines and as you**
6  **refer, cracks in them.  So that's why -- and I**
7  **actually felt that area and it was smooth.  So I**
8  **didn't feel anything as far as a crack, no.  There**
9  **was no -- couldn't feel a big gap in between, but**
10  **it was all nice and smooth, so that's why I just**
11  **called it as a line.**
12      Q.  Okay.  Well, let's back up and break it
13  down.  First, you said you felt the area and you
14  felt it to be smooth.  Are you referring to the
15  circle patched area in the middle of the
16  photograph?
17      **A.  Correct.**
18      Q.  So you felt that area and in your opinion
19  it was smooth?
20      **A.  Correct, because --**
21      Q.  Smooth to the touch?
22      **A.  Correct, because I wanted to make sure it**
23  **wasn't nothing loose or anything from where the**
24  **plaintiff had said she fell.**

38

1      Q.  Okay.  Now, obviously smooth is a
2  relative term.  Is it smooth like the surface of
3  this hardwood table smooth or is it smooth like
4  sand paper or concrete?  Because obviously
5  concrete is not the same thing as like marble;
6  right?
7      **A.  Right.  Yeah, as far as concrete goes,**
8  **there was no unevenness that caused for alarm.**
9  **Everything when I felt it, felt like the gritty**
10  **sand paper that concrete feels like, but nothing**
11  **uneven.**
12      Q.  Okay.  So maybe smooth isn't the right
13  characterization.  Maybe what you are saying is
14  there's no unevenness to that area of the
15  concrete.
16      **A.  Correct.**
17      Q.  But as far as smooth goes, it still has
18  the same texture of a concrete which is more in
19  the vein of a sand paper than a marble?
20      **A.  Correct.**
21      Q.  Now, the lines.  You said you view or you
22  characterize that line that I discussed from the
23  curb -- it's a jagged line from the curb that runs
24  through the center of the concrete patch up to the

39

1  garbage can.  You said that you see that as more
2  as a line than a crack; is that correct?
3      **A.  Well, it's -- it's a line.  I see it no**
4  **more than what I see on other pavements or**
5  **sidewalks.  So that's why I guess -- to me I'm**
6  **thinking a crack means there's a crack that's wide**
7  **open.  Someone -- something could fall or someone**
8  **could trip.  It was more of a line to show that**
9  **there might have been, but it was still smooth --**
10  **it was still the same texture and evenness**
11  **throughout the whole sidewalk.**
12      Q.  Okay.  Again, I think what you are
13  telling us is there's no unevenness.
14      **A.  Correct.**
15      Q.  Because you'll agree with me, at least in
16  this photo, there are definitely lines in the
17  cement which are probably man-made lines; correct?
18      **A.  Correct.**
19      Q.  In fact, that's probably the way they
20  manufactured or poured the cement so that there's
21  almost like different squares --
22      **A.  Correct.**
23      Q.  -- correct?
24      **A.  Right.**

40

1      Q.  And you would agree with me that the line
2  that we are talking about that runs from the curb
3  to the center of the rough patch to the garbage
4  can is not, what we'll call, a man-made line;
5  correct?
6      **A.  Correct.  It would be more just like a**
7  **house or something settles.  So it looks like it**
8  **was from settling of some sort.**
9      Q.  Okay.  And then it also looks like
10  immediately adjacent or almost immediately
11  adjacent to the rough patch area we've got a --
12      MS. WOODWORTH:  I'm going to object to
13  your characterization of the patch as rough.
14  BY MR. PITTACORA:
15      Q.  Okay.  The circle patch area immediately
16  adjacent to or almost immediately adjacent to
17  that, we've got a dip in the curb where presumably
18  this is an area where people are to walk up
19  because there's no curb; correct?
20      **A.  Correct.  That would be the handicapped**
21  **accessible area that you could get a wheelchair**
22  **up.**
23      Q.  So it's more of a ramp up for, as you
24  said, for handicap access?

41

1    **A. Correct.**

2    **Q.** Okay. And it's fair to say that it looks

3    like the circle patch area is in the square of

4    concrete that's immediately to the left of the

5    handicap ramp as you're approaching the front door

6    of the Kohl's store; correct?

7    **A. Correct.**

8    **Q.** And is it fair to say that the remaining

9    photographs in Exhibit 1 all basically depict the

10    same circle patched area of concrete that's in

11    front of the Kohl's store?

12    **A. Correct.**

13    **Q.** Do you know if Kohl's has done anything

14    since Mrs. Prendergast's accident to repair or

15    further patch that circle-patched area of

16    concrete?

17    MS. WOODWORTH: Objection, relevance.

18    You can answer, if you know.

19    THE WITNESS: Oh, to answer?

20    MS. WOODWORTH: You can answer.

21    THE WITNESS: There was nothing done

22    after that incident, no, but our store recently

23    went through a remodel and finished in March. And

24    then as part of the remodel, along with the

EUNICE SACHS & ASSOCIATES
(708) 709-0500

42

1    landlord and, I believe, actually the city or

2    someone might have gotten involved, they redid the

3    whole parking lot, upper and lower level. And

4    part of redoing the parking lot they have redone

5    the sidewalks to make the handicapped accessible

6    and put it in the middle.

7    BY MR. PITTACORA:

8    **Q.** So the handicapped accessible that's

9    depicted on Exhibit 1 on PR 00070 is now further

10    to the left as you approach the store?

11    **A. Correct.**

12    **Q.** Because it's fair to say that the store

13    doors are to the left; correct?

14    **A. Correct.**

15    **Q.** So if I went out there today, I wouldn't

16    be able to see this circle patch area?

17    **A. No, you would not anymore.**

18    **Q.** So the whole sidewalk and parking lot

19    area has been redone?

20    **A. Correct. And that just happened this**

21    **week.**

22    **Q.** It just concluded this week?

23    **A. Yeah, and they're actually still in the**

24    **process of repaving the parking lot.**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

43

1    **Q.** Mr. Smith, I'm going to hand you what I

2    am going to mark as Exhibit 2.

3    (Deposition Exhibit No. 2 for

4    Identification was so marked by

5    counsel.)

6    MS. WOODWORTH: Thank you.

7    BY MR. PITTACORA:

8    **Q.** I'm going to ask you if you recognize

9    this document.

10    **A. Yes, that's the Kohl's incident report.**

11    **Q.** And I believe you testified that you were

12    involved, at least, partially, in the preparation

13    of the Kohl's incident report, which is Exhibit 2?

14    **A. Correct.**

15    **Q.** And it appears as though the person who

16    prepared or at least wrote the report is Beth

17    Minor; is that correct?

18    **A. Correct.**

19    **Q.** Because we see her name under store

20    information. Print full name, title, address, and

21    phone number of party completing this report;

22    correct?

23    **A. Correct.**

24    **Q.** And we see Beth Minor's name there.

EUNICE SACHS & ASSOCIATES
(708) 709-0500

44

1    And we already know Beth Minor is

2    the other assistant manager at the Kohl's

3    Department Store in Orland Park; correct?

4    **A. Correct.**

5    **Q.** Okay. And is this the same report that

6    Kohl's prepares for every accident that occurs at

7    one of their locations?

8    **A. Correct.**

9    **Q.** And directing your attention to the

10    second page of Exhibit 2. And under the area

11    where it says witnesses, we see Jerry Finnigan;

12    correct?

13    **A. Correct.**

14    **Q.** Does this refresh your recollection as to

15    the person you may have spoken with outside of the

16    Kohl's Store on November 17, 2005?

17    **A. Yes.**

18    **Q.** And it looks like we've got a phone

19    number there for Mr. Finnigan; correct?

20    **A. Correct.**

21    **Q.** Have you or anyone else, to the best of

22    your knowledge, from Kohl's attempted to contact

23    Mr. Finnigan to interview him or ask him what he

24    saw as it relates to Mrs. Prendergast's fall?

EUNICE SACHS & ASSOCIATES
(708) 709-0500

**45**

1  A. No, I have not, nor do I believe Beth did
2  as well.
3  Q. Now, Mr. Smith, it's fair to say that, to
4  the best of your knowledge, no Kohl's employee
5  personally witnessed Mrs. Prendergast's fall;
6  correct?
7  A. Correct.
8  Q. Mr. Smith, do you consider yourself to be
9  the Kohl's employee most knowledgeable about the
10 care, cleaning, and maintenance of the exterior
11 portions of the Orland Park Kohl's Department
12 Store, and more specifically the area where
13 Mrs. Prendergast fell?
14 A. The care, cleaning, no.
15 Q. Is there somebody else that would be more
16 knowledgeable on that particular issue than
17 yourself?
18 A. The store has a pers ops, personnel of
19 operations, and that typically falls into their
20 realm of responsibilities.
21 Q. And who would be the person in charge of
22 that department?
23 A. Currently it's Chris Laruccia,
24 L-a-r-c-c-u-i, Laruccia, something like that

EUNICE SACHS & ASSOCIATES
(708) 709-0500

**46**

1  L-a-r --
2  Q. -- u --
3  A. -- u-c-c-i-a.
4  Q. And how long, if you know, has Chris
5  Laruccia been with Kohl's or --
6  A. She just started. With Kohl's, oh, with
7  with Orland, maybe four, five months.
8  Q. Who -- what was that -- what was the --
9  I'm sorry. What was the title that you --
10 A. Pers ops.
11 Q. Pers ops?
12 A. I think it's o, Larocco, now that I think
13 about it.
14 Q. Who was the pers ops at Kohl's in
15 November of 2005, if you know?
16 A. His name was Tim. I'm not sure how to
17 spell it correctly. Last name, Resniak.
18 Q. And is he still a Kohl's employee?
19 A. No, he is not.
20 Q. Do you know where he's currently at? I
21 mean, did he retire, did he go to a new --
22 A. Yeah, he went somewhere else. I'm not
23 sure where he went, but yeah, he left Kohl's.
24 Q. Would you consider yourself to be the

EUNICE SACHS & ASSOCIATES
(708) 709-0500

**47**

1  person most knowledgeable from Kohl's on safety
2  policies concerning the designation of proper
3  warnings to business invitees of potentially
4  hazardous locations?
5  A. I'd say we're all equally -- if it's
6  anything that's regarding safety, we all are
7  knowledgeable as far as insuring that our
8  customers are safe, if that makes sense.
9  Q. Sure. Okay.
10 And we have already established that
11 you were the person that contacted the ambulance
12 at Mrs. Prendergast's request; correct?
13 A. Correct.
14 Q. Do you know John Hartman?
15 A. John Hartman? No.
16 Q. And just so you know, Mr. Hartman was
17 identified by your attorney in Answers to
18 Interrogatories as the -- as one of the EMS
19 personnel that was dispatched to the scene of the
20 accident.
21 A. Uh-hum. Okay.
22 Q. So you don't know him personally?
23 A. No.
24 Q. How about Robert Winkleman?

EUNICE SACHS & ASSOCIATES
(708) 709-0500

**48**

1  A. Um-um, never heard of him.
2  Q. Mike Harvin?
3  A. No.
4  Q. Have you ever dealt with those guys in
5  accidents that happened at Kohl's, either before
6  Mrs. Prendergast's accident or after?
7  A. I haven't personally dealt with them, and
8  I'm not -- I couldn't pick them out of a line up,
9  no. So if they responded to something previous, I
10 wouldn't be able to pick them out and tell you
11 that's who it was, no.
12 Q. Okay. And your attorney's also
13 identified you as a potential witness that would
14 be called at trial of this matter.
15 Other than what you have already
16 told us today in response to my questions, is
17 there anything else that you anticipate testifying
18 about at trial if this matter goes to trial?
19 A. No.
20 Q. Again, you were identified in
21 Interrogatory Response No. 5, and it's anticipated
22 that you would testify to Mrs. Prendergast's
23 physical condition immediately following the
24 accident. What was her physical condition

EUNICE SACHS & ASSOCIATES
(708) 709-0500

49

1  immediately following the accident?

2      **A. From what I could recall, I believe we**

3  **gave ice packs until the ambulance came, and I**

4  **just know from what she stated she was in a lot of**

5  **pain, like her hip or leg was hurting.**

6      **Q.** Anything else?

7      **A. To my knowledge, no. Just -- I just know**

8  **either one side of her hurt or hip or leg, and**

9  **that's all I could recall.**

10      **Q.** How about her mental condition? Again,

11  it's anticipated that you were going to testify

12  about her mental condition immediately following

13  the accident. I mean, was she lucid?

14      **A. I guess from -- she was observant and**

15  **from what -- she was just in pain. So you can**

16  **just tell she was just loud and it hurts kind of a**

17  **thing, and that's all I could remember.**

18      **Q.** Would you consider her to be competent or

19  lucid, understanding what was happening around

20  her?

21      **A. Yes.**

22      **Q.** Did she appear combative or abusive to

23  any of the Kohl's staff that were attending to

24  her?

EUNICE SACHS & ASSOCIATES
(708) 709-0500

50

1      **A. No.**

2      **Q.** How about the weather? What was the

3  weather like on the day of the accident?

4      **A. From what I could recall, it was a nice**

5  **day out. It was in November. It wasn't snow or**

6  **rain or anything. So it was just an average day.**

7  **It was dry out.**

8      **Q.** Was it cold, hot?

9      **A. I can't recall, but just -- I mean, it**

10  **was -- it must not have been that cold because I**

11  **remember going outside with no coat on to take the**

12  **photos.**

13      **Q.** And we've already established that you

14  didn't personally witness Mrs. Prendergast's fall

15  in November of 2005. So you're not going to offer

16  any opinions or any testimony about how she may or

17  may not have fallen; correct?

18      MS. WOODWORTH: Objection.

19  BY MR. PITTACORA:

20      **Q.** If you understand my question, you can

21  answer it.

22          In other words, you're not going to

23  offer any opinion one way or the other about how

24  she may or may not have fallen because you didn't

EUNICE SACHS & ASSOCIATES
(708) 709-0500

51

1  witness it; correct?

2          MS. WOODWORTH: I'm going to -- I'm going

3  to object. It calls for speculation as to what

4  this witness will or will not testify about at

5  trial. There are other factors that can lead him

6  to conclude what may or may not have occurred.

7  BY MR. PITTACORA:

8      **Q.** You didn't personally witness the

9  accident; correct?

10      **A. Correct.**

11      **Q.** Do you have any opinion as to how

12  Mrs. Prendergast fell on November 17, 2005?

13      **A. To how she fell? From --**

14          THE WITNESS: I can answer?

15          MS. WOODWORTH: Yeah, you can answer.

16          THE WITNESS: Oh, from what I gathered

17  from the site where she -- her husband showed me

18  where she fell. I -- I just -- my thought was I

19  don't know. I'm not sure how she fell, because

20  there was nothing obstructing it or and she could

21  have saw the sidewalk. So I would just really not

22  know how she fell besides just maybe just tripped

23  over the curb or just not sure, you know, with her

24  footing.

EUNICE SACHS & ASSOCIATES
(708) 709-0500

52

1  BY MR. PITTACORA:

2      **Q.** So you don't conclusively know one way or

3  the other how Mrs. Prendergast fell on

4  November 17, 2005; correct?

5      **A. Correct.**

6      **Q.** As your attorney suggested, and anything

7  that you offer on that particular issue would be

8  an opinion or speculation on your part; correct?

9      **A. Correct.**

10      **Q.** You are also identified in the Answers to

11  Interrogatories as potentially testifying about

12  activities at the scene of the occurrence.

13          Other than what you have told us

14  about the ambulance coming, what activities would

15  you be referencing?

16      **A. Just the incident report. We just, you**

17  **know, called the ambulance for her and just**

18  **observed the scene and really that's it.**

19      **Q.** So it's fair to say that you didn't

20  witness any activities beyond what you have

21  already told us about today at the deposition?

22      **A. Correct.**

23      **Q.** Okay. Same thing: Your attorney's

24  indicated that you might testify about

EUNICE SACHS & ASSOCIATES
(708) 709-0500

53

1  observations you made of the plaintiff immediately
2  following the accident.
3           Other than what you have already
4  told us today, are there any other observations
5  that you witnessed about the plaintiff immediately
6  following the accident?
7     **A.  No.**
8     **Q.**  Okay.  Same question:  Your attorney's
9  indicated that you might testify about
10 postoccurrence actions.
11          Other than what you have told us
12 today, are there any postoccurrence actions that
13 you witnessed that you'd like to tell us about?
14    **A.  None.**
15    **Q.**  And then finally, your attorney's
16 indicated you might testify about the medical
17 treatment that was provided to plaintiff at the
18 scene of the accident.
19          Other than what you have already
20 told us today, do you have anything else to say
21 about the medical treatment that was provided to
22 Mrs. Prendergast at the scene of the accident?
23    **A.  No, nope.**
24    **Q.**  And you didn't go with Mrs. Prendergast

54

1  to the hospital.  You already told us that; right?
2     **A.  Correct.**
3     **Q.**  So you have no idea what medical
4  treatment was given to her at the hospital after
5  the accident; correct?
6     **A.  Correct.**
7     MR. PITTACORA:  That's it, Nancy.  I
8  don't have anything else.
9           E X A M I N A T I O N
10          BY MS. WOODWORTH
11
12    **Q.**  Okay.  Mr. Smith, before
13 Mrs. Prendergast's incident, no customer had ever
14 reported any issue whatsoever with the concrete
15 sidewalk in front of the store where
16 Mrs. Prendergast claims to have fallen?
17    **A.  No, no one had reported any issues.**
18    **Q.**  And before Mrs. Prendergast's incident,
19 no employee had ever reported any issue or problem
20 with the concrete sidewalk in front of the store
21 where Mrs. Prendergast claims to have fallen?
22    **A.  No employees had either.**
23    **Q.**  Okay.  Before Mrs. Prendergast's
24 incident, you had the opportunity to walk by the

55

1  concrete sidewalk where she claims to have fallen
2  on numerous occasions; is that right?
3     **A.  Yes.**
4     **Q.**  Each day on your way into the store you
5  parked on the upper level and observed the area
6  where she fell on your way into the store?
7     **A.  Yes.**
8     **Q.**  And each day on your way out of the store
9  you observed the area where she claims to have
10 fallen?
11    **A.  Yes.**
12    **Q.**  And sometimes during your shift you're
13 required to go outside and again have the
14 opportunity to observe the area where
15 Mrs. Prendergast claims to have fallen?
16    **A.  Yes.**
17    **Q.**  Was there ever any point in time before
18 her fall on November 17, 2005, that you believe a
19 dangerous condition existed on the sidewalk in
20 front of the store?
21    **A.  No.**
22    **Q.**  If there had been a condition on the
23 concrete sidewalk that you believed posed a danger
24 to customers, what would you have done?

56

1     **A.  Took appropriate action and get the**
2  **situation rectified.**
3     **Q.**  Okay.  And you never reported it to
4  anyone because you never felt that it posed a
5  danger?
6     **A.  Correct.**
7     **Q.**  Okay.  After Mrs. Prendergast's fall, you
8  were called to the scene; is that right?
9     **A.  Yes.**
10    **Q.**  Okay.  And the only information you have
11 regarding where she fell came from
12 Mr. Prendergast --
13    **A.  Correct.**
14    **Q.**  -- correct?
15          And he pointed to the area where she
16 claims that where he believes she fell?
17    **A.  Yes.**
18    **Q.**  And that area is depicted in Exhibit 1?
19    **A.  Oh, yes.**
20    **Q.**  Okay.  Did you visually inspect the area
21 where Mrs. Prendergast claims to have fallen?
22    **A.  Yes.**
23    **Q.**  Okay.  And what did you observe about
24 that area?

57

1      A.   That it was as far as -- there was
2   nothing uneven or loose.  You know, I just wanted
3   to make sure it wasn't something someone could
4   trip on that was hanging and everything seemed to
5   be in order.
6      Q.   Did you observe any defect whatsoever in
7   the concrete sidewalk at that time?
8      A.   No, no defect.
9      Q.   Did you -- did you observe anything that
10  you believed to present a dangerous condition in
11  the sidewalk at that time?
12     A.   No.
13     Q.   Was the concrete area where she claims to
14  have fallen a flat, even surface?
15     A.   There was nothing uneven and about it.
16  So everything was the same level.
17     Q.   Okay.  There was no difference in
18  elevation between the area that plaintiff's
19  counsel referred to as the patched area and the
20  surrounding pavement area?
21     A.   Correct.
22     Q.   Did you touch the pavement?
23     A.   Yes.
24     Q.   And did you touch the pavement in the

EUNICE SACHS & ASSOCIATES
(708) 709-0500

58

1   area surrounding the patched area?
2      A.   Yes.
3      Q.   Okay.  And what did you observe?
4      A.   I touched it because I wanted to make
5   sure nothing was loose and nothing was.
6   Everything was intact and nothing was frayed or
7   jarred that someone could get snagged on or to
8   make someone fall.
9      Q.   And what did you conclude after touching
10  it?
11     A.   That the area was okay and it didn't
12  pose, you know, any issue or hazard.
13     Q.   Okay.  We have discussed this incident
14  occurred on November 17, 2005, is that correct, to
15  the best of your knowledge?
16     A.   Yes.
17     Q.   Since that time, hundreds, possibly
18  thousands of customers have traversed that
19  concrete sidewalk to enter and exit the store?
20          MR. PITTACORA:  Objection, speculation on
21  the part of the witness.
22  BY MS. WOODWORTH:
23     Q.   How many customers would you estimate
24  have traversed that area since November 17, 2005?

EUNICE SACHS & ASSOCIATES
(708) 709-0500

59

1      A.   Thousands.
2      Q.   Okay.  Has a single complaint been made
3   since that time regarding the area where plaintiff
4   claims to have fallen?
5      A.   No.
6      Q.   Has a single report been made by an
7   employee since that time regarding the concrete
8   area where plaintiff claims to have fallen?
9      A.   No.
10     Q.   So at no point in time before on
11  November 17, 2005, or since then has there ever
12  been a single complaint regarding the area where
13  plaintiff claims to have fallen other than by
14  Mrs. Prendergast herself?
15     A.   Correct, no complaint.
16     Q.   Okay.  You've provided some description
17  of the area that plaintiff's counsel referred to
18  as the patched area.  Were there any raised edges
19  in that area that could obstruct or catch a
20  person's shoe?
21     A.   Not in the area, no.
22     Q.   Not in the patched area?
23     A.   Right, not in the patched area.
24     Q.   And there were also no -- were there any

EUNICE SACHS & ASSOCIATES
(708) 709-0500

60

1   holes or depressions in the concrete in the
2   patched area?
3      A.   No, not that I could feel.
4      Q.   It was completely flat and even?
5      A.   It was the same level, yes.
6      Q.   It was the same level as the surrounding
7   pavement?
8      A.   Correct.
9      Q.   Okay.  The patch that is depicted in
10  Exhibit 1, as you recall, was that area of
11  pavement plainly visible to the naked eye?
12     A.   Yes.
13     Q.   And would you estimate that it could be
14  seen if you looked at it from five feet away?
15     A.   Yes.
16     Q.   Could a person see it standing ten feet
17  away?
18     A.   Yes, as you're walking up to the -- to go
19  into the store, yes.
20     Q.   Okay.  And could you describe in PR 00070
21  in Exhibit 1 the curb that is directly in front of
22  the area that's referred to as the patched area.
23     A.   The curb itself is highlighted with
24  yellow paint to try to -- as a landmark so people

EUNICE SACHS & ASSOCIATES
(708) 709-0500

61

1  **could see that that is a curb and then it just**
2  **goes into the parking lot itself.**
3       **Q.**  Okay.  And also it's -- your -- the
4  photos that we have are black and white.  But
5  referring you to the color photographs, the
6  wheelchair ramp itself, can you describe just the
7  wheelchair ramp, the lines around it.
8       **A.  Oh, the lines are yellow markings as well**
9  **and the ramp is just like a ramp where you can**
10 **drive up the ramp with the wheelchair to get onto**
11 **the sidewalk.**
12      **Q.**  Okay.  If a person were walking directly
13 up the handicapped ramp, would they cross the
14 patch to get into the store?
15      **A.  Yes and no.  It depends on which way they**
16 **go, but you would -- if you walked towards the**
17 **left, you would, but if you kept going straight up**
18 **the ramp, you'd bypass it.**
19      **Q.**  Okay.  So if you exited the ramp and went
20 over the yellow line, then a person would be cause
21 to cross the patched area?
22      **A.**  Correct.
23      **Q.**  Okay.  So on -- am I correct that on two
24 sides of the square where the patch is located

62

1  there is yellow paint on the curb in front of the
2  patch and then on the handicapped ramp line
3  separating the pavement and the handicapped ramp?
4       **A.  Correct, yes, there's a yellow border.**
5       **Q.**  Okay.  And -- okay.  Is there anything in
6  that sidewalk in -- depicted in that photograph
7  that would obstruct a person's view so that they
8  wouldn't be able to see that patched area?
9       **A.  No, there's nothing that would.**
10      **Q.**  It's an open area?
11      **A.  Correct, it is open.**
12      **Q.**  How many feet would you estimate are
13 between the curb and the front of the store?
14      **A.  The curb and the front of the store?**
15 **Ten, twelve feet.**
16      **Q.**  Okay.  And there are no -- there are no
17 items or anything in between that area?
18      **A.  Correct.**
19      **Q.**  When you inspected that area immediately
20 after Mrs. Prendergast fell, is it true that you
21 couldn't find anything wrong with the concrete
22 patch?
23      **A.  Correct, I couldn't find anything wrong.**
24      **Q.**  Okay.  And since that time, you've

63

1  continued to walk past that area and you've never
2  found anything to be wrong with that concrete
3  patched area?
4       **A.  Correct.**
5       **Q.**  What's your opinion as to what happened
6  to Mrs. Prendergast on that day?
7       **A.  I'm really unsure.  From looking at the**
8  **photos and inspecting the area, I'm just not sure**
9  **how she fell.**
10      **Q.**  Do you believe there's anything in the
11 patched area itself that could have caught her
12 shoe and caused her to fall?
13      **A.  From what I inspected and -- no, there's**
14 **been no incidents, so I've just -- didn't seem**
15 **there was something there that would make her**
16 **fall, no.**
17      F U R T H E R   E X A M I N A T I O N
18      BY MR. PITTACORA
19
20      **Q.**  Mr. Smith, you don't routinely or in any
21 capacity work with concrete; is that fair to say?
22      **A.  True, I do not work with concrete.**
23      **Q.**  You don't consider yourself to be an
24 expert on laying concrete; is that fair to say?

64

1       **A.  True.**
2       **Q.**  And you wouldn't consider yourself to be
3  an expert on seams or patchwork in concrete?
4       **A.  No, I would not be an expert.**
5       **Q.**  So it's fair to say that all of your
6  prior testimony that was just elicited by your
7  attorney is essentially your layperson's opinion;
8  correct?
9       **A.  From inspecting it from what I felt, yes.**
10      **Q.**  And your attorney asked you some
11 questions about dangerous conditions.  Obviously
12 as an assistant store manager at Kohl's, you have
13 to be aware of dangerous conditions and take
14 action to make those conditions safe; correct?
15      **A.  If there's dangers, yes.**
16      **Q.**  What or how would you describe or
17 characterize for us -- give me an example of a
18 dangerous condition that would warrant some
19 immediate attention.
20      **A.  Like a pole sticking out of the ground,**
21 **for example.  Like a stop sign pole got snapped**
22 **off or something slippery or, you know, ice or**
23 **snow that could cause someone to slip.  You know,**
24 **just things inside the store that, you know, a**

65

1  **spill or something inside the store. So just**
2  **things like that, those natures or something that**
3  **could poke someone or have them cause them to trip**
4  **without them seeing it.**
5      **Q.**  So it's fair that based on I think what
6  you just told us that a dangerous condition could
7  be something that could basically injure a
8  business invitee of Kohl's?
9      **A.  Attempt to injure -- yes.**
10     **Q.**  So it's also fair to say that I use the
11 word potential, meaning it may cause injury to
12 someone, but it doesn't necessarily have to;
13 correct?
14     **A.  Correct.**
15     **Q.**  And you understand what I mean.
16 Obviously, it's a dangerous condition that
17 warrants attention, but that doesn't necessarily
18 mean it's going to hurt somebody because,
19 obviously, until it does, you know --
20     **A.  Yes.**
21     **Q.**  -- it hasn't hurt someone.
22     **A.  Correct.**
23     **Q.**  Okay. So isn't it fair to say that one
24 person, one business invitee of Kohl's being

66

1  injured, wouldn't the cause of that injury, in
2  your opinion, be defined as a dangerous condition
3  or how many -- let me ask you a different way.
4  How many people need to be hurt before you would
5  consider it to be a dangerous condition?
6      MS. WOODWORTH:  Objection, calls for
7  speculation, improper question.
8  BY MR. PITTACORA:
9      **Q.**  You can answer, if you know.
10     **A.  Oh, I'm not sure.**
11     **Q.**  I mean, is it -- would one person being
12 injured by -- by something, would that rise to the
13 level of a dangerous condition or do we need to
14 have two or three or four or five? How many
15 people, in your opinion, need to be hurt before it
16 amounts or rises to the level of a dangerous
17 condition?
18     MS. WOODWORTH:  Objection. Mr. Smith's
19 opinion on that is completely irrelevant in this
20 case.
21     MR. PITTACORA:  Well, the door has
22 already been opened. You talked about dangerous
23 conditions. You asked him if he thought certain
24 things were dangerous conditions.

67

1      So I want to find out from his
2  opinion what amounts or what rises to the level of
3  a dangerous condition. I mean, how many people
4  need to be hurt before it's considered a dangerous
5  condition.
6      MS. WOODWORTH:  And he can answer, but
7  it's -- and he can answer if he thinks a certain
8  number of people or if he thinks the condition
9  itself is what defines a dangerous condition.
10     THE WITNESS:  I don't think there's any
11 number. So that one I really couldn't answer.
12 There's no number.
13 BY MR. PITTACORA:
14     **Q.**  There's no specific number of people that
15 have to be injured before something becomes a
16 dangerous condition?
17     **A.  Because are you referring to just in life**
18 **in general or to this patch?**
19     **Q.**  Right now I'm asking you hypothetically.
20 I'm not referring to the circle patch of concrete.
21 Your attorney asked you some questions about
22 dangerous conditions. And what I am trying to
23 determine is, in your mind, in your opinion, what
24 brings an otherwise -- a stop sign being snapped

68

1  off, what makes that a dangerous condition? Is it
2  somebody being injured? Is it just the nature of
3  the stop sign being snapped off? And in your
4  opinion, what raises something to the level of a
5  dangerous condition?
6      MS. WOODWORTH:  I'm going to object.
7  That question is vague and ambiguous.
8      THE WITNESS:  I would say to the stop
9  sign, would be the condition that it snapped that
10 it could harm someone because of the jagged,
11 pointed edge.
12 BY MR. PITTACORA:
13     **Q.**  So it's the propensity to harm somebody
14 that makes it a dangerous condition?
15     MS. WOODWORTH:  Objection, it's vague and
16 ambiguous; and he's only speaking to the stop sign
17 hypothetical that you have given.
18     MR. PITTACORA:  Sure. I understand that.
19 I think he understands that.
20     THE WITNESS:  Yeah, it just -- I would
21 refer back to the stop sign, because I don't see
22 anything of danger within our environment that
23 would cause harm to someone.
24

69

1  BY MR. PITTACORA:

2     **Q.**  Are you referring to the stop sign or are

3  you referring to the circle patch of concrete now?

4  Because what we're talking about now is the stop

5  sign.

6     **A.  Okay.**

7     **Q.**  What I am trying to get from you or

8  trying to understand is, in your opinion, because

9  your attorney asked you about dangerous

10  conditions, I want to find out from you what or

11  how do you define a dangerous condition. And

12  you've given me some examples which helps me put

13  things into perspective. Now I want to try and

14  find out what makes something a dangerous

15  condition.

16        Is it the condition itself, is it

17  the propensity to harm, is it somebody actually

18  gets harmed?

19     **A.  In the store environment it would be**

20  **being able to physically see that it would cause**

21  **harm. Because in life everything could be**

22  **harmful. So you could get stung by a bee and be**

23  **harmed and swell up and die, so I would say.**

24

70

1     **But danger it would have to be**

2  **something that you could physically see in a**

3  **physical setting that you felt would cause harm or**

4  **have someone to be injured.**

5     **Q.**  And I think you'll agree with me or I'll

6  ask you if you do, that a dangerous condition or

7  the propensity to cause harm is a subjective

8  concept; correct?

9        In other words, there's no objective

10  criteria to say this is definitively a dangerous

11  condition. It's more subjective. It's what you

12  in your experience as an assistant manager think

13  could cause harm to somebody. That would be a

14  dangerous condition; is that fair?

15     **A.  What I would think would cause harm?**

16  **in -- oh, go ahead.**

17       MS. WOODWORTH:  You can have her read

18  back the question if you need to.

19       THE WITNESS:  Yeah, can you read back the

20  question.

21         (The record was read as

22         requested.)

23       MS. WOODWORTH:  I'm going to object to

24  that question. It's vague, ambiguous, compound.

71

1       MR. PITTACORA:  Do you understand my

2  question?

3       THE WITNESS:  Not particularly.

4  BY MR. PITTACORA:

5     **Q.**  Okay. I'll break it down.

6        You would agree with me that a

7  dangerous condition is a subjective concept;

8  correct?

9     **A.  For who though?  For --**

10     **Q.**  That's the subjective nature of it.

11        If it was objective, then it would

12  be a list of criteria that we could all sit at the

13  table and say this is dangerous, this is not.

14        So you understand what I mean when I

15  say subjective; correct?

16       MS. WOODWORTH:  If you don't understand,

17  let him know.

18       THE WITNESS:  Well, subjective, that

19  would just be how you feel. It could be anybody's

20  feeling or opinion.

21  BY MR. PITTACORA:

22     **Q.**  Exactly.

23        So you would agree with me that a

24  dangerous condition, determining whether something

72

1  is a dangerous condition is subjective.

2        In other words, does Kohl's -- let

3  me ask you it a different way. Does Kohl's have a

4  list of things that it defines as a dangerous

5  condition?

6     **A.  Do we have a list of things as defined as**

7  **dangerous?  We have a list of things defined**

8  **unsafe, but not dangerous. Things that could be**

9  **unsafe.**

10     **Q.**  Is there a difference in your mind

11  between unsafe and dangerous?

12     **A.  Yes.**

13     **Q.**  What is that difference or explain to me

14  the difference.

15     **A.  Because dangerous would be jumping off of**

16  **a mountain, you know -- but unsafe would be not**

17  **wiping up a spill or putting up caution signs to**

18  **say, hey, there's a wet spill.**

19     **Q.**  Okay. For purposes of this line of

20  questioning, would you feel more comfortable using

21  the words dangerous condition or unsafe?

22     **A.  I would say unsafe.**

23     **Q.**  Okay. So it's fair to say that Kohl's

24  does everything in its power to make sure that

73

1 unsafe conditions do not exist in its stores; is
2 that fair to say?
3     **A.  Yes.**
4     **Q.**  And you gave me one example of an unsafe
5 condition, that being a spill on the floor that's
6 not wiped up.
7     **A.  Correct.**
8     **Q.**  So is it fair to say that an unsafe
9 condition is an existing condition that could
10 cause harm to a business invitee of Kohl's?
11     **A.  It could cause harm, yes.**
12     **Q.**  Doesn't necessarily have to.  It could.
13     **A.  Correct.**
14     **Q.**  Okay?
15         MS. WOODWORTH:  I'm going to object to
16 this whole line of questioning.
17 BY MR. PITTACORA:
18     **Q.**  Okay.  Unsafe conditions.  We're going to
19 use the words unsafe conditions.
20         Is an unsafe condition subjective or
21 objective?
22         MR. PITTACORA:  I mean, you can object.
23         MS. WOODWORTH:  I'm going to object.  It
24 doesn't have to be one or the other.  It could be

EUNICE SACHS & ASSOCIATES
(708) 709-0500

74

1 both.
2         MR. PITTACORA:  Well, if he can tell me
3 that.
4         MS. WOODWORTH:  Okay.  Well, you gave him
5 two options so --
6         THE WITNESS:  Yeah, it can be both,
7 because it just depends on -- it depends on
8 different factors.
9 BY MR. PITTACORA:
10     **Q.**  Okay.  I think you told me that Kohl's
11 has a list of things that it considers to be
12 unsafe; is that correct?
13     **A.  Yes.**
14     **Q.**  Okay.  To the best of your knowledge,
15 tell me what conditions are on the list -- what
16 things are unsafe.  What's on that list of unsafe
17 things?
18     **A.  Like leaving a ladder on the floor or**
19 **climbing up the ladder the wrong way.**
20     **Q.**  Anything else?  I mean, you've already
21 told me a spill on the floor that's not cleaned
22 up, leaving a ladder out.
23     **A.  Just leaving freight on the floor, you**
24 **know, unattended.**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

75

1     **Q.**  Leaving merchandise on the floor?
2     **A.  Uh-hum.**
3     **Q.**  Anything else?
4     **A.  I mean, just the list can go on and on.**
5 **Just --**
6     **Q.**  Is there anything on the list that talks
7 about concrete, uneven concrete, patched concrete,
8 chips in concrete, anything like that on this
9 list?
10     **A.  To my knowledge, I'd have to look at**
11 **everything, but I would -- I'm not sure.**
12     **Q.**  Is this a list that's distributed to
13 every Kohl's employee or is it just certain
14 people?
15     **A.  No, it just -- it's probably not really a**
16 **list.  It just says unsafe conditions or acts.**
17         **So it wants the associates to act**
18 **safely and it wants the managers to make sure the**
19 **environment is safe.**
20         **So there's really no specific, like,**
21 **fifty things on the list or ten things.  It's just**
22 **categories of ladders and unsafe things that**
23 **potentially be unsafe.**
24     **Q.**  Okay.  Does -- do you, as assistant

EUNICE SACHS & ASSOCIATES
(708) 709-0500

76

1 manager at Kohl's, hold meetings with your
2 employees to talk about potentially unsafe
3 conditions?
4     **A.  Yes, we do.**
5     **Q.**  Is it like a weekly meeting, a monthly
6 meeting, a daily meeting?
7     **A.  Managers, we have weekly meetings; and**
8 **then, I believe, every two weeks we'll have a**
9 **meeting with the different people that we're**
10 **pulling from the store.**
11     **Q.**  I'm assuming if something happens,
12 somebody gets injured or somebody gets hurts,
13 that's probably discussed at one of these meetings
14 as something to potentially keep an eye out for or
15 look out for; is that fair to say?
16     **A.  Yes.**
17     **Q.**  So again, is it fair to say that these
18 unsafe conditions -- I know you told it to a
19 certain extent or objective is also subjective,
20 meaning you add to this list as your experience
21 dictates.
22     **A.  There may be things that come up, yes,**
23 **that are out of the ordinary that were no fault of**
24 **anyone's.  It just came up.**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

77

1    **Q.** Okay. So is it fair to say an accident.
2  We are not ascribing fault or assigning fault to
3  anyone. Things -- you said things happen.
4  Everybody knows that. Accidents happen; right?
5    **A. Correct.**
6    **Q.** And just because you talk about it at one
7  of your meetings doesn't mean it's going to happen
8  again.
9        What it means is maybe you're
10 looking to keep an eye out for certain things.
11 You want to try to prevent accidents from
12 happening; correct?
13    **A. Correct.**
14    **Q.** Okay. And would you agree with me that
15 what may be unsafe to you might not be unsafe to
16 me. In other words, you and I might have a
17 different opinion about what's unsafe.
18    **A. In the real world, yes. But inside the**
19 **retail store, no, we are all on the same page.**
20    **Q.** So everybody, obviously, that works at
21 Kohl's is on the same page as to what they
22 consider to be unsafe and what to look out for and
23 what to try to prevent?
24    **A. Correct.**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

78

1    **Q.** But you would agree that that may not be
2  the same viewpoint that somebody outside of Kohl's
3  has; correct?
4    **A. Someone outside, yes, correct.**
5    **Q.** Because obviously I don't work in retail
6  and I don't know what you may consider unsafe.
7    **A. Correct.**
8    **Q.** And is it also fair to say what's unsafe
9  for, you know, say a five-year-old child might not
10 be unsafe for a twenty-five-year-old man.
11    **A. In the retail world they would be equal.**
12 **Whatever would be unsafe for a five-year-old kid**
13 **would be unsafe for the twenty-five-year-old man.**
14    **Q.** Okay. Turning back to the pictures.
15 Your attorney asked you some questions about this
16 yellow line that what I will say rims the curb and
17 then also goes up to the right of the circle patch
18 of concrete; correct?
19    **A. Correct.**
20    **Q.** How far of a distance would you say the
21 circle patch of concrete is from the yellow curb
22 line which is depicted in Exhibit 1?
23    **A. If I had to just rough guess from the**
24 **pictures, I'd say maybe under two feet from the**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

79

1  curb to the patch.
2    **Q.** Okay. And immediately below, as what's
3  depicted in Exhibit 1, this would be the street
4  area or the parking lot area; correct?
5    **A. Correct.**
6    **Q.** And is it fair to say that it would be
7  possible for a car to pull up fairly close to this
8  yellow curb and then unload a passenger who would
9  get out and then walk into the Kohl's Department
10 Store?
11    **A. People get dropped off at the curb, yes,**
12 **every day.**
13    **Q.** Okay. And is it fair to say that if you
14 pull up to this area depicted in Exhibit 1, if you
15 pull up adjacent to the curb, the yellow curb, and
16 you get out of the car, what is going to draw your
17 eye first? Is it going to be the yellow-striped
18 curb or, in your opinion, is it going to be the
19 circle patch of concrete?
20    **A. That's depends on the person. They could**
21 **just be looking at the doors and so it could be**
22 **they could look at the patch or the yellow line.**
23 **So it just depends on that person.**
24    **Q.** Or they could be looking at the doors;

EUNICE SACHS & ASSOCIATES
(708) 709-0500

80

1  right?
2    **A. Yeah.**
3    **Q.** So again, it's a subjective thing. Where
4  somebody's eye goes when they get out of a car
5  adjacent to this curb, it could be the yellow
6  line, it could be the circled patch of concrete,
7  it could be the front door, it could be anything;
8  correct?
9    **A. Correct.**
10       MR. PITTACORA: I don't have anything
11 else.
12       MS. WOODWORTH: Okay. I don't have
13 anything.
14       Actually, I'm sorry. I do have a
15 couple more.
16    F U R T H E R   E X A M I N A T I O N
17       BY MS. WOODWORTH
18
19    **Q.** Mr. Smith, plaintiff's counsel asked you
20 a number of questions about dangerous or unsafe
21 conditions. Would you agree that many -- many
22 factors determine whether a condition is dangerous
23 or unsafe?
24    **A. Yes.**

EUNICE SACHS & ASSOCIATES
(708) 709-0500

81

1    Q.  Would you agree that the condition itself
2  is one factor to be evaluated in determining
3  whether a condition is unsafe or dangerous?
4    A.  Correct.
5    Q.  Would you agree that the number of people
6  injured is an additional factor, one of many to be
7  considered in whether a condition is unsafe or
8  dangerous?
9    A.  Yes.
10    Q.  Would you agree that the propensity to
11  harm is one of many factors that you evaluate to
12  determine whether a condition is unsafe or
13  dangerous?
14    A.  Yes.
15    Q.  Would you agree that we all use common
16  sense in evaluating whether a condition is
17  dangerous or unsafe as well?
18    A.  Yes.
19    Q.  Okay.  And did you consider each of these
20  factors when you evaluated the paved area where
21  plaintiff claims to have fallen?
22    A.  Yes.
23    Q.  And in considering each of those factors,
24  you came to the conclusion that this was not a

EUNICE SACHS & ASSOCIATES
(708) 709-0500

82

1  dangerous or unsafe condition?
2    A.  Correct.
3    MS. WOODWORTH:  Okay.  That's all I have.
4    MR. PITTACORA:  I don't have anything
5  else.
6    THE REPORTER:  And signature, waive or
7  reserve?
8    MR. PITTACORA:  You have the opportunity
9  to review your transcript and --
10    Could we go off the record.
11    (A discussion was had that was
12    off the record.)
13    THE WITNESS:  I don't see any reason.
14    AND FURTHER DEPONENT SAITH NAUGHT.
15
16
17
18
19
20
21
22
23
24

EUNICE SACHS & ASSOCIATES
(708) 709-0500

83

1  UNITED STATES OF AMERICA      )
  NORTHERN DISTRICT OF ILLINOIS  )SS.
2  EASTERN DIVISION              )
  STATE OF ILLINOIS             )
3  COUNTY OF COOK                )

4    I, DIANA DEBRA SABO, Certified Shorthand
5  Reporter and Notary Public in and for the County
6  of Will, State of Illinois, do hereby certify that
7  DARRYL SMITH, was first duly sworn by me to
8  testify the whole truth and that the above
9  deposition was reported stenographically and was
10  reduced to typewriting under my direction.
11    I further certify that the said
12  deposition was taken at the time and place
13  specified and that the taking of said deposition
14  commenced on the 25 of June, A.D. 2008, at 10:25
15  o'clock a.m.
16    I further certify that I am not a
17  relative, employee, attorney, or counsel of any of
18  the parties, nor a relative or employee of such
19  attorney or counsel or financially interested
20  directly or indirectly in this action.
21
22
23
24

EUNICE SACHS & ASSOCIATES
(708) 709-0500

84

1    In witness whereof, I have hereunto set
2  my hand and affixed my seal of office at Tinley
3  Park, Illinois, this 30 day of June, A.D. 2008.
4
5
6    DIANA DEBRA SABO, CSR
7
8
9  License No. 084-002667
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

EUNICE SACHS & ASSOCIATES
(708) 709-0500

NOTARY PUBLIC STATE OF ILLINOIS  "OFFICIAL SEAL" DIANA DEBRA SABO COMMISSION EXPIRES 04/02/09